## ADMINISTRATIVE (AFBCMR) RECORDS
Marc J. Millican
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

Docket Number BC-2003-02505
Original (Volume 1 of 1)

## PRIVACY ACT DATA OF 1974
*****

Under the Privacy Act of 1974, information reflected (including attachments) must be safeguarded. Disclosure of information is IAW AFI 33-119, AFI 33-127, AFI 33-129, AFI 33-332, AFI 33-219, and PL 93-579. For Official Use Only (FOUO)
*****



# United States      of America

## DEPARTMENT OF THE AIR FORCE

Andrews AFB, Maryland, February 10, 2006

I HEREBY CERTIFY that I am the official custodian of all Air Force records and material on file in the office of the Air Force Board for Correction of Military Records, and that the papers attached hereto are authentic copies of Air Force records and material contained in said files relative to the case of: MARC J. MILLICAN, 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, AFBCMR Docket Number BC-2003-02505.

MACK M. BURTON
Executive Director
Air Force Board for Correction
of Military Records



REBY CERTIFY that MACK M. BURTON, who signed the foregoing certificate, is the Director of the Air Force Board for Correction of Military Records and OFFICIAL CUS N, and that to his certification as such, full faith and credit are and ought to be given.

IN TESTIMONY WHEREOF, I, Michael W. Wynne, Secretary of the Air Force, have hereunto caused the seal of the Department of the Air Force to be affixed and my name to be subscribed by the Administrative Assistant to the Secretary of the Department, at the city of Arlington, State of Virginia.

this 13rd day of MARCH , 2006.

MICHAEL W. WYNNE
*Secretary of the Air Force.*

By _____

*Administrative Assistant.*

AF M 44 A (EF) (MSWord 2.0)      PREVIOUS STOCK WILL BE USED UNTIL STOCK IS EXHAUSTED

# Table of Contents

| Page No. | Content |
|---|---|
| *i* | AF Form 44, dtd 10 Feb 06 |
| *ii* | Table of Contents |
| 1 | AFBCMR Memo, dtd 4 Aug 04 |
| 2 | Record of Proceedings, dtd 4 Aug 04 |
| 10 | Exhibit A, DD Form 149, dtd 21 Jul 03, w/atchs |
| 63 | Exhibit B, Master Personnel Records - withheld |
| 64 | Exhibit C, ARPC/DPB Ltr, dtd 5 Sep 03, w/atchs |
| 92 | Exhibit D, SAF/MRBR Ltr, dtd 26 Sep 03 |
| 93 | Exhibit E, Counsel's Ltr, dtd 17 Nov 03 |
| 95 | Exhibit F, Counsel's Ltr, dtd 22 Dec 03, w/atch |
| 130 | Exhibit G, HQ USAF/JAA Ltr, dtd 14 Jan 04 |
| 136 | Exhibit H, AFBCMR Ltr, dtd 20 Jan 04 |
| 137 | Exhibit I, Counsel's Ltr, dtd 17 Feb 04, w/atchs |
| 176 | Exhibit J, Counsel's Ltr, dtd 23 Mar 04, w/atch |
| 188 | Exhibit K, HQ USAF/JAA Ltr, dtd 15 May 04 |
| 192 | Exhibit L, AFBCMR Ltr, dtd 21 May 04 |
| 193 | Exhibit M, Counsel's Ltr, dtd 11 Jun 04 |

AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS
1535 COMMAND DRIVE, EE WING THIRD FLOOR
ANDREWS AFB MD 20762-2002

4 Aug 2004

MILLICAN, MARC
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  USAFR    Maj
BC-2003-02505 BCMR CASE#01

Case was:

a. _____Granted                    c. _____Admin Closed

b. ___X_____Denied


_____Congressional interest is indicated in this case; therefore, a copy of
the letter to the applicant regarding the decision of the Board is
being forwarded to the Director of Legislative Liaison with a
request that a copy of their final correspondence, with the interested
parties, be furnished to this office:
Congressional Interest: _____.

Enclosure(s):

____X____  Master Personnel Records

_____  Selection folder

_____  Micro Fiche

_____  VA Records

_____  Medical Records

DELAINNA WILLIAMS
Administrative Assistant, AFBCMR
Air Force Review Boards Agency

AUG - 4 2004

## RECORD OF PROCEEDINGS
## AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

IN THE MATTER OF:

MARC J. MILLICAN

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

DOCKET NUMBER:  BC-2003-02505

COUNSEL:  JOHN A. WICKHAM

HEARING DESIRED:  YES

---

## APPLICANT REQUESTS THAT:

His Officer Performance Report (OPR) rendered for the period 14 Jul 98 through 29 Feb 00 be voided and removed from his records.

The Letter of Reprimand (LOR) dated 19 Dec 99 be voided and removed from his records.

The Propriety of Promotion Action initiated on 13 Mar 00 and related documents be set aside.

The removal of his name from the Fiscal Year 2000 (FY00) Air Force Reserve Line Promotion Selection List on 17 Apr 02 be set aside.

His second deferral of promotion be set aside.

His transfer to the Retired Reserve on 1 Apr 03, which was his mandatory separation date (MSD), be set aside.

His promotion to the Reserve grade of lieutenant colonel retroactive to 30 Jun 00 be reinstated, with constructive service credit in participating status through 30 Jun 03 and back pay and allowances for missed unit training assemblies (UTAs).

He be retired in the Reserve grade of lieutenant colonel effective 1 Jul 03.

His appeal be processed under the provisions of 10 USC 1034, Whistleblower Protection Act.

---



APPLICANT CONTENDS THAT:

He acted in good faith in refusing to take part in the anthrax program because he believed there was sufficient evidence showing the drug was investigational or experimental and, therefore, required his voluntary and informed consent in order to undergo the immunization regimen.

The LOR and OPR were unlawful reprisals after he had exposed falsehoods made concerning the anthrax vaccine (AVIP), in violation of 10 USC 1034.

The removal of his name from the FY00 promotion list was an unlawful promotion delay.

In support of his appeal, the applicant provided a counsel's brief, copies of the LOR, OPR, Propriety of Promotion Action, and other documents associated with the matter under review.

Applicant's complete submission, with attachments, is at Exhibit A.

---

STATEMENT OF FACTS:

Applicant's OPR profile since 1993 follows:

| PERIOD ENDING | EVALUATION |
|---|---|
| 13 Jul 93 | Meets Standards (Non-EAD) |
| 13 Jul 94 | Meets Standards (Non-EAD) |
| 13 Jul 95 | Meets Standards (Non-EAD) |
| 13 Jul 96 | Meets Standards (Non-EAD) |
| 13 Jul 97 | Meets Standards (Non-EAD) |
| 13 Jul 98 | Meets Standards (Non-EAD) |
| * 29 Feb 00 | Does Not Meet Standards (Non-EAD) |

* Contested Report.

Applicant was selected for promotion to the grade of lieutenant colonel by the Fiscal Year 2000 (FY00) Reserve of the Air Force Lieutenant Colonel Board, effective and with a date of rank (DOR) of 22 Jun 00.

On 19 Dec 99, the applicant received an LOR for engaging in acts of nature to cause discontent and undermine military discipline within his squadron. Specifically, after the members of the squadron were notified of the requirements to undergo the anthrax immunization series, he sought out and spoke to members of his squadron advocating they refuse to undergo the anthrax protocol. Further, he actively encouraged other pilots to persuade additional members of his peer group to defy official Air Force policy and refuse to undergo the anthrax immunization series.

3

On 13 Mar 00, the 349th AMW commander recommended the applicant's name be removed from the FY00 Lieutenant Colonel Promotion List. The basis for the recommendation was the applicant's efforts to purposefully undermine the credibility of the squadron leadership and his attempt to disrupt the orderly operation of the unit and wing by encouraging others to disregard the commander's directives.

On 7 Jan 02, the Deputy Secretary of Defense recommended the applicant's name be removed from the FY00 Lieutenant Colonel Promotion List, indicating the applicant had refused to undergo an anthrax immunization and had advised members of the squadron to refuse their anthrax inoculations. He further indicated the Secretary of Air Force stated he had serious reservations about the applicant's future potential to serve in the higher grade, and that the Secretary recommended the applicant's name be removed from the promotion list. The President of the United States approved the removal recommendation on 17 Apr 02.

On 2 Oct 02, the applicant was notified that he was not recommended for promotion to the grade of lieutenant colonel by a Reserve of the Air Force Selection Board, which was his second deferral.

Applicant was relieved of his Reserve assignment and assigned to the Retired Reserve awaiting pay at age 60, effective 1 Apr 03.

---

AIR FORCE EVALUATION:

ARPC/DPB recommended denial indicating the basic premise of evaluation reports is that they are accurate and objective and the applicant has not provided evidence the contested report was inaccurate; he has not presented any evidence to establish the LOR was incorrect or unjust; he has not provided information to contradict the underlying premise for the propriety of promotion action; the Presidential removal of the applicant was statutorily and administratively proper; there was no credible reason to set aside the second deferral for the applicant's promotion to the grade of lieutenant colonel; the applicant's automatic transfer to the Retired Reserve on his MSD was appropriate; and, his nonparticipation in UTAs was not the foundation for the propriety of promotion action and subsequent removal of his name from the promotion list by the President. The nonparticipation resulted from his refusal to accept the anthrax immunizations.

A complete copy of the ARPC/DPB evaluation is at Exhibit C.

---

APPLICANT'S REVIEW OF AIR FORCE EVALUATION:

Counsel provided a response indicating the advisory opinion simply parroted various language within Air Force Instructions offering little to address the applicant's specific allegations against the LOR, referral OPR, or to explain why his evidence should be dismissed as not credible. With respect to the promotion delay statute, the advisory opinion is not a legal opinion, nor offers analysis of the Rolader case, nor why its regulatory spin on the law makes no sense.

Counsel's complete response is at Exhibit E.

By letter, dated 22 Dec 03, counsel provided a response and additional documentary evidence for the Board's consideration which included documentation pertaining to a preliminary injunction that ordered the Department of Defense to stop inoculating service-members with the anthrax vaccine.

Counsel's complete response, with attachments, is at Exhibit F.

_____

ADDITIONAL AIR FORCE EVALUATION:

HQ USAF/JAA recommended denial noting the applicant's contention he acted in good faith in refusing to take part in the anthrax program because he believed there was sufficient evidence showing the drug was investigational or experimental and, therefore, required his voluntary and informed consent in order to undergo the immunization regimen. They also noted his complaints concerning this matter and indicated they were unfounded. All of the administrative consequences that occurred were as a direct result of the applicant's actions and decisions. Throughout the process, the commander acted in accordance with established Department of Defense (DoD) guidelines and within the bounds of his discretion as a commander. The commander was responsible for ensuring that all military personnel under his command received the immunizations. He did not have the authority to allow members to voluntarily refuse to get the shots because they disagreed with the program.

HQ USAF/JAA indicated the commander notified the applicant on several occasions that his refusal to begin taking the vaccine would render him ineligible to perform UTAs and would result in his being administratively sent to the Standby Reserves.

HQ USAF/JAA stated in this case, the commander reproached the applicant not for refusing the anthrax shot, but for inciting disloyalty and mistrust within the squadron. While the applicant was entitled to his own viewpoint concerning the efficacy of AVIP, he was not at liberty to actively persuade other squadron members to refuse to participate. Likewise, the resulting

referral OPR was a direct reflection of the applicant's failure
to meet required standards in leadership, professional qualities,
judgment, and decisions.  In HQ USAF/JAA's view, the applicant
has provided no evidence showing the referral OPR was inaccurate.
The OPR accurately reflected the applicant's negative impact on
mission readiness, good order, and discipline.

According to HQ USAF/JAA, the wing commander's decision to
recommend the applicant's removal from the lieutenant colonel
promotion list was justified and neither arbitrary or capricious.
As with the LOR and OPR, the promotion propriety action was based
on the applicant's attempt to cause dissension within the
squadron.  His actions were inconsistent with the standard of
conduct and professionalism required for a lieutenant colonel.
The standard for removing an officer's name from the promotion
list is very broad.  The governing Air Force Instruction (AFI 36-
2504) instructs commanders to initiate a propriety of promotion
action when there is cause to believe the officer is not
mentally, physically, morally, or professionally qualified to
perform the duties of the higher grade.  There was certainly
sufficient evidence to substantiate the wing commander's
recommendation.  Every member of the applicant's chain of
command, to include the Secretary of the Air Force and Deputy
Secretary of Defense concurred in the removal action.
Ultimately, the President made an independent determination the
applicant's conduct made him unfit for the higher grade.  There
was no evidence indicating the applicant was singled out due to
his personal views on the anthrax program.

HQ USAF/JAA noted the applicant's assertion he is entitled to be
retroactively promoted because the President did not sign the
removal action within 18 months from the time he was notified of
the commander's initiation of the propriety action.  They also
noted his reliance on Rolader v. United States to support his
argument.  HQ USAF/JAA indicated because the applicant's
promotion was processed as a removal rather than a delay, the 18-
month deadline discussed in 10 USC 14311 did not apply and the
Rolader decision is not dispositive.

HQ USAF/JAA stated there was no grounds for the Board to set
aside the applicant's second nonselection for promotion.  His
promotion record was considered by a properly convened selection
board that determined the applicant was not qualified for
promotion.

With respect to the applicant's request to set aside his
automatic transfer to the Retired Reserve on 1 Apr 03,
HQ USAF/JAA noted such an action was statutorily mandatory upon
his second nonselection for promotion and is not a basis for
relief.

HQ USAF/JAA indicated the applicant's argument he was the victim
of reprisal for testifying before Congress is baseless.  The
various disciplinary and administrative actions that were taken

were as a direct result of the applicant's conduct and his impact to mission readiness and good order and discipline.

HQ USAF/JAA noted the documentation provided from a recent Federal District Court decision (Doe v. Rumsfeld) wherein the judge issued a preliminary injunction against inoculating service members without their informed consent until such time the Food and Drug Administration (FDA) made a written declaration concerning the effectiveness of the vaccine against inhalation anthrax.   The applicant now argues that in granting the injunction, the judge accepted the plaintiff's assertion the anthrax vaccine is an investigational drug and the commander's order for all squadron members to receive the vaccine was illegal.   According to HQ USAF/JAA, the argument is invalid, as the same judge has now lifted the injunction after the FDA made a written determination the anthrax vaccine is safe and effective against all forms of anthrax.

In HQ USAF/JAA's view, the applicant has failed to demonstrate the existence of any error or present facts and circumstances supporting an injustice.   The applicant bears the responsibility of the consequences of his actions.

A complete copy of the HQ USAF/JAA evaluation is at Exhibit G.

_____

APPLICANT'S REVIEW OF ADDITIONAL AIR FORCE EVALUATION:

Counsel reviewed the HQ USAF/JAA evaluation and furnished a detailed response and additional documentary evidence which are attached at Exhibit I.

By letter, dated 23 Mar 04, counsel provided additional documentation for the Board's consideration, which included a recent published Federal Court case issued which counsel believes is relevant to the applicant's argument that the disciplinary actions taken against him were in retaliation for expressing his First Amendment free speech rights against the anthrax vaccine.

Counsel's complete response, with attachment, is at Exhibit J.

_____

ADDITIONAL AIR FORCE EVALUATION:

HQ USAF/JAA reviewed the applicant's responses and additional documentary evidence and recommended denial.   HQ USAF/JAA indicated, in summary, that what the applicant refuses to acknowledge or accept is that the removal action was not done simply because he refused to take the anthrax shot.   The administration actions that were taken, to include the LOR, referral OPR, and promotion removal action resulted directly from

7

the applicant's attempts to dissuade other members of the squadron from participating in the AVIP, undermining the authority of his commander, and his repeated efforts to cause dissension within the unit. That, in and of itself, was sufficient to warrant each of the administrative actions that were taken. Regardless of his personal views on the anthrax program, the applicant had absolutely no right, constitutional or otherwise, to make statements disloyal to his commander and to commit misconduct that was detrimental to the unit's mission. Such behavior is incompatible with that expected of an Air Force officer and warranted his promotion removal. In USAF/JAA's view, the applicant has failed to carry his burden of proving the existence of an error or injustice.

A complete copy of the HQ USAF/JAA evaluation is at Exhibit K.

APPLICANT'S REVIEW OF ADDITIONAL AIR FORCE EVALUATION:

Counsel reviewed the HQ USAF/JAA evaluation and furnished another detailed response which is attached at Exhibit M.

THE BOARD CONCLUDES THAT:

1.  The applicant has exhausted all remedies provided by existing law or regulations.

2.  The application was timely filed.

3.  Insufficient relevant evidence has been presented to demonstrate the existence of error or injustice. The applicant's complete submission was thoroughly reviewed and his contentions were duly noted. However, we do not find the applicant's assertions and the documentation presented in support of his appeal sufficiently persuasive to override the rationale provided by the Air Force offices of primary responsibility (OPRs). In our view, the issues raised by the applicant were more than adequately addressed by the OPRs. Therefore, in the absence of sufficient evidence to the contrary, we agree with the recommendation of OPRs and adopt their rationale as the basis for our decision that the applicant has failed to sustain his burden of establishing that he has suffered either an error or an injustice. Accordingly, we find no compelling basis to recommend granting the relief sought in this application.

4.  The applicant's request his appeal be processed under the provisions of 10 USC 1034, Whistleblower Protection Act, was noted. However, no evidence has been presented which would lead us to believe that the applicant filed a complaint alleging reprisal with the Department of Defense (DoD) Inspector General,

or that he did so within the specified time limit.  Accordingly, his appeal was processed under the provisions of 10 USC 1552.

5.  The applicant's case is adequately documented and it has not been shown that a personal appearance with or without counsel will materially add to our understanding of the issues involved. Therefore, the request for a hearing is not favorably considered.

---

THE BOARD DETERMINES THAT:

The applicant be notified that the evidence presented did not demonstrate the existence of material error or injustice; that the application was denied without a personal appearance; and that the application will only be reconsidered upon the submission of newly discovered relevant evidence not considered with this application.

---

The following members of the Board considered AFBCMR Docket Number BC-2003-02505 in Executive Session on 14 Jul 04, under the provisions of AFI 36-2603:

    Ms. Olga M. Crerar, Panel Chair
    Mr. Michael J. Novel, Member
    Mr. Robert S. Boyd, Member

The following documentary evidence was considered:

    Exhibit A.   DD Form 149, dated 21 Jul 03, w/atchs.
    Exhibit B.   Applicant's Master Personnel Records.
    Exhibit C.   Letter, ARPC/DPB, dated 5 Sep 03, w/atchs.
    Exhibit D.   Letter, SAF/MRBR, dated 26 Sep 03.
    Exhibit E.   Letter, counsel, dated 17 Nov 03.
    Exhibit F.   Letter, counsel, dated 22 Dec 03, w/atch.
    Exhibit G.   Letter, HQ USAF/JAA, dated 14 Jan 04.
    Exhibit H.   Letter, AFBCMR, dated 20 Jan 04.
    Exhibit I.   Letter, counsel, dated 17 Feb 04, w/atchs.
    Exhibit J.   Letter, counsel, dated 23 Mar 04, w/atch.
    Exhibit K.   Letter, HQ USAF/JAA, dated 15 May 04.
    Exhibit L.   Letter, AFBCMR, dated 21 May 04.
    Exhibit M.   Letter, counsel, dated 11 Jun 04.

OLGA M. CRERAR
Panel Chair

21 JUL 2003

**APPLICATION FOR CORRECTION OF MILITARY RECORD
UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552**
*(Please read instructions on reverse side BEFORE completing application.)*

| | Form Approved |
| --- | --- |
| | OMB No. 0704-0003 |
| | Expires Sep 30, 2003 |

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports (0704-0003), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.
**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ADDRESS. RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.**

### PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 US Code 1552, EO 9397.

**PRINCIPAL PURPOSE:** To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record.

**ROUTINE USE(S):** None.

**DISCLOSURE:** Voluntary; however, failure to provide identifying information may impede processing of this application. The request for Social Security number is strictly to assure proper identification of the individual and appropriate records.

**1. APPLICANT DATA**

| a. BRANCH OF SERVICE (X one) | | ARMY | | NAVY | X | AIR FORCE | | MARINE CORPS | | COAST GUARD |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

| b. NAME (Last, First, Middle Initial) (Please print) | c. PRESENT PAY GRADE | d. SERVICE NUMBER (If applicable) | e. SSN |
| --- | --- | --- | --- |
| MILLICAN, MARC J. | O-4 | | 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 |

| 2. TYPE OF DISCHARGE (If by court-martial, state type of court) | 3. PRESENT STATUS, IF ANY, WITH RESPECT TO THE ARMED SERVICES (Active duty, Retired, Reserve, etc.) | 4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY (YYYYMMDD) |
| --- | --- | --- |
| HONORABLE | RETIRED | 1 APRIL 2003 |

| 5. ORGANIZATION AT TIME OF ALLEGED ERROR IN RECORD | 6. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C. (No expense to the Government) (X one) |
| --- | --- |
| 312TH AIRLIFT SQUADRON, TRAVIS AFB, CALIFORNIA | X YES     NO |

**7. COUNSEL** (If any)

| a. NAME (Last, First, Middle Initial) | b. ADDRESS (Street, Apartment Number, City, State and ZIP Code) |
| --- | --- |
| WICKHAM, JOHN A. | 32975 SAINT MORITZ DRIVE EVERGREEN COLORADO 80439-6720 (303) 670-3825 |

**8. I REQUEST THE FOLLOWING CORRECTION OF ERROR OR INJUSTICE:**

SEE ATTACHED SUPPLEMENTAL STATEMENT

**9. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST IN THE FOLLOWING PARTICULARS:**

SEE ATTACHED SUPPLEMENTAL STATEMENT

**10. IN SUPPORT OF THIS APPLICATION I SUBMIT AS EVIDENCE THE FOLLOWING:** *(If Veterans Administration records are pertinent to your case, give Regional Office location and Claim Number.)*

SEE ATTACHED SUPPLEMENTAL STATEMENT (LEGAL BRIEF) AND EXHIBITS A-O

**11. ALLEGED ERROR OR INJUSTICE**

| a. DATE OF DISCOVERY (YYYYMMDD) | b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IT IN THE INTEREST OF JUSTICE TO CONSIDER THIS APPLICATION. |
| --- | --- |
| 17 APRIL 2002 | |

**12. APPLICANT MUST SIGN IN ITEM 16. IF THE RECORD IN QUESTION IS THAT OF A DECEASED OR INCOMPETENT PERSON, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY APPLICATION. IF APPLICATION IS SIGNED BY OTHER THAN APPLICANT, INDICATE RELATIONSHIP OR STATUS BY MARKING APPROPRIATE BOX.**

| SPOUSE | | WIDOW | | WIDOWER | | NEXT OF KIN | | LEGAL REPRESENTATIVE | | OTHER (Specify) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

**13. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM.** *(U.S. Code, Title 18, Sec. 287, 1001, provides that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)*

| 14.a. COMPLETE CURRENT ADDRESS, INCLUDING ZIP CODE *(Applicant should forward notification of all changes of address.)* | | DOCUMENT NUMBER (Do not write in this space.) |
| --- | --- | --- |
| 2540 CURLEW CIRCLE ANCHORAGE AK, 99502-1653 | b. TELEPHONE NUMBER (Include Area Code) (907) 248-6875 | 0302505 |

| 15. DATE SIGNED (YYYYMMDD) | 16. SIGNATURE (Applicant must sign here.) |
| --- | --- |
| 21 JULY 2003 | |

**DD FORM 149, SEP 2000**          PREVIOUS EDITION IS OBSOLETE.

SUPPLEMENTAL STATEMENT

OF

MARC J. MILLICAN
Major, USAFR (Ret.)
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

<u>Item 8: Requested Correction of Error or Injustice</u>

1.      Marc Millican, hereinafter "applicant," by and through his undersigned attorney, hereby
requests that the AFBCMR,

      (A) set aside his Officer Performance Report, period 14 JUL 1998 to 29 FEB 2000;

      (B) set aside his Letter of Reprimand darted 19 DEC 1999;

      (C) set aside the propriety of promotion action initiated 13 MAR 2000 and related
documents;

      (D) set aside applicant's removal from the FY 2000 Air Force Reserve Line Promotion
Selection List on 17 APR 2002;

      (E) set aside applicant's second deferral of promotion 2 OCT 2002;

      (F) set aside applicant's automatic transfer to the Retired Reserve on 1 April 2003, his
mandatory separation date (MSD);

      (G) reinstate applicant's promotion to LTC (USAFR) retroactive to 30 June 2000, by
operation of law under 10 U.S.C. § 14311(d),  with constructive service credit in active
participating status through 30 June 2003; with back pay and allowances for missed UTAs.

      (E) retire applicant as a LTC (USAFR), effective 31 JUN 2003.

*Note:* because applicant on 1 APR 2003 was involuntarily transferred to the Retired Reserve, he
may appeal directly to the AFBCMR without exhausting his administrative remedies before the
ERAB, pursuant to AFI 36-2401, Table 1, Rule 3.

Items 9 and 10: Factual Support/Errors and Injustice

1.      Applicant in January 1999 was a C-5 pilot with the 312th Airlift Squadron (AMC) based in Travis AFB, California. Applicant's full-time civilian profession was a airline pilot.

2.      In February 1999, as part of the Air Force's Anthrax Vaccination Immunization Program (AVIP), the 312th Commander, LTC Padilla sent an official memorandum to all squadron members and families.[1] LTC Padilla acknowledged the public controversy surrounding the adverse affects of the vaccination. LTC Padilla then stated that

> our medical people say the Anthrax shot is no more harmful than any other shots you have received in your military career. . . .*with virtually no known long-term side effects* [emphasis added]. Exhibit A ¶ 9.

However, to assist members in the unit to make an informed decision whether to accept the vaccination, LTC Padilla "encouraged" all to look at information available on the Internet "both positive and negative." Ex. A. ¶ 6. LTC Padilla ended his memo stating that members should "think about it a lot." Ex. A ¶ 10.

3.      In the May 1999 monthly newsletter of 312th Airlift Squadron, LTC Padilla reaffirmed his previous February 1999 memo by applauding members for trying to become "experts" on the Anthrax vaccination program. He told all members to

> Please think hard, read the briefing [by the 349th Contingency Hospital], talk to people you know and trust and make your choice. If you choose not to get the shot, please come and talk to me . . . .in the end we will respect your decision. Ex. B, page 2.[2]

This was a purported offer of a "voluntary" excusal from the anthrax series based upon informed consent. However, LTC Padilla issued a concurrent policy that prevented members from participation in UTAs unless they complied with the anthrax series. Refusal to comply would result in a "no pay, no points, no participation" status, with involuntary reassignment to the

---

[1] In May 1998, the Department of Defense initiated the AVIP program.

[2] Th3 312th policy was more generous than one ARNG unit permitting only a list of questions to be submitted by concerned pilots. Ex. A-2 (*Army Times* editorial, 4 NOV 02).

/12

Standby Reserve.   Members were told that the new "stop-loss" authority invoked in June 1999 did not apply.  Ex. B (May and June newsletters).

     5.       Because of the "level of members' concern and number of unanswered questions," the 312th temporarily suspended the anthrax immunization series in May 1999.  This "cool-off" period lasted for 60 days.  Exhibit C.

     6.       In June 1999, applicant's personnel files were submitted for promotion consideration to LTC.  The 349th Wing commander, Colonel (P) Black, issued applicant a Promotion Recommendation Form (PRF) with the highest rating of "definitely promote."  Ex. D.

     7.       Applicant was selected for promotion to Lieutenant Colonel by the FY 2000 Air Force Reserve Line and Health Professions Promotion Selection Board, the board convening in July 1999.  Effective date of promotion was 22 June 2000.


## AVIP Congressional hearings, Presidential Executive order, case law  (1999-2002)

     8.       During the 312th "cool-off" period of suspended the anthrax immunizations, applicant contacted the U.S. House Subcommittee on National Security to provide both testimony and solicit information concerning upcoming congressional hearings on the anthrax program.  In July, 1999, applicant then attended a variety of Congressional hearings in Washington D.C., on the anthrax program.  For applicant's participation in the hearing, he later received a letter of thanks in August 1999 from Rep. Shays, Subcommittee chairman.  Representative Shays stated that congressional investigation determined that "no studies have been conducted on the long-term health effects of the vaccine."  Ex. E.   This was at odds with LTC Padilla's February 1999 memo, where he induced members to accept the vaccine stating that "our medical people say the Anthrax shot [has] virtually no known long-term side effects."  Exhibit A ¶ 9.

     9.       As a result of the Congressional hearings in the Summer of 1999, President Clinton on 30 September 1999 issued Executive Order 13139, providing military members with the right to "informed consent" before administering an investigational drug.  The President,

/3

after findings by the Secretary of Defense, may waive this right if "absolutely necessary." Ex. E
(executive order).

   10. The congressional subcommittee in the Summer of 1999, issued a lengthy report
with findings and recommendations. One finding was that the AVIP, as administrated by DoD
for inhalation anthrax without FDA license amendment, was an "investigational or experimental
drug" under FDA regulations. In a subsequent letter to the Secretary of Defense, the
congressional subcommittee asked DoD to "take immediate action to suspend the AVIP." Ex. E
at 10 (May 16, 2000).

   11. On May 5, 2001, a federal lawsuit was filed by unrelated Air Force officers
seeking a declaration that the AVIP was unlawful as an investigational drug. Bates, Buck v.
Rumsfeld, No. 01-0941 (D.D.C.). The court's decision noted for the record that the basis for
plaintiffs' allegation of AVIP as an investigational drug was because the manufacturer *still had*
*pending* an FDA application to amend an existing drug license to include a new use for
inhalation anthrax. The court also noted that plaintiff Buck's court-martial in May 2001 had
determined AVIP was not an investigational drug. Bates v. Rumsfeld, __F.Supp.2d.__ 2002 WL
32128718, at nn. 4, 7 (May 5, 2002), appeal voluntarily dismissed. No. 02-5202 (December 24,
2002).

   12. The Bates court dismissed the lawsuit on procedural grounds without reaching
the declaratory issue whether AVIP was an investigational drug. In effect, the court merely
determined that the lawsuit was premature—the plaintiffs were seeking only an advisory opinion
to let them later go back and challenge their adverse personnel actions before intra-service
remedies, whether before a correction board or court-martial appellate tribunal. Id at 5-6.

## 312th Airlift Squadron AVIP policy: encourage public debate

   13. The 312th "cool-off" period of suspended anthrax immunizations resumed at
the end of July 1999. Applicant returned to his duties at the 312th from the Congressional

4

*14*

hearings in Washington D.C..  Applicant then acted consistent with LTC Padilla's memo to use the Internet to update his fellow pilots at the 312th of "both positive and negative" information about the AVIP.

14.    Applicant posted to an Anthrax website frequented by service members, the current information he had obtained from his Washington D.C. visits, including summaries of subcommittee letters and reports, testimony, and the executive order.  The internet site was the privately maintained 312th Pilot website that offered an open-forum postings, a chat room, and related links.

15.    On the 312th Pilot website the applicant, for example, summarized the July 1999 congressional testimony of Dover AFB pilots who had become sick, such as pilot Captain Michelle Piel who testified she had acquired auto-immune disease and grounded.  This contradicted LTC Padilla's rumor-report to the 312th earlier in June that Capt. Piel from Dover AFB "was fine and back on flying status."  Applicant also posted reports that some officers and airmen had alleged retaliation for their 1999 testimony on the AVIP.  Ex. F (Air Force Times article 17 Jan 2000, "Lawmaker seeks probe of possible retaliation.").  Pilots from other units found misrepresentations by DoD.  Ex. A-2 (DoD retracted claim that veterinarians routinely used AVIP; manufacturer lost FDA validation; AVIP investigated as particular cause for Gulf War Illness; adverse reaction rate of 35% or 175 times the DoD published rate).

16.    At no time did applicant provide any in-person nor e-mail attempts with false information to intimidate any unit members to refuse the vaccination.  Nor did applicant threaten LTC Padilla in any way with respect to the AVIP.  There is also no corroborating record that LTC Padilla ever reported to the OSI, or any other authority, that applicant made threats.

17.    Applicant elected not to accept the AVIP, believing in good faith that he had just cause to believe the AVIP was an investigational or experimental drug within the meaning of Executive Order 13139, and therefore required his "voluntary" informed consent.  Applicant's honest belief was supported by the Congressional hearings he had just attended, the subsequent Congressional AVIP Report in 1999 that recommended DoD immediately cease vaccinations as

/5

"investigational," and the lack of DoD waiver finding under Executive Order 13129 to otherwise compel his vaccination.

     18.     According to applicant's local command's policy at the 312th, it clearly appeared that the AVIP was in effect a voluntary program consistent with applicant's belief. Members refusing to accept the voluntary vaccination program would only be transferred to the non-participating Standby Reserve in a non-pay status. No correspondence was circulated by LTC Padilla for members to otherwise believe that AVIP refusal at the 312th would result in punitive action. Moreover, LTC Padilla sent a letter to applicant that if he did not start the AVIP, he simply was "no longer eligible to perform UTAs" —in other words, the commander informed unit members, and applicant in particular, that there no need to perform further UTAs because you will be immediately transferred to the Standby Reserve. Ex. G (26 JUL 99 letter from LTC Padilla to applicant).

     19.     Applicant however, was placed in a predicament: he had over 19 good reserve years, but less than 20 for retirement purposes, and therefore risked forfeiting his substantial investment towards military retirement. Applicant also had invested nearly 18 years towards retirement as a civilian airline pilot. Maintaining applicant's flight status as a civilian airline pilot required absolutely no medical problems or he faced medical grounding and even termination. Applicant feared more the threat of permanent or even temporary adverse reaction to the AVIP that would jeopardize his livelihood, than a temporary transfer to the USAF Standby Reserve.

     20.     Applicant's commander on 15 November 1999 gave applicant the expected notice of his involuntary transfer to the Standby Reserve. Ex H. The actual request was then forwarded on 19 December 1999. The purported regulatory basis for the transfer was "unsatisfactory Reserve participation" in UTAs. However, LTC Padilla had already determined that members refusing AVIP were ineligible to participate in any UTA. The request to transfer

6

/6

dated 19 DEC 1999 added that "derogatory data," was NONE, "record of disciplinary actions"
NONE.  Ex. G (request at ¶2f, h).

## 312th AVIP bungled policy with "bait and switch"

21.      Despite LTC Padilla's request informing ARPC on 19 December 1999 that
there no evidence of derogatory data or disciplinary actions against applicant, Padilla dubiously
issued on the same day a UIF filed Letter or Reprimand to applicant for causing "discontent and
disloyalty" with the AVIP.  Ex. I.  LTC Padilla's policy over the past months was to invite
members to openly discuss the AVIP program and research the issue under the guise of a
voluntary consent decision.  Congressional inquiries and their demands to DoD to cease the
AVIP, no doubt went in tandem with Padilla's education focus.  Applicant on 16 December had
also just answered several questions about the AVIP posed by a news reporter from a local
newspaper, where applicant stated "he was not taking the AVIP." [3]

22.      Padilla's "open-debate" policy obviously backfired and members began refusing
AVIP.  Padilla then began a punitive campaign to chill any further education on the AVIP.  LTC
Padilla exaggerated efforts taken by applicant to educate his fellow pilots, with concocted
"seditious" allegations in the LOR  Ex. I at ¶ 1 ("intent to raise discontent and disloyalty").
Finally, applicant's internet postings exposed that Padilla had made several false public
statements.

23.      When reassignment to the Standby Reserve was unsuccessful, Padilla on 13
MAR 2000 issued a command-directed Referred OPR for the period JUL 98- FEB 00.  Ex. K.
The accusations were essentially the same as contained in the LOR.  Conspicuous was the
acknowledgment in the OPR that only "undocumented" verbal performance feedback was given.
Moreover, the adverse OPR contradicts Padilla's 19 DEC 99 request to transfer applicant to the

---

[3]   Applicant answered questions after telephone inquiry by the Fairfield Daily Republic Reporter
(local Travis AFB), with answers appearing in the paper on 17 December 1999.   Padilla did not
mention this in the LOR or later OPR.

Standby Reserve that had declared "no derogatory data or disciplinary actions" have been taken against applicant.

24.    Applicant replied to both the LOR and OPR by inviting LTC Padilla and OPR rater LTC Brunz, to produce any corroboration, e-mails, or witnesses to support their contentions.  Applicant also alleged that Padilla had exaggerated and distorted his efforts to educate fellow unit members about the AVIP.  Applicant also pressed Padilla about his LOR allegation that in 2 September 1999 phone call applicant allegedly made a life threat to Padilla.  Applicant denied this had occurred because Padilla's phone call was to congratulate applicant for making LTC, with applicant's pleasant acceptance.  Applicant then later played golf with Padilla in a Travis AFB tournament.   Moreover, Padilla's own request to transfer applicant to the Standby Reserve curiously stated that no derogatory data or disciplinary actions had occurred through 19 December 199, other than failure to attend UTA.  More suspicious to the allegation of fomenting mass mutiny is that applicant lives in Alaska and spent little time at the 312th home base in Travis AFB, California.   Finally, there is no record of any report by Padilla's of any life threats or seditious acts to the OSI.   Certainly such dangerous allegations occurring for the past 6 months would have prompted some prior report somewhere other than suddenly in a coincidental 19 DEC 99 transfer request to the Standby Reserve.

25.    It appears LTC Padilla simply trumped up this LOR to coincide with his transfer request to make sure ARPC would act and get rid of dissenting members and override the new "stop-loss" policy.  Ex. J (1 JUN 99 ARPC notice implementing stop-loss).  Alternatively, LTC Padilla retaliated when applicant honestly answered a reporter's question, or applicant publicly exposed false information issued by Padilla: it was not true that Capt. Piel from Dover AFB "was fine and back on flying status," and not true that studies had been undertaken to showed "no long-term adverse effects" from AVIP.

26.    When applicant sent his reply to the LOR and OPR, Padilla conveniently, but predictably, invoked the rebuttal time limit to refuse consideration of applicant's contentions.

/8

Therefore, Padilla's LOR is admittedly without support, and is a dubious filing when submitted together with a transfer request noting "no derogatory data." Certainly an alleged life threat to Padilla and applicant's seditious acts would have constituted derogatory data.

27.    Padilla cannot encourage his unit members to use the Internet to look at information available, both positive and negative, and talk to people "you know and trust" to make your choice—and then complain later that members in positions of trust responded to this very invitation. It is more probable that after encouragement by Padilla to engage in public debate over the AVIP, that the Congressional Report and Presidential EO inflamed unit members to quickly swing against AVIP—regardless of whatever influence certain individuals had in the unit. In a damage-control knee-jerk response, Padilla was forced to back-peddle by retaliating and finding scapegoats to set an example.

28.    Applicant did nothing more than honestly and in good faith at that time, express his First Amendment right *within the very limit previously condoned by his commander.* Here, Padilla had once expressed the government interest in promoting free and candid discussion of the controversial AVIP. But after the public relations disaster from Congressional outrage, Padilla reversed the government interest to punish *ex post facto* that same free inquiry in his unit. To misdirect frustration with a poor command "open-forum" policy after Congressional backlash, cannot serving a legitimate governmental interest. O'Brien v. United States, 391 U.S. 367, 369-72 (1968)(military's regulation of free speech justified only where it is unrelated to suppression of free expression).

29.    Moreover, AVIP was curiously suspended indefinitely in 2001 for "alleged" shortages by the manufacturer Bioport. Bates v. Rumsfeld, 2002 WL 32128718, at page 5, n. 9 (DoD ceased AVIP in 2001 for all but special missions with no current plans to resume due to shortage). Although an alleged shortage was the circulated public reason, this certainly appeared timed to appease the constant Congressional inquires. AVIP suddenly resumed after the public outcry had lost steam while the 2001 September 11th terrorist bombings eclipsed public interest

*19*

altogether.  Whether AVIP shortage was the complete reason for AVIP suspension, it was not unreasonable for concerned service-members to believe that DoD was reconsidering AVIP. Nevertheless, upon later full resumption it was clear that DoD was publicly reaffirming that it would not consider AVIP an investigational drug under EO 13139, and thus the defense of informed consent would not apply.[4]   Applicant's efforts to educate his fellow unit members in mid-1999, predate this.  They occurred when legitimate concerns were present over AVIP safety, whether it was an experimental drug, whether fellow pilots were medically grounded for serious side affects, and whether DoD would agree to the Congressional demand to cease vaccinations.

30.     In any event, Padilla's LOR and OPR were unlawful reprisals after applicant had exposed, through his Congressional inquiries, and an IG complaint in October 1999, falsehoods made earlier at the 312th concerning AVIP.  This violates the military Whistleblower statute, 10 U.S.C. § 1034.  Special BCMR procedures apply to Whistleblower complaints. § 1034(f).[5]

**Unlawful promotion delay and removal from FY00 LTC promotion list**

31.     In response to filing the LOR and Referred OPR, applicant's additional rater, BG Black, Commander , 349th Air Mobility Wing, wrote a letter to applicant dated 13 March 2000 giving notice that he was recommending removal of applicant from the FY 2000 LTC promotion list.  The letter stated applicant's promotion was automatically delayed until the SECAF made a final decision.  Exhibit L.  According to BG Black, the subsequent orders dated 12 MAY 2000 that promoted applicant to LTC, had no effect.  Ex. M (12 MAY 00 promotion orders); Ex. M-1 (25 MAY 00 letter of congratulations to applicant from HQ USAF/RE, MG Sherrard, Chief, Air Reserve).

---

[4]   See Bates at n. 4 (noting plaintiff Buck's court-martial in May 2001 rejected accused's defense that AVIP was an investigational drug).

[5] In October 1999, applicant signed, along with other officers, an IG complaint against General Weaver, ARNG, for false testimony at a Congressional hearing alleging that only one officer had left the ARNG in lieu of accepting AVIP.



32.     President Bush on 17 April 2002 removed applicant's name from the FY 00 LTC promotion list. Ex. N. Removal from the list occurred 22 months after applicant would have promoted on 22 JUN 2000. This is beyond the six-month initial Secretarial delay period without extension, imposed under the promotion delay statute, 10 U.S.C. § 14311(d). This is also beyond the 18-month absolute outer limit or deadline for delaying promotions. Id.

33.     There is no record that the SECAF, nor any other official, extended applicant's promotion delay after the six month period. The law does not permit the military to allow any subordinate official, here BG Black, to impose an indefinite delay of a promotion. The controlling case is Rolader v. United States, 42 Fed.Cl. 782 (1999)(removal of Air Force officer's name from Colonels promotion list 24 months after he would have been promoted, was invalid where Air Force did not strictly follow due process). Although not necessary to its result there, the Rolader court warned the Air Force in future "related cases" involving promotion delays, that it has

> serious misgivings about the enforceability of the [purported] automatic delay provision in AFR 36-89. The effect of the regulation is to allow a relatively subordinate officer to initiate a delay that continues indefinitely. This seems inappropriate when one considers that a six-month delay extension requires the approval of the Secretary. Id at 786, 787.

See, Nation v. Dalton, 107 F.Supp.2d 37, 44-45 (D.D.C.2000) (promotion unlawfully delayed when Assistant Secretary of Navy was not delegated authority to extend delay beyond six months).[6]

34.     The Rolader court also examined the other services' regulatory interpretation of the delay statute and questioned the Air Force's contention to allow "unlimited postponements" of a promotion beyond the 18-month maximum limit. The court found that the Army and Navy construed § 14311(d) to permit only Secretarial extensions beyond the six-month initial period,

---

[6] In Nation, the court ultimately found the officer's claim was moot after the Secretary removed her name from the promotion list within the statutory deadline, Id at 45.

but that the 18 months operated

> as an outer limit on delays that preclude removal of a name after that point.  Absent
> Presidential action within 18 months, promotion is automatic.  Rolader at 785-86.

See also Nation 107 F.Supp.2d at 44-45 (Assistant Navy Secretary was without delegated

authority to extend delays); Lewis v. Rumsfeld, 154 F.Supp.2d. 56, 59 (D.D.C. 2001)(officer's

claim of an unlawfully delayed promotion was not ripe when Navy's pending removal action had

not exceeded 18-month statutory deadline).   Therefore, the Air Force's alleged indefinite

promotion delay by BG Black of applicant's LTC promotion beyond the 18-months deadline, is

legally untenable.

   35.    Moreover, the Air Force cannot claim it's interpretation of § 14311(d) must be

entitled to any deference as being correct because the other services share responsibility to

administer that same statute.  Lipsman v. Sec'y of Defense, 257 F.Supp.2d 3 (D.D.C.2003)(court

rejected Army's demand to defer to its interpretation of correction board statute; when Army

shares responsibility to administer a statute with other agencies, the courts owe no deference as

normally accorded under Chevron v. NRDC, 467 U.S. 837 (1984), citing Rapaport v. Dep't of

Treasury, 59 F.3d 212, 216-17 (D.C.Cir.1995)).

   36.    Applicant's unlawful promotion claim is also not moot as in Nation, where the

Navy did not exceed the 18-month deadline when removing that officer's name from the

promotion list.  Applicant's removal from the FY 00 list on April 2002— 22 months after the

time he would have been promoted— as an unlawful promotion delay.  Applicant was promoted

to LTC by operation of law.  Cf., Lewis at 59;  Rolader at 787-88;

## CONCLUSION

For the foregoing reasons, applicant requests that the AFBCMR grant relief as set forth above under Item 8.

Respectfully submitted,

John A. Wickham, Esq.
Counsel for Major Millican

Incl:
Exhibits A-O.

23



# DEPARTMENT OF THE AIR FORCE
## Air Force Reserve Command (AFRC)

February 22, 1999

Lieutenant Colonel Frank J. Padilla
312 AS/CC
511 Waldron Street
Travis AFB CA 94535-2154

Fellow 312th Airlift Squadron Members and Families
Worldwide

Dear Fellow Squadron Members and Families,

As you have undoubtedly heard, the Department of Defense (DoD) and, in turn, the Air Force Reserve have instituted a program to vaccinate our people against the Anthrax virus. I know emotions are running very high on this issue for many of you. It is with this in mind that I write you today.

Today's military member faces an ever-increasing number of threats, many of which are from new and unconventional sources. Specifically, chemical and biological weapons pose significant dangers to the safety and well being of our fighting forces. Due to the nature of these weapons, the risk is literally everywhere, not just on the battlefield.

While there are other forms of biological and chemical weaponry, Anthrax has and will become the weapon of choice of our enemies for many reasons. It is relatively easy to mass-produce, it stores well with a shelf life that literally spans decades and it deploys effectively as a weapon. Most importantly, the effect of the virus is nearly always fatal.

As your commander, I simply must do everything I can to protect the men and women of this great squadron. Sometimes this means imposing a program that is very unpopular. In truth, I dislike shots probably as much as anyone, but after completing a thorough study of this issue, I know getting the shot is the right thing to do. It is my most fervent hope that eventually all of you will feel the same way too.

Effective immediately, everyone must start the Anthrax series before going out on any airlift mission and in no case later than 1 July 99. Our business is worldwide, and in these turbulent times, itineraries can change with little or no notice. Our crews must be ready to meet every demand placed before us. I know these directions differ slightly from what I stated at the last UTA, but higher headquarters has further refined the policy. This issue continues to be dynamic so please stay alert for additional guidance.

News of this vaccine hit this base like a wild fire in the California hills. There are all kinds of information, both positive and negative, on the Internet and in the news. I encourage you to look at all of it. Capt Tom Bell has helped me compile a read file on all the latest Anthrax news. It is in the pilot briefing room for all of you to read. Also, I obtained copies of the PBS *FRONTLINE* program entitled *"Plague Wars"* which is available for your viewing. If that doesn't raise the hair on the back of your neck, I don't know what will. Finally, ABC's *"20/20"* will broadcast a "balanced coverage" program on Anthrax on 23 Feb 99. This letter may not reach you by then, but we will record the program and have it available at the squadron. Bottom line, I want you to read and watch all the information available so you, with your family, can make an informed decision.

EXHIBIT ___A__ 24

I know for some of you, this is less of an issue over the shot and more of an issue concerning trust. Certainly, past debacles such as exposing our servicemen to nuclear fallout, Agent Orange and our government's handling of the Gulf War Syndrome, do not speak well of our government's track record in this area. Also, there is a lot of faceless rhetoric, particularly on the Internet, speaking out against this program. I choose to turn toward experts I know and trust.

Dr Anna McHargue has been our squadron's flight surgeon for over 20 years. I cannot begin to convey all the ways she has helped so many of us over the years to maintain our health and medical qualifications. I trust her implicitly and she says, "get the shot." I trust Dr. Rob Singler, who came to us from the 708th and has provided us with two excellent briefings on Anthrax. He says, "get the shot." Non-affiliated and disinterested organizations such as the Air Line Pilots Association's (ALPA) and American Airlines' medical departments, to name a few, say "get the shot." I trust them also.

Our medical people say the Anthrax shot is no more harmful than any of the other shots you have received during your military career. It is a dead enzyme and has been given to over 150,000 military members with virtually no known long-term side effects. We will need to get six shots, three given two weeks apart followed by three additional injections given at 6, 12 and 18 months. An annual booster is required after that to maintain ongoing immunity. It is a tough regimen, I know. I realize strict adherence may not be possible, but as long as you are close to the required timeline, your protection will be sufficient. I have included a letter to our civilian employers in your v-file outlining the program and asking for support in this matter. Hopefully this will help.

In conclusion, I vividly remember being on the ramp at Ben Gurion Airport in Tel Aviv, Israel during Desert Storm when the Iraqi Military launched a scud missile our way. With sirens blaring, we abandoned our C-5 for the safety of an air raid shelter. Up until that time, I remember thinking what a pain it was to carry around all that Chemical Defense Gear. Obviously, at that particular time, I was very happy I had it. Like so many of us, I am not exactly thrilled about getting this shot. I hope and pray we never encounter a situation where we need its protection... but if we do, I am satisfied we will be armed with the best protection available. Please, stay calm, think about it a lot, make a decision and go get the shot... or come and talk to me. Thank you and Godspeed.

Sincerely

FRANK J. PADILLA, Lt. Col, USAFR
Commander

Attachment: What Every Person Needs to Know About the Anthrax Vaccine

# TOM REMPFER AND RUSS DINGLE

## 'Safe, effective and FDA-approved' tramples troops' right to say no



Over the past four years, service members and lawmakers have dutifully analyzed the Defense Department's Anthrax Vaccine Immunization Program. Our conclusions require reflection on how to properly — and legally — protect our troops from biological weapons, especially as our nation debates going to war with Iraq.

Our anthrax vaccine education and duty began in 1998, when our commander officially formed a "Tiger Team" and ordered us to develop a list of questions for higher headquarters of service members' concerns about the vaccine. Trained as aviators, we reviewed the facts related to the anthrax vaccine no differently than the preflight of an aircraft prior to a training or combat sortie. The bottom line was no different: You don't take a broken plane airborne.

We found government reports documenting that the vaccine manufacturer lost its Food and Drug Administration validation within one month of the start of the military's mandatory inocula-

tions and remained closed for the next four years.

We found that the vaccine was known to be of questionable effectiveness, a possible cause of Persian Gulf War illness and not approved for use against inhalation anthrax, which is more likely to be found on the battlefield.

Our findings ran directly counter to the rhetoric promoting the Pentagon's program.

One of the first misrepresentations we discovered and continue to claim that civilian veterinarians routinely used the vaccine. By April 5, 1999, Army Times found AVIP officials correcting themselves to say "at-risk veterinarians." The Defense Department subtly admitted only military researchers and lab workers used the vaccine routinely.

Subsequent congressional inquiries found the vaccine to be experimental and, therefore, by law, could be made mandatory only by presidential order.

But the complexity of the debate was continually glossed over as the Defense Department

maintained that the vaccine was "safe, effective and FDA-approved."

In fact, the newest vaccine label reveals an adverse reaction rate of up to 35 percent — 175 times greater than the rate originally published on the old product's label. Its effectiveness was known to be experimental for inhalation anthrax, as shown by the Pentagon, FDA and congressional documents. The Pentagon helped the manufacturer apply for approval for this use, without success.

Most amazingly, the FDA never finalized the vaccine's license rule, but instead relied on a 1970 Public Health Service approval that lacked the proper and lawful effectiveness data.

Knowing our leaders had been mislead, we continued our research despite being grounded as pilots and forced out of the Air National Guard. Recently, FDA officials responded to a petition we filed requesting a regulatory review. They acknowledged the following:

■ The FDA has not issued a final rule for the anthrax vaccine.

■ They would not release for

use any old vaccine lots . . . ed in our petition.

■ They dismissed their responsibility to follow their own rules requiring disapproval of government contracts with deviant manufacturers. Their excuse was that their guidelines were not legally binding.

However, a service member's right of informed consent to an experimental drug or vaccine is statutory and legally binding.

It is time to correct. We believe President Bush will agree that Defense Department officials would be derelict in their duty if they do not:

■ Direct the correction of records for service members previously punished over the old anthrax vaccine.

■ Properly care for the service members made ill by the vaccine.

■ Continue using the vaccine only in accordance with the law — voluntary with informed consent, or mandatory by presidential order.

At a time when thousands of troops face the possibility of deploying to Southwest Asia, strict compliance with the law is more important than ever for a vaccine that lacks a legally finalized licensing rule by the FDA and has never been approved for inhalation anthrax. □

Rempfer, top, and Dingle are former Air National Guard pilots who have filed a citizen's petition with the FDA and a lawsuit against anthrax vaccine manufacturer BioPort Corp.

EXHIBIT
26
A-2

## The 312th Airlift Squadron Monthly Newsletter

**MAY 1999**



# UTA/Today

## FROM THE COMMANDER

*"The meaning of things lies not in the things themselves, but in our attitude towards them."*
Antoine de Saint Exupery

**ONE "KILLER A" DOWN...THREE TO GO** Hi Folks! As I write you this, we are winding down from another excellent adventure...ASEV is DEAD! The outbrief is Friday, 21 May. This is where we find out how we *really* did. Early indications are *very* positive... But, come what may, our ASEV blowout party is at *The Cabin* in Elmira on Friday night. I hope you were able to make it. Thanks to everyone who put his or her qualifications on the line to participate in this big dance. You watered my eyes! I can't imagine working with a better bunch of people...Even *you*, Sean.

**THAT WASN'T SO HARD...WAS IT?!** Wow! What a UTA! April was AWESOME! It started with the golf tourney on Friday and ran, non-stop, through the 3-mile walk on Sunday.... Camaraderie and Esprit de Corps were had by all... (I hope). As most of you know, these momentous events don't happen by accident. A special thanks to our training gurus; Dave Smallidge, John Ovitt, Mike Spannaus, and Larry Cantrell for putting all that ground training together. Thanks also to Alan Chung for arranging the squadron photo and 3-mile walk. Mike Delgiacco made the mistake of making himself invaluable as our Sports guy...He put together that unbelievable golf tourney. (Although, I'm kind of mad at him for sticking me with Ang, Dave Raymond and Spanky! I had to carry them through 18 holes....*and don't believe anything they say about how I did...They're just jealous!*). Please keep in mind, this is *your* UTA...so if you can think of a better way to do something, please let us know. Each year we learn from the past one ... and continue to tweak our program to make it better and better for *you*. Our next hard UTA is 8 - 9 April 2000! *Please plan ahead... and be there!*

**ANOTHER HEARTY PARTY** Our Annual Recognition Dinner started noisy... and got noisier! Judging by the dull roar, which permeated throughout the evening, I think a good time was had by all. A special thanks to Lt Sam for putting it all together. Overcome with emotion, he was unable to continue as MC... 'Must have been that stirring honor guard performance accompanied by *Kool and the Gang.* "Mr Entertainment" himself, Dale Andrews carried the torch for us for the rest of the evening... 'Definitely watered my eyes! Doug "Don't call me Bob Saggett" Beyer dazzled us with a tremendous array of raffle prizes. (Thanks *Oddball*, I take back all the bad things I said about you!) It is so hard to pick the award winners. So many of you do so much for us... The list is long and distinguished... And in case you couldn't hear, here's our honorees for 1999:

| | |
|---|---|
| Airman of the Year | Tim O'Neil |
| NCO of the Year | Boyde Crawford |
| SNCO of the Year | Dave Raymond |
| Junior Officer of the Year | Rebecca Gross |
| Field Grade Officer of the Year | Lee Davis |
| Pirate of the Year | Rich Beale |
| Engineer of the Year | John Ludke |
| Loadsmasher of the Yer | John Mooch |
| Ops/Admin of the Year | Elaine Kennedy |
| Flight Surgeon of the Year | Anna McHargue |
| Booster Club Volunteer | Fred Longoria |
| Trougher of the Year | Jason Malone |
| Aircrew of the Year | Blackburn's |
| CrewART of the Year | Dave Smallidge |
| Unsung Hero | "Sin" |
| Citizen Airman of the Year | Warren Leslie |
| Commander's Cup | Pete Briggs |

PAGE 1  COMMANDERS COMMENTS
PAGE 2  1ST SERGEANT
PAGE 3  OPS/ADMIN
PAGE 4  SAFETY
PAGE 4  PILOTS
PAGE 5  ENGINEERS
PAGE 5  LOADMASTERS
PAGE 6  TRAINING

MAKE IT VOLUNTARY
INFORMATION WAS TAKE

EXHIBIT
B

## The 312th Airlift Squadron Monthly Newsletter

**PAGE 2**                                                    **MAY 1999**

**MORE GOOD TIMES TO COME** I have always believed, if you have fun at what you do, the fun will see you through to tough times. Well, times are tough. There is no doubt about that. Our Killer A's (ASEV, ANTHRAX, ACTIVATION and AIRCRAFT ANOMOLIES) continue to hang over our heads and make being a reservist harder than it's ever been. Please, please join us in some of the fun to come:

| White Water Rafting | 18 Jun 99 |
| Squadron Bowling Tourney | 25 Jun 99 |
| Oakland A's Game/Fireworks | 3 July 99 |
| Family Appreciation Day/Picnic | 24 July 99 |
| Annual House Boat Trip | 10 -13 Sep 99 |

**WAITING TO EXHALE** As you all know, the deadline for receiving your first Anthrax shot is 31 May 99. No pay or points are allowed after that date until you comply with this directive. It is my deepest hope that all of you will comply. I don't want to see any of you go...not for this reason. Good people, we know and trust, have made it their business to become experts in this program. Doc Rob Singler and Doc Anna McHargue, among others, endorse this shot. Doc Singler has provided us with some very excellent briefings on Anthrax and its immunization program. For those of you who were unable to attend his briefings, his answers to most of the questions we had about the shot are included in this issue of UTAToday. (Thanks to Brain Paddock for putting the questions together and submitting them to the Doc.) Please, think hard, read Singler's briefing, talk to people you know and trust and make your choice. If you choose not to get the shot, please come and talk to me. Give me the chance to make sure, in my mind and yours, you are making this choice for the right reasons. In the end, we will respect your decision.



**A STELLAR FELLER** I am more than certain many of you are tired of my stories... particularly ones about my Grandpa... But, I'm stubborn and this is *my* newsletter input. So here I go again... My Grandpa would always make me tag along with him whenever I wasn't in school. Every week, he dragged me to the local barbershop in town, more to sit around and B.S. rather than any real need for a haircut. One of his old friends had a reputation for being a Class A, heavy-duty whiner. I think his name was Tom, but it's been a long time. I remember Grandpa asking Tom how he was doing. Tom, would reply, "Not so good." There was a distinct whine to his voice. "You see, it's this summer heat. I just hate it. Oh, I hate it so much. It just frazzles me up and frazzles me down. I just hate the heat. It's almost killing me!" My Grandpa would simply mumble, "Uh-huh" and he would cut his eyes at me to make certain I heard the lamentation. Then Tom would again mewl, "I hate plowing. That packed-down dirt ain't got no reasoning, and mules ain't got no sense. It's killing me. I can't never seem to get done. My feet and hands stay sore, and I get dirt in my eyes and up my nose. I just can't stand it." My Grandpa would simply say "Uh-huh, Uh-huh" and then look at me and nod. On the way home, my Grandpa would ask me, "Did you hear what ol' Tom had to say?" I would nod. My Grandpa would continue, "Boy, there are people who went to sleep all over the world last night, poor and rich and white and black, but they will never wake up again. And those dead folks would give anything at all for just five minutes of this weather or 10 minutes of the plowing that ol' Tom was grumbling about. So you watch yourself about complaining, boy. What you're supposed to do when you don't like a thing is change it. If you can't change it, change they way you think about it. Don't complain." Remember folks, *Attitude is Everything! Try to focus on the good we do.* Until next time, stay well, fly straight and may all your landings be happy ones! fj

## 1ST SERGEANT

Hi gang! It's a real pleasure to become part of the 312th family. My job is people, and everyone is my business. If something comes up, please drop by and let me know. If nothing is up, drop by anyway and let me know what going well with the family, the job, and even the reserves. My door is always open for you.

**LODGING** The good attendance at the hard UTA brought out some requirements for using lodging that some of us were not aware of.

You must sign up for a room before the Wednesday prior to the UTA if you need a room and you will be in UTA status. If you sign up for a room and you end up not being able to attend the UTA, you must cancel the reservation. If you do use a room on base, you must turn the key in yourself, and sign the log at the front desk before 1100 on Sunday. If you have any questions please let me know.

**INTERNET USE / ABUSE** This is scary. Someone who has been living in the jungle evading capture for the last three years obviously never heard that we can't use Internet access in the squadron to look at porn. It happened to another squadron in our wing



# The 312th Airlift Squadron Monthly Newsletter

**JUNE 1999**



# UTA *Today*

## FROM THE COMMANDER

*"While we are here, we should set goals and achieve them, make the best of things, make others feel good about themselves, and be happy with what we are and what we are doing."*

Janet Evans

### A NEW HOPE

Howdy folks! Thanks so much for making us all look so good during our ASEV. The final report was glowing ...as predicted. We have succeeded in keeping the team away from us for at least another couple of years. *AWESOME!* With ASEV gone and Kosovo winding down (thank goodness!), I can only see one "Killer A" in our windscreen.... And you know what it is. The deadline for you to receive your first Anthrax shot is this UTA (19 Jun). After that, it's no points, pay, or participation until you receive the shot. (Our current Stop Loss policy has no real bearing on this.) Please come in and chat with me if you feel you will not get the shot. (I promise I'll be nice). In the end, we will respect your decision. I know many of you have decided to get the shot, but will hold out for the very end before getting it. I can't say I blame you... but please consider the fact that many of our squadron mates depend on their reserve participation to keep their families clothed and fed... Namely our troughers. These are the people who have supported you through thick and thin through it all. Please, if you have decided to get the shot, do it soon. We want to keep the missions rolling and the paychecks flowing. Thanks!

### RETURN OF THE JEDI

So much to do....So little time. Please tell your section when you will complete your annual tour. This will allow our wing to free up unobligated funds to use in other areas, such as refurbishing our squadron or getting us more computers. Also, please see the Shirt and weigh in by the end of this month. If you think you might be close, please communicate with us and we will work out a program that will work for you. Finally, and most importantly,

please strive to complete your semi-annual currency by the end of this month. When it's all said and done, the most important thing we do is fly the jet. Flying safe takes practice.

### THE PHANTOM MENACE

Our airplanes are broke and maintenance is becoming more and more frustrated as pressure is brought to bear on them to improve reliability. When tempers flare, it becomes easy to engage in finger pointing and to become distracted by separate issues. One of our crews was the recipient of these frustrations and I thought it might be nice to pass along the experience to you. The thought of passing along a compliment to Sean Neilon sort of runs against my grain.... But, oh well. Our very own, John "this is not a personal crusade" Davis spied an improper temp fix on bleed ducting on the wing. He notified maintenance, but they held fast that it was a good repair. Standing firm, John notified "Stump" Neilon and he refused the airplane and they went to the spare. (They were on a high priority banner mission.) High ranking maintenance folks emerged and comments were made. Our crew acted professionally and they held firm. The lesson is: (1) Stand by your beliefs. Mx doesn't have to fly that airplane. We do. I will support your decision. (2) If you are getting high level attention from the actives or from maintenance, call me, Spencer or the OG/CC out to your airplane, please! We can talk to these people from a different perspective. Help us to help you! (3) Remember... *Style and Grace.* Sean and his crew refused to get caught up in the emotion and therefore the attention never wavered from the mechanical problem to the crew's behavior.

PAGE 1   COMMANDERS COMMENTS
PAGE 2   1ST SERGEANT
PAGE 3   OPS/ADMIN
PAGE 3   SAFETY
PAGE 4   PILOTS
PAGE 4   ENGINEERS
PAGE 5   LOADMASTERS
PAGE 6   TRAINING

25

No copyright
Xerox this and
distribute to whomever you like

LTC Robert Singler
Chief, Hospital Services
349th Contingency Hospital
Travis AFB, CA

Edition #3;  7 May, 1999

# Anthrax News Flash

## Edition #3 of what will be a briefly continuing newsletter for our Reservists

Disclaimer
This "newsletter" represents the personal opinion of Robert C. Singler, MD. It has neither been reviewed nor sanctioned by the US Air Force, which bears no responsibility for its content.

Strong Request
Make sure that everything you quote to someone else has references attached. Otherwise it's hearsay.

The Latest
Here's a perfect example of the power of rumor at work:

YES! It's true. The Dover AFB Active Duty Wing CC has placed the anthrax immunization program temporarily on hold. Sort of.

However, the program is not on hold because of new info on supposed dangers of the anthrax vaccine. In fact, for those getting on an airplane for deployment to a high-threat area, the program is not on hold at all.

Here are the facts (source: Dover Mil Pub Health OIC via HQ 349CH/CC):

1) Dover is now going through exactly what Travis went through three months ago. Air Staff provided the flying community with a briefing which reportedly, at least in part, came across poorly from a public relations standpoint. Is that not a little reminiscent of one of our own squadrons?

2) Because of the level of members' concerns, and the number of unanswered questions, the AD Wing/CC has decided not to require that all members immediately start their anthrax immunization series. During this cooling off period, additional briefings will be held and members will have a chance to have their concerns addressed. Just like Travis.

3) Those in the process of deployment to areas where anthrax immunization is required are required to start their shots.

Most important, as this issue is addressed at a Command medical level or at a Congressional level, I'll keep you apprised of developments. **There is currently no scientific information I have received that makes me unwilling to get my next shot.**

MORE TO FOLLOW as the facts come in.

Rob Singler

**EXHIBIT** 30
C

## PROMOTION RECOMMENDATION

### I. RATEE IDENTIFICATION DATA (Read AFI 36-2402 carefully before filling in any item)

| 1. NAME (Last, First, Middle Initial) MILLICAN, MARC J. | 2. SSN 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 | 3. GRADE MAJ non-EAD | 4. DAFSC 11A2A |
|---|---|---|---|
| 5. ORGANIZATION, COMMAND, LOCATION 312th Airlift Squadron (AMC), Travis AFB CA | | | 6. PAS CODE T81LFLPG |

### II. UNIT MISSION DESCRIPTION

The mission of the 312th Airlift Squadron is to train and provide qualified C-5 aircrews to fly worldwide airlift missions and augment the active duty forces under various readiness conditions up to and including full mobilization.

### III. JOB DESCRIPTION

**1. DUTY TITLE:**
AIRCRAFT COMMANDER C-5

**2. KEY DUTIES, TASKS, RESPONSIBILITIES:** Responsible for the safe and timely movement of the largest aircraft in the Air Force, valued at over 100 million dollars. Supervises flight crews of up to 22 people and is directly responsible for the safety of up to 73 passengers. Has personal responsibility for the management of strategic airlift missions to include: contingency operations, joint Army-Air Force training exercises, NATO operations and special assignment airlift missions. Ensures strict compliance with Air Force, AMC and international flight procedures. SIGNIFICANT ADDITIONAL DUTIES: Flight Commander

### IV. PROMOTION RECOMMENDATION

- Superior officer with remarkable leadership abilities and time-tested skills in aviation--truly unsurpassed performance as C-141 Aerial Refueling Instructor Aircraft Commander--always exceeds every challenge
- Wealth of knowledge; diverse background--rapidly ascended to CT-39 Instructor Aircraft Commander
- Goal-oriented; ability to motivate/inspire others resulted in most successful ORIs, ASEVs, QAFAs ever Combat tested--commanded over 110 sorties inOperations DESERT STORM/SHIELD; ensuring success
- Impeccable military bearing; served with distinction as White House Aide for Ronald Reagan 1981-1983
- Chosen by 312 AS/CC as Flight Commander--due to superb dedication/standards/managerial qualities
- Tireless contributor; Wing Presentations/Ground Safety/Executive/Operations Officer--a top performer
- Promotion a must; consummate team player, well-rounded leader/officer with command potential/abilities

| V. PROMOTION ZONE | VI. GROUP SIZE | VII. BOARD | VIII. SENIOR RATER ID |
|---|---|---|---|
| BPZ [ ]  I/APZ [ ] | 1/3/12 | A0500D | 0M4T8 |

| IX. OVERALL RECOMMENDATION | X. SENIOR RATER |
|---|---|
| | NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION GERALD A. BLACK, Colonel, USAFR 349th Air Mobility Wing (AMC) Travis AFB CA |
| DEFINITELY PROMOTE  [X] | DUTY TITLE Commander |
| PROMOTE  [ ]  DO NOT PROMOTE THIS BOARD  [ ] | SSN 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 |  SIGNATURE |

### Instructions

Review previous OERs, OPRs, Education/Training Reports, and Supplemental Evaluation Sheets. Evaluate the officer's performance and assess his or her potential. Write Promotion Reccomendation (Section IV) in concise "bullet" format.

Provide an accurate, unbiased assessment free from consideration of race, sex, ethnic origin, age, religion, or marital status.

*31*

Provide the officer a copy of this report approximately 30 days prior to the board for which this report is prepared.

**EXHIBIT D**

AF FORM 709, JUN 95 *(EF-V1) (PerFORM PRO)*     PREVIOUS EDITION IS OBSOLETE.

DAN BURTON, INDIANA,
CHAIRMAN

BENJAMIN A. GILMAN, NEW YORK
CONSTANCE A. MORELLA, MARYLAND
CHRISTOPHER SHAYS, CONNECTICUT
ILEANA ROS-LEHTINEN, FLORIDA
JOHN M. McHUGH, NEW YORK
STEPHEN HORN, CALIFORNIA
JOHN L. MICA, FLORIDA
THOMAS M. DAVIS III, VIRGINIA
DAVID M. McINTOSH, INDIANA
MARK E. SOUDER, INDIANA
JOE SCARBOROUGH, FLORIDA
STEVEN C. LaTOURETTE, OHIO
MARSHALL "MARK" SANFORD, SOUTH CAROLINA
BOB BARR, GEORGIA
DAN MILLER, FLORIDA
ASA HUTCHINSON, ARKANSAS
LEE TERRY, NEBRASKA
JUDY BIGGERT, ILLINOIS
GREG WALDEN, OREGON
DOUG OSE, CALIFORNIA
PAUL RYAN, WISCONSIN
JOHN T. DOOLITTLE, CALIFORNIA
HELEN CHENOWETH, IDAHO

ONE HUNDRED SIXTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5074
MINORITY  (202) 225–5051
TTY       (202) 225–6852

HENRY A. WAXMAN, CALIFORNIA,
RANKING MINORITY MEMBER

TOM LANTOS, CALIFORNIA
ROBERT E. WISE, Jr., WEST VIRGINIA
MAJOR R. OWENS, NEW YORK
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
GARY A. CONDIT, CALIFORNIA
PATSY T. MINK, HAWAII
CAROLYN B. MALONEY, NEW YORK
ELEANOR HOLMES NORTON,
DISTRICT OF COLUMBIA
CHAKA FATTAH, PENNSYLVANIA
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
ROD R. BLAGOJEVICH, ILLINOIS
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
JIM TURNER, TEXAS
THOMAS H. ALLEN, MAINE
HAROLD E. FORD, JR., TENNESSEE

BERNARD SANDERS, VERMONT,
INDEPENDENT

SUBCOMMITTEE ON NATIONAL SECURITY, VETERANS AFFAIRS
AND INTERNATIONAL RELATIONS
Christopher Shays, Connecticut
Chairman
Room B-372 Rayburn Building
Washington, D.C. 20515
Tel: 202 225-2548
Fax: 202 225-2382
E-mail: nsvair.groc@mail.house.gov

August 24, 1999

Mr. Marc Millican
2540 Curlew
Anchorage, AK 99515

Dear Mr. Millican,

Thank you for contacting the Subcommittee on National Security, Veterans Affairs, and International Relations concerning our investigation of the Department of Defense (DoD) force-wide Anthrax Vaccine Immunization Program (AVIP).

To date, we have held four hearings on various aspects of the program. Our investigation is ongoing, and I anticipate that we will conduct additional hearings before we will be able to arrive at specific findings and recommendations. Our review should be completed later this year.

The program mandates the immunization of 2.4 million military and civilian personnel at a cost of over $130 million. Six injections are required over a period of 18 months, followed by an annual booster. The AVIP represents a daunting logistical challenge and a new concept of medical force protection against biological warfare threats.

While we have not yet arrived at firm conclusions, we have identified a number of significant issues of concern to service members and their families. No studies have been conducted on the long term health effects, if any, of the vaccine. The sole FDA-approved anthrax vaccine manufacturer has experienced serious quality control and financial problems. Moreover, there are important questions about the vaccine's effectiveness against weaponized anthrax. These concerns compel many to ask whether the threat of hostile use of anthrax justifies the use of this vaccine in a force-wide, mandatory immunization program.



EXHIBIT __E__
32

Some military personnel, at a risk to their careers, are refusing to take the shots. Others are suffering adverse health reactions. The impact of the program on retention and morale, particularly in Guard and Reserve units, is becoming troubling.

Even if we were to agree with the Department of Defense that anthrax inoculations were in fact indispensable as a force protection measure, it is becoming readily apparent to many Members of Congress that something ought to be done to make the current AVIP more efficient and effective.

Our military personnel deserve the very best. Like the weapons systems developed for success in combat, the vaccine chosen to meet the most serious biological threat should be as well-tested and as technologically advanced as possible. But the current vaccine, approved in 1970 for use by woolen mill workers, veterinarians and researchers exposed to low levels of anthrax, is difficult to administer and known to be reactogenic.

I very much appreciate your interest in the activities of the Subcommittee and your taking the time to share your concerns with us. You may be assured that whatever actions we take as a consequence of our investigation, we will act only in the best interests of our national security and out of our deep concern for the health and welfare of the fine men and women of our Armed Forces.

Sincerely,

Christopher Shays
Chairman

33
2

THE WHITE HOUSE

Office of the Press Secretary

For Immediate Release                                     September 30, 1999

EXECUTIVE ORDER *13139*

- - - - - - -

## IMPROVING HEALTH PROTECTION OF MILITARY PERSONNEL PARTICIPATING IN PARTICULAR MILITARY OPERATIONS

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 1107 of title 10, United States Code, and in order to provide the best health protection to military personnel participating in particular military operations, it is hereby ordered as follows:

Section 1. Policy. Military personnel deployed in particular military operations could potentially be exposed to a range of chemical, biological, and radiological weapons as well as diseases endemic to an area of operations. It is the policy of the United States Government to provide our military personnel with safe and effective vaccines, antidotes, and treatments that will negate or minimize the effects of these health threats.

Sec. 2. Administration of Investigational New Drugs to Members of the Armed Forces.

(a) The Secretary of Defense (Secretary) shall collect intelligence on potential health threats that might be encountered in an area of operations. The Secretary shall work together with the Secretary of Health and Human Services to ensure appropriate countermeasures are developed. When the Secretary considers an investigational new drug or a drug unapproved for its intended use (investigational drug) to represent the most appropriate countermeasure, it shall be studied through scientifically based research and development protocols to determine whether it is safe and effective for its intended use.

(b) It is the expectation that the United States Government will administer products approved for their intended use by the Food and Drug Administration (FDA). However, in the event that the Secretary considers a product to represent the most appropriate countermeasure for diseases endemic to the area of operations or to protect against possible chemical, biological, or radiological weapons, but the product has not yet been approved by the FDA for its intended use, the product may, under certain circumstances and strict controls, be administered to provide potential protection for the health and well-being of deployed military personnel in order to ensure the success of the military operation. The provisions of 21 CFR Part 312 contain the FDA requirements for investigational new drugs.

Sec. 3. Informed Consent Requirements and Waiver Provisions.

(a) Before administering an investigational drug to members of the Armed Forces, the Department of Defense (DoD) must obtain informed consent from each individual unless the Secretary can justify to the President a need for a waiver of informed consent in accordance with 10 U.S.C. 1107(f). Waivers of informed consent will be granted only when

absolutely necessary.

(b) In accordance with 10 U.S.C. 1107(f), the President may waive the informed consent requirement for the administration of an investigational drug to a member of the Armed Forces in connection with the member's participation in a particular military operation, upon a written determination by the President that obtaining consent:

>    (1)  is not feasible;

>    (2)  is contrary to the best interests of the member; or

>    (3)  is not in the interests of national security.

(c) In making a determination to waive the informed consent requirement on a ground described in subsection (b)(1) or (b)(2) of this section, the President is required by law to apply the standards and criteria set forth in the relevant FDA regulations, 21 CFR 50.23(d).  In determining a waiver based on subsection (b)(3) of this section, the President will also consider the standards and criteria of the relevant FDA regulations.

(d) The Secretary may request that the President waive the informed consent requirement with respect to the administration of an investigational drug.  The Secretary may not delegate the authority to make this waiver request.  At a minimum, the waiver request shall contain:

>    (1) A full description of the threat, including the potential for exposure.  If the threat is a chemical, biological, or radiological weapon, the waiver request shall contain an analysis of the probability the weapon will be used, the method or methods of delivery, and the likely magnitude of its affect on an exposed individual.

>    (2) Documentation that the Secretary has complied with 21 CFR 50.23(d).  This documentation shall include:

>>    (A) A statement that certifies and a written justification that documents that each of the criteria and standards set forth in 21 CFR 50.23(d) has been met; or

>>    (B) If the Secretary finds it highly impracticable to certify that the criteria and standards set forth in 21 CFR 50.23(d) have been fully met because doing so would significantly impair the Secretary's ability to carry out the particular military mission, a written justification that documents which criteria and standards have or have not been met, explains the reasons for failing to meet any of the criteria and standards, and provides additional justification why a waiver should be granted solely in the interests of national security.

>    (3) Any additional information pertinent to the Secretary's determination, including the minutes of the Institutional Review Board's (IRB) deliberations and the IRB members' voting record.

(e) The Secretary shall develop the waiver request in consultation with the FDA.

(f) The Secretary shall submit the waiver request to the President

35  4

and provide a copy to the Commissioner of the FDA (Commissioner).

(g) The Commissioner shall expeditiously review the waiver request and certify to the Assistant to the President for National Security Affairs (APNSA) and the Assistant to the President for Science and Technology (APST) whether the standards and criteria of the relevant FDA regulations have been adequately addressed and whether the investigational new drug protocol may proceed subject to a decision by the President on the informed consent waiver request. FDA shall base its decision on, and the certification shall include an analysis describing, the extent and strength of the evidence on the safety and effectiveness of the investigational new drug in relation to the medical risk that could be encountered during the military operation.

(h) The APNSA and APST will prepare a joint advisory opinion as to whether the waiver of informed consent should be granted and will forward it, along with the waiver request and the FDA certification to the President.

(i) The President will approve or deny the waiver request and will provide written notification of the decision to the Secretary and the Commissioner.

Sec. 4.   Required Action After Waiver is Issued.

(a) Following a Presidential waiver under 10 U.S.C. 1107(f), the DoD offices responsible for implementing the waiver, DoD's Office of the Inspector General, and the FDA, consistent with its regulatory role, will conduct an ongoing review and monitoring to assess adherence to the standards and criteria under 21 CFR 50.23(d) and this order. The responsible DoD offices shall also adhere to any periodic reporting requirements specified by the President at the time of the waiver approval.

The Secretary shall submit the findings to the President and provide a copy to the Commissioner.

(b) The Secretary shall, as soon as practicable, make the congressional notifications required by 10 U.S.C. 1107(f)(2)(B).

(c) The Secretary shall, as soon as practicable and consistent with classification requirements, issue a public notice in the Federal Register describing each waiver of informed consent determination and a summary of the most updated scientific information on the products used, as well as other information the President determines is appropriate.

(d) The waiver will expire at the end of 1 year (or an alternative time period not to exceed 1 year, specified by the President at the time of approval), or when the Secretary informs the President that the particular military operation creating the need for the use of the investigational drug has ended, whichever is earlier. The President may revoke the waiver based on changed circumstances or for any other reason. If the Secretary seeks to renew a waiver prior to its expiration, the Secretary must submit to the President an updated request, specifically identifying any new information available relevant to the standards and criteria under 21 CFR 50.23(d). To request to renew a waiver, the Secretary must satisfy the criteria for a waiver as described in section 3 of this order.

(e) The Secretary shall notify the President and the Commissioner if the threat countered by the investigational drug changes significantly or if significant new information on the investigational drug is received.

36

5

Sec. 5. Training for Military Personnel.  (a) The DoD shall provide ongoing training and health risk communication on the requirements of using an investigational drug in support of a military operation to all military personnel, including those in leadership positions, during chemical and biological warfare defense training and other training, as appropriate.  This ongoing training and health risk communication shall include general information about 10 U.S.C. 1107 and 21 CFR 50.23(d).

(b) If the President grants a waiver under 10 U.S.C. 1107(f), the DoD shall provide training to all military personnel conducting the waiver protocol and health risk communication to all military personnel receiving the specific investigational drug to be administered prior to its use.

(c) The Secretary shall submit the training and health risk communication plans as part of the investigational new drug protocol submission to the FDA and the reviewing IRB.  Training and health risk communication shall include at a minimum:

> (1) The basis for any determination by the President that informed consent is not or may not be feasible;

> (2) The means for tracking use and adverse effects of the investigational drug;

> (3) The benefits and risks of using the investigational drug; and

> (4) A statement that the investigational drug is not approved (or not approved for the intended use).

(d) The DoD shall keep operational commanders informed of the overall requirements of successful protocol execution and their role, with the support of medical personnel, in ensuring successful execution of the protocol.

Sec. 6. Scope.  (a) This order applies to the consideration and Presidential approval of a waiver of informed consent under 10 U.S.C. 1107 and does not apply to other FDA regulations.

(b) This order is intended only to improve the internal management of the Federal Government.  Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

WILLIAM J. CLINTON

THE WHITE HOUSE,
September 30, 1999.

# # #

37

6

2b District, Washington

COMMITTEE ON TRANSPORTATION
AND INFRASTRUCTURE
SUBCOMMITTEES:
AVIATION
GROUND TRANSPORTATION

COMMITTEE ON SCIENCE
SUBCOMMITTEE:
ENERGY AND ENVIRONMENT

# Congress of the United States
## House of Representatives
### Washington, DC 20515-4702

SUBCOMMITTEES:
HOUSING
FINANCIAL INSTITUTIONS
DOMESTIC AND INTERNATIONAL
MONETARY POLICY

CHAIR, REPUBLICAN HOUSING
OPPORTUNITY CAUCUS

REPUBLICAN POLICY COMMITTEE

The Honorable William S. Cohen                              May 16, 2000
Secretary of Defense
The Pentagon
Washington, DC 20301-1010

Dear Secretary Cohen:

We are writing to ask for an immediate halt to the Department of Defense (DOD) Anthrax

Vaccination Immunization Program (AVIP). The following developments in recent months

confirm our concerns regarding this program and its impact on the health and morale of our

military service members.

- The Institute of Medicine Committee On Health Effects Associated With Exposures
  During The Gulf War, in response to a DOD request, provided a letter report entitled "An
  Assessment of the Safety of the Anthrax Vaccine" on March 30, 2000. In its summary the
  committee stated:

  > There is a paucity of published peer-reviewed literature on the safety of the
  > anthrax vaccine. The committee located only one randomized peer-reviewed
  > study of the type of anthrax vaccine used in the United States (Brachman et al.,
  > 1962). However, the formulation of the vaccine used in that study differs from
  > the vaccine currently in use . . . The committee concludes that in the peer-
  > reviewed literature there is inadequate/insufficient evidence to determine whether
  > an association does or does not exist between anthrax vaccination and long-
  > term adverse health outcomes.

- An internal legal memorandum written in March by two Air Force Reserve judge
  advocates addressed the following crucial question: *Are orders currently being given to
  members of the U.S. Armed Forces to submit to anthrax vaccinations consistent with
  federal law?* In summary, the response stated:

  > Orders currently being given to members of the United States Armed Forces to
  > submit to anthrax vaccinations are illegal because they contradict the express

WASHINGTON OFFICE:
1510 LONGWORTH HOB
WASHINGTON, DC 20515
(202) 225-2605

EVERETT OFFICE:
2930 WETMORE AVENUE, #9E
EVERETT, WA 98201
(425) 252-3188
(800) 562-1385

PRINTED ON RECYCLED PAPER

BELLINGHAM OFFICE:
322 NO. COMMERCIAL, #203
BELLINGHAM, WA 98225
(360) 733-4500


738

*Page Two - The Honorable William S. Cohen - May 16, 2000*

terms of Presidential Executive Order 13139 and 10 U.S.C. Section 1107 (1999). Because the anthrax vaccine is being used in a manner inconsistent with both its original licensing and for a purpose for which it has never been tested, the vaccine is properly considered an Investigational New Drug under Food and Drug Administration ("FDA") regulations and federal court decisions. Both the Executive Order and the statute mandate that informed consent is a prerequisite to all vaccinations with an Investigational New Drug. It is undisputed that service members are not giving their informed consent to the vaccination process.

- On March 22, 2000 the Inspector General, Department of Defense issued an "Audit Report on Contracting for Anthrax Vaccine (Report No. D-2000-105). It documents troubling financial management practices and multiple deficiencies cited by FDA that continue to compromise the program.

- The House Subcommittee on National Security, Veterans Affairs, and International Relations issued an oversight report on February 17, 2000 entitled, "The Department of Defense Anthrax Vaccine Immunization Program: Unproven Force Protection." The report was approved and adopted by the full Committee on Government Reform. After a thorough review of current relevant scientific data and compelling testimonies, the Subcommittee made the following recommendations in brief:

> (1) The force-wide, mandatory AVIP should be suspended until DOD obtains approval for use of an improved vaccine. To accomplish this:  (2) DOD should accelerate research and testing on a second-generation, recombinant anthrax vaccine; and,  (3) DOD should pursue testing of the safety and efficacy of a shorter anthrax inoculation regimen; and,  (4) DOD should enroll all anthrax vaccine recipients in a comprehensive clinical evaluation and treatment program for long term study.

In addition, the Subcommittee also recommended:

> (5) While an improved vaccine is being developed, use of the current anthrax vaccine for force protection against biological warfare should be considered experimental and undertaken only pursuant to FDA regulations governing investigational testing for a new indication.

(It is important to note that this recommendation concurs with the Senate Report 103-97, prepared for Senator John D. Rockefeller and the Senate Committee on Veterans' Affairs in 1994. After a review of the scientific data it concluded, "The vaccine should

8 39

therefore be considered investigational when used as a protection against biological warfare.")

- The American Public Health Association Governing Council adopted a policy statement November 10, 1999 urging the DOD to "delay any further immunization against anthrax using the current vaccine or at least to make immunization voluntary." They also called on the DOD to create a commission of military and non-military public health experts ". . . to review the evidence for effectiveness and safety of the current vaccine and the time at which an improved vaccine may be available, and to make recommendations about the continuation of the current immunization program."

- The General Accounting Office (GAO) presented testimony on October 12, 1999 before the House Committee On Government Reform on Anthrax vaccine safety and efficacy issues. The report summary includes the following statements:

    (a) No studies have been done to determine the optimum number of doses of the anthrax vaccine. (b) The long-term safety of the licensed vaccine has not been studied. (c) Since DOD's mandatory inoculation program began in 1998, DOD has conducted two efforts to actively collect data on the short-term safety of the vaccine ... According to the data gathered in both efforts, a higher proportion of females reported reactions to the anthrax vaccine than did their male counterparts. (d) There has been no specific study of the efficacy of the licensed vaccine in humans. Rather, its efficacy in humans has been inferred from other data... (e) Until 1993, FDA inspectors did not inspect the MDPH facility where the anthrax vaccine was made. According to FDA, access was not granted because its inspectors had not been vaccinated against anthrax. DOD conducted inspections, however, and identified deficiencies during a March 1992 inspection, including the absence of stability studies...FDA's subsequent inspections of the production facility in 1997 and 1998 found a number of deficiencies...The facility received warning letters from FDA, including one in March 1997 stating its intent to revoke the facility's license.

- Anecdotal evidence continues to grow of severe, adverse systemic reactions in recipients of the vaccine as demonstrated by congressional testimonies and other sources.

It is clear the AVIP program, while well-intended, is a flawed policy that should be immediately stopped and re-examined in light of the growing preponderance of evidence challenging the DOD's position. We ask that you take immediate action to suspend the AVIP until DOD complies with the recommendations of the Subcommittee on National Security, Veterans Affairs, and International Relations, House Committee on Government Reform as contained in its February 17, 2000 report.

Sincerely,


Jack Metcalf
_____
Jack Metcalf


Bob Filner
_____
Bob Filner


Dan Burton
_____
Dan Burton


_____
Nick Rahall


_____
Cynthia McKinney


Christopher Shays
_____
Christopher Shays


Ben Gilman
_____
Ben Gilman


Peter DeFazio
_____
Peter DeFazio


George Nethercutt
_____
George Nethercutt


Ron Paul
_____
Ron Paul

10
41



Dana Rohrbacher

Maurice Hinchey

James Oberstar

Jim Kolbe

Bob Barr

Tammy Baldwin

Bernard Sanders

John Hostettler

Tom Campbell

Martin Frost

James Traficant

Rick Hill

Donald Manzullo

Nancy Johnson

Richard Baker

Lincoln Diaz-Balart

42

Mark Souder



John Conyers,

Helen Chenoweth-Hage

Donna Christensen

Charles Taylor

Ron Klink

Robert E. "Bud" Cramer, Jr.

Christopher H. Smith

Bud Shuster

43

newslings The Air Force

# Lawmaker seeks probe of possible retaliation

## Letter cites cases of airmen who testified about anthrax shots

### By David Castellon
TIMES STAFF WRITER

Congressman Dan Burton is using his political clout to aid an Air Force pilot who could face up to two years in prison for refusing his anthrax vaccination.

In a Dec. 28 letter, Burton, R-Ind., and chairman of the House Government Reform Committee, asks Defense Secretary William Cohen to grant Maj. Sonnie Bates' offer to resign his commission rather than face a possible court-martial for refusing a direct order.

Burton also asks Cohen to investigate the treatment of Bates and other service members who have testified before Congress about their concerns over the vaccine's safety.

"It appears that individuals within these witness' command, particularly at Dover Air Force Base (Del), may have behaved in a retaliatory fashion," the letter states. "Members of the military were assured that they would be protected from retaliation as a result of their bravery for testifying before a congressional committee."

Bates, a C-5 pilot with Dover's 9th Airlift Squadron, is the only person Burton cites as an alleged victim of retaliation. He says that after Bates' testimony Oct. 12, the pilot was ordered to begin his anthrax vaccinations "sooner than other individuals who arrived at Dover at the same time, even prior to those who had been there longer."

"It's not just Sonnie," said a Reform Committee staff member who asked not to be named. "There are things that have happened to other witnesses that cause us concern. There were witnesses who have had reassignments below the level of (duties) they were handling."

The staffer would not give other examples and Burton was unavailable for comment.

Bates, who had a Jan. 7 deadline to accept an Article 15 or face a possible court-martial, declined to comment on Burton's letter, as did a Dover spokesman.

Pentagon and Air Force officials also declined comment.

Over the past year, 17 military members — 14 of them from the Air Force or its reserve branches — testified before Congress criticizing the shots' safety, the treatment of service members who have suffered ill effects and how the mandatory vaccinations affect morale.

The committee staffer said Bates was invited to testify to discuss his research on the vaccine's safety and his discussions with Dover personnel who had begun the shot regimen.

"I have found that 12 people, in my squadron alone, have unusual or disabling illnesses that did not exist prior to the an-

thrax vaccine, and the causes are unknown," according to a written statement turned in with his testimony. "Medically diagnosed conditions of thyroid damage, liver damage, external and internal cysts (including cysts around the heart), autoimmune disorders, crippling bone/joint pain, seizures, memory loss, vertigo and inability to concentrate have been documented."

Maj. Frank Smolinsky, a Dover spokesman, said in a November interview that a review by the Mayo Clinic in Minnesota of 80 people at Dover reporting medical problems after beginning the vaccinations concluded that the symptoms "appear to be explained by pre-existing illnesses, current illnesses, other concomitant illnesses and stressors or known side effects to the anthrax vaccine."

Another Dover airman, who spoke on condition of anonymity, said he has experienced no repercussions from testifying.

> ### 'I've been called a boldfaced liar.'
> TECH. SGT. DAVID J. CHURCHILL

But Tech. Sgt. David J. Churchill, a member of the Air National Guard's 110th Fighter Wing at W.K. Kellogg Airport, Mich., said that since testifying, "I'm being watched very carefully."

Churchill, who also is a full-time technician working as a base supply specialist, said he has been restricted to his work area.

"I can't leave the building or anything. I stay in my work area. I can't talk to other people."

He said his public comments about the vaccinations also affected his relationship with fellow guardsmen.

"I've been called a boldfaced liar about the base," he said, while others complained he "was bringing bad publicity on the base."

Churchill said he has suffered severe allergic reactions to the shot including blood blisters in his mouth and had to be taken to an emergency room shortly after his fifth shot.

"My blood pressure was sky high. I thought I was having a heart attack," he said.

He said civilian physicians told him his symptoms appear to be severe allergic reactions to the anthrax vaccine, but said he has been told he must get his sixth shot.

He said he is fed up and told his commanders Jan. 4 that he is quitting his technician job.

In a written statement, 110th officials denied those claims, saying that Churchill was advised in August that he could not conduct activities "contrary or detrimental to the current DOD anthrax vaccination program" on the base, but no restrictions were placed on him.

Wing officials said they were unaware of Churchill's claims of coworker harassment and will take action to make Churchill's work environment "less uncomfortable."

Churchill said he hopes to get an Individual Mobilization Augmentee position in an active-duty unit that will not require him to continue the shots before he has 20 years of service. ▢



"Serv

is a resp

don't t

**Service.** A w
about it from our
know what it m
USAA was four
by military perso
serve our memi
and services tl
to banking to i
unique package
you through a
member servi
highest by a wid
members thems
or officers, on
Guard or Reser
a word. It's a wo

**Call us**


We kno

USAA   INSURANCE · 1


LENDER

USAA Federal Savings Bank  a
offer banking and credit card p
Investment Management Com
Company, Property and casua
provided by United Services Au
General Indemnity Company, U

44


EXHIBIT

F



**DEPARTMENT OF THE AIR FORCE**
Air Force Reserve Command (AFRC)

26 JUL 99

MEMORANDUM FOR MAJOR MARC MILLICAN

FROM: 312 AS/CC
511 Waldron Street
Travis AFB CA 94535-2154

SUBJECT: AF 1288

Per my E-mail to you this date, please sign the enclosed AF 1288 and return it in the envelope provided. At your option, you alternatively may sign the enclosed AF 131, which will then be processed at the appropriate time. As you may know, those who have not started the Anthrax regimen are no longer eligible to perform UTAs. As such, if I have not received either your signed AF 1288 or AF 131 by 20AUG99 the remaining UTA periods this fiscal year will be considered unexcused. Such absences could jeopardize 1999 from being recorded as a "good" year for retirement purposes.

FRANK J. PADILLA, Lt Col, USAFR
Commander

cc: 349 OG/CC
312 AS/DO
312 AS/DOP

EXHIBIT _G_

45



# DEPARTMENT OF THE AIR FORCE
Air Force Reserve Command (AFRC)

15 NOV 99

MEMORANDUM FOR MAJOR MARC MILLICAN

FROM: 312 AS/CC
511 Waldron Street
Travis AFB CA 94535-2154

SUBJECT: Notification of Initiation of Involuntary Reassignment to the Standby Reserve

1. I am recommending you for involuntary reassignment to the Standby Reserve (ARPC) in accordance with AFI 36-2115, *Assignments Within the Reserve Components*, paragraph 4.2, and Table 5.1, Rule 39. AFI 36-2115 is available for your review at your servicing Military Personnel Flight. The specific reason for this recommendation is based on your unsatisfactory Reserve duty participation in CY 1999. Specifically, the following Unit Training Assembly (UTA) dates were recorded as unexcused: 21/22 AUG 99, 25/26 SEP 99, 16/17 OCT 99, and 13/14 NOV 99. Since you failed to respond to my 26 JUL 99 memorandum to you, in which I requested that you return either a AF 1288 or AF 131 (both of which had been enclosed), your career intentions were not known and all subsequent UTA periods were deemed unexcused. A copy of the 26 JUL 99 memorandum is enclosed (without attachments) as Atch 1.

2. If approved, this action will result in your involuntary reassignment to the Standby Reserve and may impact your ability to obtain future assignments. In the interim, you are denied from taking part in pay or point gaining activities, i.e. UTAs, annual tour, man days, etc., pending the approval authority's decision.

3. Within 24 hours after you receive this memorandum, you must complete and return the attached acknowledgment of receipt (Atch 2). You are entitled to submit statements or/ documents which you desire to be considered in the disposition of your case. These statements or documents must be submitted to this office within 15 calendar days after you receive this memorandum. A return envelope (Atch 3) is provided for your convenience.

4. You should note that failure to acknowledge receipt of this memorandum or failure to submit statements or documents within 15 calendar days after receipt of this memorandum constitutes a waiver of your right to rebut this proposed involuntary reassignment and will result in your case being processed based on the information available.

FRANK J. PADILLA, Lt Col, USAFR
Commander

Attachments:
1. Memorandum dated 26 JUL 99 from 312 AS/CC to Major M. Millican
2. Acknowledgement of Receipt
3. Return envelope

C/6

EXHIBIT H



MEMORANDUM FOR 312 AS/CC

FROM:   Major M. Millican
        2540 Curlew Cir
        Anchorage AK 99515

1. I hereby acknowledge receipt of and understanding of your memorandum dated 15NOV99 notifying me that an action has been initiated for my involuntary reassignment. I understand that if I do not respond within 15 calendar days after receipt of notification of initiation of involuntary reassignment action, involuntary reassignment action will continue on the basis of the available information.

2. I do / do not desire to submit rebuttal statements or documents for consideration. Rebuttal statements are / are not attached.

                                        MARC J. MILLICAN, Major, USAFR

47

 TAB I



**DEPARTMENT OF THE AIR FORCE**
Air Force Reserve Command (AFRC)

19 DEC 99

MEMORANDUM FOR  349 OG/CC
                349 AMW/JA
                349 MAA/DPMSA
                349 AMW/CC
                IN TURN

FROM:  312 AS/CC
       511 Waldron Street
       Travis AFB CA  94535-2154

SUBJECT:  Request for Involuntary Reassignment to ARPC – Marc J. Millican/Major/SSN 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

1. I request that Major Marc J. Millican be involuntarily reassigned to ARPC for failure to meet military conduct standards. The authority for my recommendation is AFI 36-2115, *Assignments Within the Reserve Components*, paragraph 4.2, and Table 5.1, Rule 39. The specific reason for the proposed reassignment action is contained in Attachment 1, the memorandum of notification to the member (dated 15 NOV 99). As of the date of this memorandum, no response has been received from Major Millican and the written notification to him of this action was returned unclaimed.

2. Military personnel information:

   a. Date of Commission:  22 JUN 79

   b. Unit and PAS Code of assignment:  312 AS / T81LFLPG

   c. Date assigned:  14 DEC 94

   d. Current grade and effective date:  Major / 22 JUN 93
      Note: Member is a LtCol Selectee, with an anticipated promotion date of 22 JUN 00.

   e. Demotions (if any), reasons, and dates:  None

   f. Record of Disciplinary Actions:  None

   g. No OPR rendered during the time the infractions occurred (last OPR completed on 13 JUL 98 and subsequent OPR for 1999 not accomplished due to member's absence). All previous OPRs indicates member meets standards.

   h. Derogatory data:  None

   i. Has discharge been considered/requested:  N/A

48

j.   ART status:  N/A

k.   Has retraining/return to secondary/tertiary AFSC been considered?  N/A

FRANK J. PADILLA, Lt Col. USAFR
Commander

Attachments:
1.   Memorandum dated 15 NOV 99 from 312 AS/CC to Major M. Millican
2.   Memorandum dated 26 JUL 99 from 312 AS/CC to Major M. Millican
3.   Certified mail receipt (from attachment 1)



# DEPARTMENT OF THE AIR FORCE
AIR FORCE RESERVE COMMAND

19 DEC 99

MEMORANDUM FOR MAJOR MARC MILLICAN

FROM:  312 AS/CC
      511 Waldron Street
      Travis AFB  CA  94535-2154

SUBJECT:  Letter Of Reprimand

1.  It has come to my attention that you have engaged in acts of a nature to cause discontent and undermine military discipline within this squadron.  Specifically, after the members of this squadron were notified of the requirement to undergo the anthrax immunization series, you sought out and spoke with members of this squadron advocating that they refuse to undergo the anthrax protocol.  Further, you actively encouraged other pilots to persuade additional members of your peer group (e.g. the pilot section) to defy official Air Force policy and refuse to undergo the anthrax immunization series.  In furtherance of your apparent intent to raise discontent and disloyalty, you sent electronic mail to members of this squadron advising them that I do not care about them and encouraging them to disregard my advice and directives.  On 2 September 1999, when I spoke with you by telephone regarding the anthrax immunization, you were also disrespectful to me in stating that I was not considering the best interest of the members of the squadron.  During this same conversation, you also issued an implied threat against me by stating, "you better protect yourself."  Finally, you attempted to persuade members of this unit to refrain from flying missions for the 301 AS, even though I had specifically requested such assistance be rendered due to their impacted manning levels.  Your actions appear designed to disrupt the effectiveness of not just this squadron, but the Wing as a whole.  For these actions, you are hereby reprimanded.

2.  As a C-5 pilot and an officer in this wing, I expect you to exhibit the judgment and professionalism attendant with your responsibilities.  I view your actions in encouraging discontent within the unit as a very serious breach in judgment and leadership.  You have greatly compromised your integrity by these actions, and have called into question your abilities and leadership as an officer in the United States Air Force.

3.  I intend to place this Letter of Reprimand in an Unfavorable Information File.

4.  Privacy Act Statement:  AUTHORITY: 10 U.S.C. 8013.  Purpose: To obtain any comments or documents you desire to submit (on a voluntary basis) for consideration concerning this action.  ROUTINE USES:  Provides you an opportunity to submit comments, or documents for



EXHIBIT ___

consideration. If provided, the comments and documents you submit become a part of the action. DISCLOSURE: Your written acknowledgement of receipt and signature are mandatory. Any other comment or document you provide is voluntary.

5. You are directed to acknowledge receipt of this Letter of Reprimand by signing below and returning the document to me in the enclosed envelope. If you desire, you may respond to this action in writing no later than (30) days from this date. Any written response will be considered by me and attached to this Letter of Reprimand. An additional copy has been provided for your records.

FRANK J. PADILLA, Lt Col, USAFR
Commander

<u>LTR MAILED CERTIFIED RETURN RECEIPT REQUESTED</u>

cc:  349 OG/CC
     312 AS/DO
     312 AS/DOP

1st Ind, Maj Millican

MEMORANDUM FOR 312 AS/CC

1.  I acknowledge receipt of this LOR, dated 19 DEC 99.

2..  I do/do not intend to submit matters for you to consider in evaluating this matter.

MARC MILLICAN, Maj, USAFR

5 1



# DEPARTMENT OF THE AIR FORCE
## AIR FORCE RESERVE COMMAND

1 Jun 99

MEMORANDUM FOR MAJ MILLICAN MARC J 004524134

FROM: 349 MSS/DPM

SUBJECT: Implementation of Stop-Loss

1. The President of the United States has the authority (under 10 USC 673C) to suspend certain laws pertaining to the availability of military members, including reservists, during a contingency. This action, commonly known as Stop-Loss, has been implemented. The result is to stop the voluntary separation, retirement, or transfer to a pool of lesser availability for affected members for the duration of the order.

2. You fall under the provisions of Stop-Loss. This means that, if enlisted, you will not separate at the end of your enlistment. Neither airmen or officers may apply for separation, retirement (except mandatory retirement), or transfer to a pool of lesser availability until the President revokes the order. You will be notified when this occurs.

3. This is not a call to Active Duty. This document is intended to advise you that you have been identified as essential to national security. If you are identified for recall, you will be notified of your selection and be provided reporting instructions. If and when you may be recalled cannot be predicted. You should prepare for the possibility of recall by arranging for child/family care, legal and financial matters, and uniform requirements.

4. If you had a loss pending at the time Stop-Loss was imposed, a new effective date has been generated in the Personnel Data System. The revised effective date is for administrative purposes and you should not use it in your personal plans at this time. The date may be adjusted forward or back as the current world situation becomes more clear. You will be advised when any change does occur. The Stop-Loss actions temporarily reflected in your record are:

**Affected by Stop-Loss and Ineligible for Retirement/Discharge/Transfer until released.**

CHRISTOPHER C. STEVENS, Lt Col, USAFR
Director, Military Personnel

1st Ind. MAJ MILLICAN MARC J & 312 AS/CC

MEMORANDUM FOR 349 MSS/DPM

Acknowledge Receipt

_____
Member's Signature & Date

_____
Unit Commander's Signature & Date





**DEPARTMENT OF THE AIR FORCE**
Air Force Reserve Command (AFRC)

13 MAR 00

MEMORANDUM FOR MAJOR MARC J. MILLICAN
2540 Curlew Circle
Anchorage AK 99515-1353

FROM:    312 AS/CC
511 Waldron Street
Travis AFB CA 94535-2154

SUBJECT:    Referral Officer Performance Report

1.  In accordance with AFI 36-2402, *Officer Evaluation* System, para. 3.7, I am referring the attached Officer performance Report (OPR) to you. The OPR contains comments and ratings which make the report a referral as defined in the AFI. Specifically, the OPR references your actions in the latter half of CY1999 and early CY2000 to foment discord within this unit and undermine the credibility of squadron leadership, as well as your failure to respond to official communications.

2.  Comment on the report by endorsement to this memo and sign in reproducible ink. Send the report and your endorsement to reach Lt Col J. Brunz not later than 30 calendar days from the date you receive this letter. A return envelope has been enclosed for this purpose. If you need additional time, request an extension from the individual named above. You may submit attachments (limited to ten pages), but they must directly relate to the reason the report was referred. Pertinent attachments will remain attached to the report filed in the personnel record. Your endorsement and any attachment you include may not contain any reflection on the character, conduct, integrity, or motives of the evaluator unless you fully substantiate and document the remarks. Contact the MPF career enhancement section (349 MSS/DPMSCE @ 707/424-1663) if you require any assistance in preparing your reply to the referral report.

3.  If you believe this report is inaccurate, unjust, or unfairly prejudicial to your career, you may apply for a review of the report under AFI 36-2401, *Correction of Airman and Officer Evaluation Reports*. once the report becomes a matter of record as defined in AFI 36-2402, attachment 1.

FRANK J. PADILLA, Col (Select), USAFR
Commander

LTR MAILED CERTIFIED RETURN RECEIPT REQUESTED



## FIELD GRADE OFFICER PERFORMANCE REPORT

**0 5 JUN 2000**

### I. RATEE IDENTIFICATION DATA *(Read AFI 36-2402 carefully before filling in any item)*

| 1. NAME *(Last, First, Middle Initial)* | 2. SSN | 3. GRADE | 4. DAFSC |
|---|---|---|---|
| MILLICAN, MARC J. | 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 | MAJ non-EAD | 11A2A |

| 5. PERIOD OF REPORT | | 6. NO. DAYS SUPERVISION | 7. REASON FOR REPORT |
|---|---|---|---|
| From: 14 Jul 1998 | Thru: 29 Feb 2000 | 180 | Directed by Commander |

| 8. ORGANIZATION, COMMAND, LOCATION | 9. PAS CODE |
|---|---|
| 312th Airlift Squadron (AMC), Travis AFB CA | T81LFLPG |

### II. UNIT MISSION DESCRIPTION

The mission of the 312th Airlift Squadron is to train and provide qualified C-5 aircrews to fly worldwide airlift missions and augment the active duty forces under various readiness conditions up to and including full mobilization.

### III. JOB DESCRIPTION

**1. DUTY TITLE:**

AIRCRAFT COMMANDER C-5

**2. KEY DUTIES, TASKS, AND RESPONSIBILITIES:** Responsible for safe and timely movement of the largest aircraft in the Air Force, valued at over 100 million dollars. Supervises flight crews of up to 22 people and is directly responsible for the safety of up to 73 passengers. Has personal responsibility for the management of strategic airlift missions to include: contingency operations, Joint Army-Air Force Training exercises, NATO operations and Special Assignment Airlift Missions. Ensures strict compliance with Air Force, AMC and international flight procedures.

### IV. IMPACT ON MISSION ACCOMPLISHMENT

- Volunteered to fly several critical airlift missions, supporting Air Force mobility objectives worldwide
- Noted for above average airmanship and aircraft systems knowledge during local training sortie
- Accumulated more than 5833 accident-free flying hours, contributing to unit safety record
- Successfully completed recurring instrument qualification checkride, resulting in passing rating
- Superior effort resulted in flawless completion of written examinations of aircraft systems and procedures
- Selected by squadron management to fly with less experienced crewmembers on sensitive missions
- Paved the way as one of the first pilots to transition to C-5 Flight Management System modified aircraft
- Negatively impacted Wing readiness by dissuading unit members from augmenting sister squadron
- Lack of participation adversely affected combat readiness and mission effectiveness of the squadron

### V. PERFORMANCE FACTORS

| | DOES NOT MEET STANDARDS | MEETS STANDARDS |
|---|:---:|:---:|
| **1. Job Knowledge** <br> Has knowledge required to perform duties effectively. <br> Strives to improve knowledge. <br> Applies knowledge to handle nonroutine situations. | ☐ | ☒ |
| **2. Leadership Skills** <br> Sets and enforces standards. Motivates subordinates. Works well with others. Fosters teamwork. Displays initiative. Self-confident. Has respect and confidence of subordinates. Fair and consistent in evaluation of subordinates. | ☒ | ☐ |
| **3. Professional Qualities** <br> Exhibits loyalty, discipline, dedication, integrity, honesty, and officership. Adheres to Air Force standards. Accepts personal responsibility. Is fair and objective. | ☒ | ☐ |
| **4. Organizational Skills** <br> Plans, coordinates, schedules, and uses resources effectively. Schedules work for self and others equitably and effectively. Anticipates and solves problems. Meets suspenses. | ☐ | ☒ |
| **5. Judgement and Decisions** <br> Makes timely and accurate decisions. Emphasizes logic in decision making. Retains composure in stressful situations. Recognizes opportunities and acts to take advantage of them. | ☒ | ☐ |
| **6. Communication Skills** <br> Listens, speaks, and writes effectively. | ☐ | ☒ |

AF FORM 707A, 19991201 *(EF -V1)*     PREVIOUS EDITION IS OBSOLETE.

54

**VI. RATER OVERALL ASSESSMENT**
- Acted as Aircraft Commander for several strategic airlift missions in support of Air Mobility Command
- Served for a period as Flight Commander for 10 junior pilots, providing mentoring and career guidance
- Capable officer; maintains standards for uniform/personal appearance and technical expertise
- While active in unit, maintained required flight and ground currency items, enhancing combat readiness
- Displayed questionable judgement during initial phases of the Anthrax Immunization program
  -- Inappropriately used leadership position in an attempt to influence other unit members to resist program
  -- Actively sought to foment discord and attempted to instill a culture of distrust for squadron leadership
- Displayed lack of military discipline by failing to respond to official correspondence from unit commander
  -- Repeatedly failed to provide unit with duty intentions resulting in repeated unexcused absences

Last performance feedback was accomplished on: _____ *(consistent with the direction in AFI 36-2402.)*
*(If not accomplished, state the reason)*

Verbal performance feedback was given but not documented.

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| JERALD L. BRUNZ, Lt Col, USAFR | Flight Examiner Pilot C-5 | 10 Mar 2000 |
| 312th Airlift Squadron (AMC) | SSN | SIGNATURE *Jerald L Brunz* |
| Travis AFB  CA | | |

**VII. ADDITIONAL RATER OVERALL ASSESSMENT**    ☒ CONCUR    ☐ NONCONCUR
- Flying skills and general airmanship are admirable; an accomplished aviator
- Questionable decision making ability; negatively impacted squadron and wing mission accomplishment
- Rebuffed numerous informal and official attempts by squadron senior leadership to ameliorate situation
- Poor officership; demonstrated lack of integrity allowed personal feelings to cloud professional judgement
- Comments from the ratee were requested but not received within the time period

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| FRANK J. PADILLA, Lt Col, USAFR | Commander | 19 Apr 2000 |
| 312th Airlift Squadron (AMC) | SSN | SIGNATURE |
| Travis AFB  CA | | |

**VIII. REVIEWER**    ☒ CONCUR    ☐ NONCONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| GERALD A. BLACK, Brig Gen, USAFR | Commander | 19 May 2000 |
| 349th Air Mobility Wing (AMC) | SSN | SIGNATURE |
| Travis AFB  CA | | |

**Instructions**

**All:** Recommendations must be based on performance and the potential based on that performance. Promotion recommendations are prohibited. Do not comment on completion of or enrollment in PME, advanced education, previous or anticipated promotion recommendations on AF Form 709, OER indorsement levels, family activities, marital status, race, sex, ethnic origin, age, or religion.

**Rater:** Focus your evaluation in Section IV on what the officer did, how well he or she did it and how the officer contributed to mission accomplishment. Write in concise "bullet" format. Your comments in Section VI may include recommendations for augmentation or assignment.

**Additional Rater:** Carefully review the rater's evaluation to ensure it is accurate, unbiased and uninflated. If you disagree, you may ask the rater to review his or her evaluation. You may not direct a change in the evaluation. If you still disagree with the rater, mark "NON-CONCUR" and explain. You may include recommendations for augmentation or assignment.

**Reviewer:** Carefully review the rater's and additional rater's ratings and comments. If their evaluations are accurate, unbiased and uninflated, mark the form "CONCUR" and sign the form. If you disagree with previous evaluators, you may ask them to review their evaluations. You may not direct them to change their appraisals. If you still disagree with the additional rater, mark "NONCONCUR" and explain in Section VIII. Do not use "NONCONCUR" simply to provide comments on the report.

| IX. ACQUISITION EXAMINER/AIR FORCE ADVISOR *(Indicate applicable review by marking the appropriate box(es).)* | | ACQUISITION EXAMINER *(If applicable)* | AIR FORCE ADVISOR *(If applicable)* |
|---|---|---|---|
| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | SIGNATURE | | DATE |
| | | | 55 |

AF FORM 707A, 19991201 *(REVERSE) (EF-V1)*



**DEPARTMENT OF THE AIR FORCE**
Air Force Reserve Command

13 Mar 00

MEMORANDUM FOR MAJOR MARC J. MILLICAN

FROM:   349 AMW/CC
        520 Waldron Street
        Travis AFB  CA  94535-2100

SUBJECT:    Intent To Remove From Recommended Promotion List

1.  In accordance with AFI 36-2504, *Officer Promotion, Continuation And Selective Early Removal · In The Reserve Of The Air Force*, I am recommending removal of your name from the FY 2000 Lieutenant Colonel promotion list.

2.  The specific reason for this action is your inappropriate actions during the latter half of CY1999 to foment discord within the 312 AS and to purposefully undermine the credibility of squadron leadership.  You have also attempted to disrupt the orderly operation of this unit and Wing by encouraging other unit members to disregard my directives.  Further, during this same period, as well as into early CY2000, you have demonstrated a total lack of regard for Air Force policies and procedures by failing to acknowledge no less than three official written communications requiring your response.  A Letter of Reprimand dated 19 Dec 99 covering much of this same behavior is attached.  Such actions are inconsistent with the standard of conduct and professionalism expected of a senior field grade officer.

3.  As a result, your promotion is delayed until the Secretary of the Air Force makes a decision on this recommendation.  You are not to assume the higher grade even if your name appears on a promotion order.  You may submit a statement on your behalf and include any supporting documentation you deem appropriate.  Acknowledge receipt and understanding of this notification and return the notification, with your statement and supporting documents, if any, to me no later than 20 calendar days from the date of this letter.

GERALD A. BLACK, Brig Gen (Select), USAFR
Commander

Attachments:
1.  LOR dated 19 Dec 99
2.  Return envelope

cc:  349 OG/CC (no attachments)
     312 AS/DO (no attachments)



DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR RESERVE PERSONNEL CENTER
6760 E IRVINGTON PL #2000
DENVER, CO 80280-2000

RESERVE ORDERS                                    12 MAY 00
BA-1541

MAJ MILLICAN MARC J                               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
2540 CURLEW CIR
ANCHORAGE AK  99515

BY ORDER OF THE SECRETARY OF THE AIR FORCE AND DIRECTION OF
THE PRESIDENT, YOU ARE PROMOTED AS A RESERVE OF THE AIR FORCE
TO THE GRADE SHOWN BELOW, PER 10 USC CHAPTER 1405.
YOUR PROMOTION WILL BE VOID IF YOU ARE DISCHARGED, OR
TRANSFERRED TO ISLRS OR RETIRED RESERVE PRIOR TO THE
EFFECTIVE DATE OF PROMOTION.

COMPONENT:  AFRES          PAS:      TB1LFLPG

GRADE:    LT COLONEL

EFFECTIVE DATE: 22 JUN 00

DATE OF RANK: 22 JUN 00

AUTHORITY:  AFI 36-2504    SECTION:    B

REMARKS:

FOR THE COMMANDER

OFFICIAL

LINDA A. MARTIN, COLONEL, USAF
CHIEF, RESERVE OF THE AIR FORCE, SELECTION BOARD SECRETATIAT

                    1 - 349 MSS/DPMPE
                        520 WALDRON ST
                        TRAVIS AFB CA  94535-2156

                                        RO BA-1541


EXHIBIT _____
57
M



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS UNITED STATES AIR FORCE
WASHINGTON, DC

HQ USAF/RE                                                          25 May, 2000
1150 AIR FORCE PENTAGON
WASHINGTON DC 20330-1150

MAJ MARC J MILLICAN
2540 CURLEW CIR
ANCHORAGE AK 995151

Dear Major Millican

Congratulations on your selection for promotion! You have achieved this goal through outstanding performance, hard work, and dedication.

Your promotion elevates you to the level where we begin to look hard at potential future senior leaders in the Air Force Reserve. We have processes and tools to identify those future leaders. One of the criteria I want to place particular emphasis on is the accomplishment of Professional Military Education (PME) in-residence.

We, as an Air Force, have reached the final stages of our decades long evolution to a truly seamless Total Force. A prime objective is to seek participation of Air Force Reserve Command's future senior leadership in the resident PME experience. The benefits of such mutual experiences to the Total Force are obvious.

I encourage you to give strong consideration to applying for in-resident PME at the earliest opportunity available. Your base training managers (or HQ ARPC/DRM) can assist you with information on submitting an application to the Central School Selection Board. When you apply, attach this letter to your application.

Again congratulations and my best wishes for continued success!

Sincerely

JAMES E. SHERRARD III, Maj Gen, USAF
Chief of Air Force Reserve

58
M-2



DEPUTY SECRETARY OF DEFENSE
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

JAN 7 2002

MEMORANDUM FOR THE PRESIDENT

SUBJECT: Removal of Name From Promotion Board Report

On behalf of the Secretary of Defense, I recommend you remove the name of Major Marc J. Millican, United States Air Force Reserve, from the Fiscal Year 2000 Reserve of the Air Force Lieutenant Colonel Promotion List under the provisions of title 10, United States Code, Section 14310.

In 1999, Major Millican, while a member of the 312th Airlift Squadron, refused to undergo an anthrax immunization. He advised members of the squadron to refuse their anthrax inoculations. Additionally, he told members of the squadron, via e-mail, that the Squadron Commander did not care about them and that they should disregard his advice and directives. Major Millican received a letter of reprimand and an adverse performance report.

The Secretary of the Air Force states that he has serious reservations about Major Millican's future potential to serve in the higher grade. Accordingly, the Secretary of the Air Force recommends Major Millican's name be removed from the promotion list.

Your signature below will constitute removal of Major Millican's name from the promotion list.

Paul Wolfowitz

APPROVED: _____
President of the United States

April 17, 2002
Date

W61287-01



EXHIBIT 



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS AIR RESERVE PERSONNEL CENTER

2 October 2002

MEMORANDUM FOR MAJOR MARC J. MILLICAN, USAFR, 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

FROM:   HQ ARPC/DPP
        6760 E Irvington Pl #1500
        Denver CO 80280-1500

SUBJECT: Second Deferral for Promotion

1. You were not recommended for promotion by the Reserve of the Air Force Selection Board that recently convened under the provisions of Air Force Instruction 36-2504, *Officer Promotion, Continuation and Selective Early Removal in the Reserve of the Air Force.* The specific reasons why you were not recommended are known only to the combined membership of the board.

2. Due to your second deferral for promotion, and in accordance with Title 10, United States Code, Section 14506, you will be automatically transferred to the Retired Reserve on your adjusted mandatory separation date( MSD) which is April 1 2003. If you do not wish to be transferred to the Retired Reserve, you **must** submit your request for resignation within 30 days prior to your MSD.

3. If you elect to resign rather than be transferred to the Retired Reserve, you will have no military status. You will be classified a "former member", and will not be entitled to commissary, exchange, or services (formerly MWR) privileges; and at age 60 you will be entitled to retired pay and medical care, if you apply for it.

4. It is to your benefit to be transferred to Retired Reserve instead of being discharged. You maintain your military status, and as a member of the Retired Reserve you remain a viable asset in the event of a Presidential recall. Additionally, you will be entitled to the benefits in paragraph 3 above. Finally, while assigned to the Retired Reserve, you will continue to earn years of service for computation of retired pay until you reach age 60.

5. If you have any questions regarding this letter, please contact Pauline Davis, HQ ARPC/DPPS, by e-mail address: pauline.davis@arpc.denver.af.mil or call DSN 926-6362 or toll free 1-800-525-0102, ext 71261.

JUDY A. JAMES
Director of Personnel Program Management

cc:
349 MSS/DPMPS
HQ ARPC/DPPR

EXHIBIT ___O 60



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS AIR RESERVE PERSONNEL CENTER

HQ ARPC/DPPRA                                     1 May 2003
6760 E Irvington Place #1910
Denver CO 80280-1910

MAJ Marc J Millican, USAFR Retired, 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
2540 Curlew Cir
Anchorage AK 99502-1653

Dear Major Millican

    The attached order effects your assignment to the Retired Reserve. A pamphlet explaining your rights and privileges as a member of the Retired Reserve is also furnished. Air Force Instruction 36-3209, Military Personnel Service Retirements, authorizes you to participate in a retirement ceremony at any Air Force base; however, you must coordinate time and place arrangements with host officials and assume all travel expenses to and from the place of ceremony.

    Approximately four months prior to your 60th birthday, you will be furnished information and forms concerning your retirement benefits. While in the Retired Reserve and awaiting age 60, you are eligible for Veteran's Group Life Insurance (VGLI). If you wish to apply for the coverage, please complete the attached VGLI application form following instructions printed on the application. You must also forward a copy of your retirement order with your application. If you are currently enrolled in VGLI, you must reapply for coverage directly to the office of OSGLI, 212 Washington Street, Newark, NJ 07102. You should give this matter your immediate attention to ensure continued coverage.

    You may continue using the Armed Forces Identification Card, DD Form 2AF (Reserve)(Red), now in your possession. If you do not possess a DD Form 2AF (Reserve) (Red), you may obtain one in accordance with the provisions of Air Force Instruction 36-3026, Identification Cards for Members of the Uniformed Services, Their Eligible Family Members, and Other Eligible Personnel, by contacting the nearest installation that issues the ID Cards. Locations of military installations in your area may be found in your local telephone directory under United States Government or at this internet site: http://www.dmdc.osd.mil/rsi/. Also, please notify HQ ARPC/DPSSA/B, 6760 E. Irvington Pl. #3800, Denver CO. 80280-3800, or toll free 1-800-525-0102 ext 71388, if you change your address so there will be no interruption in mailing services.

    You have our best wishes for the future.

                                        Sincerely

                                        Retirement Technician
                                        Directorate of Personnel Program
                                        Management

Attachments:
1. Reserve Order
2. VGLI Information Pamphlet

61

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR RESERVE PERSONNEL CENTER
DENVER, COLORADO 80280


RESERVE ORDER                              17 APR 2003
EK-5862


MAJ MILLICAN MARC J                        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
2540 CURLEW CIR
ANCHORAGE, AK 99502-1653

IS RELIEVED FROM CURRENT ASSIGNMENT, ASSIGNED TO THE
RETIRED RESERVE SECTION AND PLACED ON THE USAF
RESERVE RETIRED LIST EFFECTIVE AS INDICATED BELOW
ENTITLED TO ARMED FORCES IDENTIFICATION CARD,
DD FORM 2 AF(RESERVE) (RED).

CURRENT ASSIGNMENT FROM WHICH RELIEVED.
0312 ALF SQ TRAVIS AFB CA 94535 (PAS: T81LFLPG)

DATE ASSIGNED TO                RETIRED RESERVE SECTION: ZA
RETIRED RESERVE
1 APR 2003

DATE OF BIRTH: 7 JAN 1957    RETIREMENT IDENTIFICATION CODE: X6

AUTHORITY: AFI 36-3209, CHAPTER 5


REASON
ELIG FOR RETIRED PAY UNDER 10 USC 12731, EXCEPT FOR
ATTAINMENT OF AGE 60


REMARKS
TRANSFER TO RETIRED RESERVE PRECLUDES PROMOTION/
PROMOTION CONSIDERATION.

PAY GRADE AT AGE 60 = (O4) MAJOR

FOR THE COMMANDER                          DISTRIBUTION: EK

    OFFICIAL

CAROLE B. PACKHAM
CHIEF, RETIREMENT ELIGIBILITY DIVISION
DIRECTORATE OF PERSONNEL
 PROGRAM MANAGEMENT

                              RO  EK-5862



**EXHIBIT B – MASTER MILITARY PERSONNEL RECORDS - WITHHELD**

**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS AIR RESERVE PERSONNEL CENTER

SEP 0 5 2003

MEMORANDUM FOR AFBCMR

FROM: HQ ARPC/DPB
      6760 E. Irvington Place #2000
      Denver CO 80208-2000

SUBJECT: Application for Correction of Military Record, Major Marc J Millican, USAFR
      (retired) 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 (AFBCMR Case #2003-02505)

1. The requested correction cannot be accomplished administratively at this headquarters.

2. The applicant requests:

    a. Set aside his Officer Performance Report (OPR) 14 Jul 1998 – 29 Feb 2000;

    b. Set aside letter of reprimand (LOR) dated 19 Dec 1999;

    c. Set aside Propriety of Promotion action initiated 13 March 2000 and all related
documents;

    d. Set aside the removal from the FY 2000 Air Force Reserve Line Promotion Selection List
on 17 April 2002;

    e. Set aside his second deferral for promotion of 2 October 2002;

    f. Set aside his automatic transfer to the Retired Reserve on 1 April 2003, his mandatory
separation date (MSD);

    g. Reinstate the promotion to lieutenant colonel retroactive to 30 June 2000 under 10 USC
Section 14311(d) with constructive service credit in active participating status through 30 June
2003, with back pay and allowances for missed UTAs (unit training assemblies);

    h. Retire as a lieutenant colonel effective 31 June 2003.

64
EX C

3. The following is an analysis of the factors surrounding the case.

    a. The applicant received a referral Officer Performance Report (OPR) for the period 14 Jul 1998 through 29 February 2000 (Attachment 2).

    <u>1</u>  The report was referral in nature because Section IV (Impact on Mission Accomplishment) noted "Negatively impacted Wing readiness by dissuading unit members from augmenting sister squadron" and "lack of participation adversely affected combat readiness and mission effectiveness of squadron"; Section V Performance Factors, was marked "Does Not Meet Standards" in Blocks 2 (Leadership Skills), 3 (Professional Qualities) and 5 (Judgments and Decisions); and Section VI (rater Overall Assessment) detailed questionable judgment during the initial phases of the Anthrax Immunization program and displaying lack of military discipline by failing to respond to official correspondence from the unit commander. The additional rater concurred with the rater adding he demonstrated a lack of integrity by allowing personal feelings to cloud professional judgment.

    <u>2</u>  The basic premise of evaluation reports is that they are accurate and objective. Therefore, strong evidence must be provided to overcome a report's presumed validity. The rating chain in effect (rater, additional rater and if appropriate the reviewer) would have the best knowledge of the performance and potential of any given officer, during the rating period.

    <u>3</u>  IAW AFI 36-2406 *Officer and Enlisted Evaluation Systems*, paragraph 1.3 ..."The vast majority of Air Force personnel serve their entire career with honor and distinction; therefore, failure to document misconduct which reflects departure from the core values of the Air Force is a disservice to all personnel competing for promotion."

    <u>4</u>  IAW AFI 36-2401, *Correcting Officer and Enlisted Evaluation Reports*, Attachment 1 paragraph A1.3, "The most effective evidence consists of statements from the evaluators or from other individuals in the rating chain when the report was signed." The applicant has provided no evidence from the rating chain in effect at the time the report was written, to indicate the report was incorrect or should be removed from his record.

    <u>5</u>  The issue of timeliness must be addressed. The OPR in question closed-out 29 February 2000. The applicant did not raise the issue of inappropriateness until filing this application 21 July 2003. On the issue of timeliness alone, the request should be denied.

    b. On 19 Dec 1999, the applicant's commander (Lieutenant Colonel Frank J Padilla) mailed a letter of reprimand (LOR) to the applicant's home address (Attachment 3). The LOR was based on the applicant engaging in acts of a nature to cause discontent and undermine military discipline. It further states the applicant attempted to persuade other members of the unit to refrain from flying missions for the 301st AS. The LOR was returned by the post office as unclaimed (Attachment 3-3).

    <u>1</u>  The applicant has not presented any evidence to establish the LOR was incorrect or unjust. The applicant's commander was reacting to the situation as it presented itself; the

applicant was causing discontent and undermining military discipline within his unit. While the applicant may have felt taking the Anthrax immunization was inappropriate for himself, he did not have the right or authority to campaign against current Air Force policies. He had the right to decide for himself, but did not have the right create the documented discord and undermine military discipline within his unit.

 2   The issue of timeliness must be addressed. The LOR in question was issued 19 Dec 1999. The applicant did not raise the issue of inappropriateness until filing this application 21 July 2003. On the issue of timeliness alone, the request should be denied.

 c.   The applicant was considered and selected for promotion by the FY00 Line and Health Professions Lieutenant Colonel Selection Board, which convened at HQ ARPC June 1999. On 13 March 2000, Brigadier General Gerald A Black (Commander, 349 AMW) initiated a Propriety of Promotion action (Attachment 4).

 1   A Propriety of Promotion action is a delay in an officer's date of promotion, a removal of an officer's name from a promotion list, or information presented to the SecAF or a selection board that shows an officer may not be qualified for promotion. A commander initiates a Propriety of Promotion action when there is cause to believe that the officer is not mentally, physically, morally or professionally qualified to perform the duties of the higher grade.

 2   Brig Gen Black notified the applicant he was recommending removal of his name from the FY 2000 Lieutenant Colonel Promotion list. His reasons were that the applicant fomented discord within the 312th AS and purposely undermined the creditability of squadron leadership; (the applicant) attempt to disrupt orderly operation of the unit and Wing by encouraging other members to disregard his (Brig Gen Black) directives; (the applicant had) a total lack of regard for Air Force policies and procedures by failing to acknowledge no less than three (3) official written communications requiring his (the applicant's) response.

 (a)   There was sufficient concern about the applicant's correct mailing address, that the 312th AS sent a query to the Postmaster in Anchorage, Alaska, to verify the applicant's address.
 (b)   The Postmaster responded that the address the unit had on record for the applicant was accurate (Attachment 5).

 4   The letter from Brig Gen Black contains the phrase "You are not to assume the higher grade even if your name appears on a promotion order." The applicant received an order promotiong him to lieutenant colonel effective 22 Jun 2000 (Reserve Order BA-1541). The order was published 12 May 2000, approximately 5 weeks before the effective date.

 5   On 30 May 2000, a message was retrieved from the Message Distribution System (transmitted by 349th MSS, Travis AFB, CA) (Attachment 6) notifying HQ ARPC of the Propriety of Promotion Action pending for the applicant. This notification followed the first review of the Propritey of Promotion action for legal sufficiency (Attachment 7) and prompted the action to "withhold" the applicant's promotion within the automated computer system

68

(preventing the promotion from consummating and halting an increase in pay and allowances), until the response from SecAF or the President was received. The promotion order was rescinded totally by Reserve Order BA 388, 9 August 2000 (Attachment 8).

    <u>6</u>    The applicant has not provided information to contradict the underlying premise for the Propriety of Promotion Action. The applicant's commander initiated the Propriety of Promotion action because he believed the applicant was not mentally, physically, morally or professionally qualified to perform the duties of the higher grade. There is sound basis for the action to remove the applicant's name from the promotion list; i.e.: failure to acknowledge official written correspondence, undermining credibility of leadership, fomenting discord within the organization.

    d.    A letter from the Deputy Secretary of Defense, dated 7 January 2002, was sent to the President recommending the President remove the applicant's name from the Fiscal Year 2000 Reserve of the Air Force Lieutenant Colonel Promotion List under the provision of Title 10 United States Code, Section 14310 (the President may remove the name of any officer from a promotion list at any time before the date on which the officer is promoted). The President approved the removal action on 17 April 2002.

    <u>1</u>    The applicant claims that according to 10 USC Section 14311, the maximum delay for a promotion is 18 months. He states that because his name was not removed from the FY 2000 lieutenant colonel promotion list until 22 months after his promotion date, the removal is unlawful and his promotion to lieutenant colonel should be reinstated.

    <u>2</u>    10 USC Section 14310 is the statute providing for **removal** of officers from a list of officers recommended for promotion. 10 USC Section 14311 provides for involuntary **delay** of a promotion. Emphasis added because the sections provide for two distinct processes. Chapter 7 of AFI 36-2504, *Officer Promotion, Continuation and Selective Early Removal in the Reserve of the Air Force*, is also specific to reflect the two statutory provisions, section 7.5 addressing involuntary delays and section 7.8 addressing removal. The commander's letter of notification and all following actions sought removal, not delay. At all times during the process, 10 USC Section 14310 was the statutory authority for the removal.

    <u>3</u>    The statute states in part: "The President may remove the name of any officer from a promotion list **at any time** before the date on which the officer is promoted." AFI 36-2504 provides in paragraph 7.8.4 "A commander's recommendation to remove an officer automatically delays the promotion until the SAF makes a decision on that recommendation..." Therefore, the June 2000 promotion (subsequently revoked) was void from the start as the promotion was halted prior to SAF decision, and would not affect the President's authority under the statue.

    <u>4</u>    The applicant argues that any delay in process requires consideration of the delay statue, 10 USC Section 14311. Although we do not agree that this action falls within that statue, assuming for the sake of argument that the provisions of that statue would have to be met, the applicable time frames therein were in fact met. AFI 36-2504 paragraph 7.8.7 provides that "The

6 7

total period of delay...should not exceed 18 months, **excluding any period attributable to the officer.**" The applicant requested and was granted an extension until 31 August 2000, to respond to the notification of removal. He did not respond. 1 September 2000 (the end of the period attributable to the officer) to 7 January 2002 (date of the Undersecretary's letter with Secretarial decision on the recommendation for removal) is 15 months and 1 week; 2 months and three weeks under the 18-month requirement. There is no time limit on Presidential action.

 <u>5</u>   The Presidential removal of the applicant was statutorily and administratively proper pursuant to 10 USC Section 14310 and AFI 36-2504. It was found to be legally sufficient at all levels of review (Attachments 9 and 10) and forwarded by HQ AFRC/CV, 5 October 2000 (Attachment 11). There is no foundation for voiding the removal action.

 e.   There is no credible reason to set aside the second deferral for promotion by the FY03 Line and Health Professions Lieutenant Colonel Selection Board. The applicant was considered by a selection board duly appointed by the Secretary of the Air Force. The selection board members were expected to consider all officers without prejudice or partiality, having in view the special fitness of the officers under consideration and the efficiency and effectiveness of the United States Air Force. Additionally, the board members are charged to use the whole-person concept to assess the performance and potential of each considered officer, to serve in the next higher grade. The board members found the applicant was not as qualified as his peers and subsequently did not select him for promotion.

 f.   The applicant's automatic transfer to the Retired Reserve, on his mandatory separation date (MSD) of 1 April 2003 is appropriate.

 <u>1</u>   The reason the applicant was automatically transferred to the Retired Reserve was because his MSD was established under 10 USC Section 14506 (officer twice not selected for promotion to the grade of lieutneant colonel must leave the Reserve active status list {RASL} [either through discharge or transfer to the Retired Reserve] when the officer achieves 20 years commissioned service or by the 1st day of the 7th month after the President approves the list of the board that did not select him for the second time, which ever is later). As the applicant was beyond 20 years commissioned service, his MSD was established at 1 April 2003, the 1st day of the 7th month after the President approved the list of the board that did not select him for the second time. Since he qualified for Reserve retired pay, he was automatically transferred to the Retired Reserve on his MSD.

 <u>2</u>   If the applicant is not automatically transferred to the Retired Reserve, he must be discharged. Accepting discharge in-lieu-of transfer to the retired reserve could affect the applicant's retired pay at age 60 years. This is not in the best interests of the applicant.

 g.   Directly related to the request to reinstate the applicant's promotion, are the requests for constructive service credit in active participating status through 30 June 2003 and back pay and allowances for missed UTAs.

68

    <u>1</u>  His nonparticipation was not the foundation for the Propriety of Promotion action and the subsequent removal by the President, of his name from the promotion list. The nonparticipation resulted from his refusal to accept the Anthrax immunizations in 1999. Had the applicant accepted the Anthrax immunizations or accepted a non-flying position (see subparagraph g <u>4</u> below), he could have continued to participate and accrue credit in an active status. He would not have missed (had "unexcused" absences) UTAs.

    <u>2</u>  In a letter dated 22 Feb 1999, the applicant's commander, Lieutenant Colonel Frank J Padilla, notified the members of the 312th Airlift Squadron of the Air Force requirement for all members to obtain Anthrax immunizations. The letter clearly states the immunizations were to begin no later than 1 Jul 1999. If any member of the group did not wish to obtain the immunizations, he invited the member to come talk with him (applicant's attachment, Exhibit A).

    <u>3</u>  Included in the applicant's package is the 312th Airlift Squadron Monthly Newsletter (May 1999) with an article discussing the Anthrax immunizations. It clearly states "As you know the deadline for receiving your first Anthrax shot is 31 May 1999. No pay or points are allowed after that date until you comply with this directive...." A second Newsletter is enclosed showing the deadline was the UTA (June) and reiterated the "no pay and points" aspect of non-compliance (applicant's attachment, Exhibit B).

    <u>4</u>  In a letter dated 26 Jul 1999, the applicant's commander requests he either complete the enclosed AF Form 1288 (Application for Ready Reserve Assignment – "Ready Reserve" is training and participation authorized) or the enclosed AF Form 133 (Application for Transfer to the Retired Reserve) by 20 Aug 1999 or the remaining UTA periods this fiscal year will be considered unexcused (applicant's attachment Exhibit G). Absences are considered "excused" (not present for duty but with reasons acceptable to the chain of command to keep the officer on strength until the situation is rectified) or "unexcused" (not present for duty and no notification to commander). The commander sent the letter because the applicant had not begun his immunizations, was no longer eligible to perform UTAs, and the commander needed to know his intentions.

    <u>5</u>  Another letter dated 15 Nov 1999 informed the applicant his commander was recommending he be involuntarily reassigned to the Standby Reserve (applicant's attachment Exhibit H) ("Standby Reserve" - no training or participation authorized). The specific reason was based on the applicant's unsatisfactory participation i.e. by his unexcused absences for UTAs in August, September, October and November 1999, and his failure to respond to the letter of 26 Jul 1999 requesting his intentions concerning his career.

    <u>6</u>  In a letter dated 19 Dec 1999, the commander does in fact request the involuntary transfer of the applicant (applicant's attachment Exhibit H, Tab I).

    <u>7</u>  There is clear and compelling evidence that the applicant made an informed choice to cease participating by opting to not take the Anthrax immunizations well before the Propriety of Promotion action was begun. The applicant was informed that the lack of immunizations would

69

make him ineligible to participate; he was repeatedly asked how he wished to continue his career (did he want to transfer to another participating Ready Reserve position or transfer to the Retired Reserve). The applicant never responded. This implies there was no concern by the applicant to continue his career in any capacity. He did not even make the attempt to have his failure to be present for duty an "excused" absence. He clearly demonstrates this as of August 1999, seven months prior to the beginning of the Propriety of Promotion action. He is not entitled to credit in an active participating status, with either pay or allowances, because he made his choice to voluntarily surrender that chance when he chose unexcused absences from duty.

   h.  The last request by the applicant is to retire as a lieutenant colonel effective 31[sic] June 2003. He was already retired on 1 April 2003 as a major. The applicant is not eligible to retire in the grade of lieutenant colonel on any date.

    <u>1</u>  10 USC Section 1370(d) requires an officer above the grade of major to satisfactorily serve (as defined by the Secretary of the military department concerned) in the higher grade, for not less than 3 years.

    <u>2</u>  The SecAF has determined that satisfactory service equates to earning a minimum of 50 participation points during the retention and retirement year, to result in a satisfactory year for retirement.

    <u>3</u>  As stated above, the applicant clearly decided to stop participating and accrue "unexcused" absences from his duty station (August 1999) well before he would have pinned on the higher grade (June 2000) had the removal action not been initiated. Within 2 weeks of the August 1999 UTA, the promotion list for the FY00 Line and Health Professions Lieutenant Colonel selection board was made public knowledge (1 September 1999). At this time, the applicant again could have requested "excused" absences by contacting his commander and making equitable arrangements for his personal situation. By choosing "unexcused" absences (not informing his chain of command what his desires were) he effectively chose not to have this promotion impact on his retirement grade.

4.  Recommend disapproval of the applicant's request in its entirety. Specifically:

   a.  Do not set aside the OPR for 14 July 1998 through 29 February 2000;

   b.  Do not set aside the LOR dated 19 December 1999;

   c.  Do not set aside the Propriety of Promotion action initiated 13 March 2000 and related documents;

   d.  Do not set aside the applicant's removal from the FY 2000 lieutenant colonel promotion list;

   e.  Do not set aside his second deferral of promotion to lieutenant colonel by the FY03 Line and Health Professions Lieutenant Colonel Selection Board;

f.   Do not set aside his automatic transfer to the Retired Reserve on 1 April 2003;

g.   Do not give the applicant "constructive service credit" in active participating status through 30 June 2003 with back pay and allowances for missed UTAs;

h.   Do not retire the applicant as a lieutenant colonel.

5.   Action officer is Diana Rotenbury-Melton, DSN 926-7193 or email diana.rotenbury@arpc.denver.af.mil.

D. M. ALDRICH, Colonel, USAF
Chief, Reserve of the Air Force
Selection Board Secretariat

Attachments
 1. SAF/MIBR application, 28 Jul 03
 2. Notice of Referral OPR, 13 Mar 00 w/OPR and certified return receipt "unclaimed"
 3. LOR, 19 Dec 99 w/certified mail return receipt "unclaimed"
 4. Propriety of Promotion Notification, 13 Mar 00
 5. Address Verification, 13 Mar 00
 6. Message, 26 May 00, retrieved 30 May 00
 7. Legal Sufficiency, 349 AMW/JA 21 May 00
 8. RO BA-388, 9 Aug 00
 9. Legal Sufficiency, AFRC/JAM 16 Jun 00
10. Legal sufficiency, AFRC/JAM 20 Sep 00
11. Recommendation for Removal, AFRC/CV 05 Oct 00

71



**DEPARTMENT OF THE AIR FORCE**
Air Force Reserve Command (AFRC)

13 MAR 00

MEMORANDUM FOR MAJOR MARC J. MILLICAN
2540 Curlew Circle
Anchorage AK 99515-1353

FROM:    312 AS/CC
511 Waldron Street
Travis AFB CA 94535-2154

SUBJECT:    Referral Officer Performance Report

1. In accordance with AFI 36-2402, *Officer Evaluation* System, para. 3.7, I am referring the attached Officer performance Report (OPR) to you. The OPR contains comments and ratings which make the report a referral as defined in the AFI. Specifically, the OPR references your actions in the latter half of CY1999 and early CY2000 to foment discord within this unit and undermine the credibility of squadron leadership, as well as your failure to respond to official communications.

2. Comment on the report by endorsement to this memo and sign in reproducible ink. Send the report and your endorsement to reach Lt Col J. Brunz not later than 30 calendar days from the date you receive this letter. A return envelope has been enclosed for this purpose. If you need additional time, request an extension from the individual named above. You may submit attachments (limited to ten pages), but they must directly relate to the reason the report was referred. Pertinent attachments will remain attached to the report filed in the personnel record. Your endorsement and any attachment you include may not contain any reflection on the character, conduct, integrity, or motives of the evaluator unless you fully substantiate and document the remarks. Contact the MPF career enhancement section (349 MSS/DPMSCE @ 707/424-1663) if you require any assistance in preparing your reply to the referral report.

3. If you believe this report is inaccurate, unjust, or unfairly prejudicial to your career, you may apply for a review of the report under AFI 36-2401, *Correction of Airman and Officer Evaluation Reports*, once the report becomes a matter of record as defined in AFI 36-2402, attachment 1.

FRANK J. PADILLA, Col (Select). USAFR
Commander

LTR MAILED CERTIFIED RETURN RECEIPT REQUESTED

2-1

Attachments:
1. AF Form 707A closing 29 FEB 00
2. Return envelope

cc:  349 OG/CC (no attachments)
     312 AS/DO (no attachments)


1st Ind, Maj Millican

MEMORANDUM FOR 312 AS/CC

1.  I acknowledge receipt of this memorandum, dated 13 MAR 00, on _____.

2.  I do/do not intend to submit matters for you to consider in evaluating this matter.


                                        MARC MILLICAN, Maj, USAFR


2

73
22

## FIELD GRADE OFFICER PERFORMANCE REPORT

| RATEE IDENTIFICATION DATA *(Read AFI 36-2402 carefully before filling in any item)* | | | |
|---|---|---|---|
| 1. NAME *(Last, First, Middle Initial)*<br>MILLICAN, MARC J. | 2. SSN<br>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 | 3. GRADE<br>MAJ non-EAD | 4. OAFSC<br>11A2A |
| 5. PERIOD OF REPORT<br>From: 14 Jul 1998  Thru: 29 Feb 2000 | 6. NO. DAYS SUPERVISION<br>180 | 7. REASON FOR REPORT<br>Directed by Commander | |
| 8. ORGANIZATION, COMMAND, LOCATION<br>312th Airlift Squadron (AMC), Travis AFB CA | | | 9. PAS CODE<br>T81LFLPG |

### II. UNIT MISSION DESCRIPTION

The mission of the 312th Airlift Squadron is to train and provide qualified C-5 aircrews to fly worldwide airlift missions and augment the active duty forces under various readiness conditions up to and including full mobilization.

### III. JOB DESCRIPTION

1. DUTY TITLE:

AIRCRAFT COMMANDER C-5

2. KEY DUTIES, TASKS, AND RESPONSIBILITIES: Responsible for safe and timely movement of the largest aircraft in the Air Force, valued at over 100 million dollars. Supervises flight crews of up to 22 people and is directly responsible for the safety of up to 73 passengers. Has personal responsibility for the management of strategic airlift missions to include: contingency operations, Joint Army-Air Force Training exercises, NATO operations and Special Assignment Airlift Missions. Ensures strict compliance with Air Force, AMC and international flight procedures.

### IV. IMPACT ON MISSION ACCOMPLISHMENT

- Volunteered to fly several critical airlift missions, supporting Air Force mobility objectives worldwide
- Noted for above average airmanship and aircraft systems knowledge during local training sortie
- Accumulated more than 5833 accident-free flying hours, contributing to unit safety record
- Successfully completed recurring instrument qualification checkride, resulting in passing rating
- Superior effort resulted in flawless completion of written examinations of aircraft systems and procedures
- Selected by squadron management to fly with less experienced crewmembers on sensitive missions
- Paved the way as one of the first pilots to transition to C-5 Flight Management System modified aircraft
- Negatively impacted Wing readiness by dissuading unit members from augmenting sister squadron
- Lack of participation adversely affected combat readiness and mission effectiveness of the squadron

| V. PERFORMANCE FACTORS | DOES NOT<br>MEET STANDARDS | MEETS<br>STANDARDS |
|---|:---:|:---:|
| 1. Job Knowledge<br>Has knowledge required to perform duties effectively.<br>Strives to improve knowledge.<br>Applies knowledge to handle nonroutine situations. | ☐ | ☒ |
| 2. Leadership Skills<br>Sets and enforces standards. Motivates subordinates. Works well<br>with others. Fosters teamwork. Displays initiative. Self-confident.<br>Has respect and confidence of subordinates. Fair and consistent<br>in evaluation of subordinates. | ☒ | ☐ |
| 3. Professional Qualities<br>Exhibits loyalty, discipline, dedication, integrity, honesty, and officership.<br>Adheres to Air Force standards. Accepts personal responsibility.<br>Is fair and objective. | ☒ | ☐ |
| 4. Organizational Skills<br>Plans, coordinates, schedules, and uses resources effectively.<br>Schedules work for self and others equitably and effectively.<br>Anticipates and solves problems. Meets suspenses. | ☐ | ☒ |
| 5. Judgement and Decisions<br>Makes timely and accurate decisions. Emphasizes logic in<br>decision making. Retains composure in stressful situations.<br>Recognizes opportunities and acts to take advantage of them. | ☒ | ☐ |
| 6. Communication Skills<br>Listens, speaks, and writes effectively. | ☐ | ☒ |

AF FORM 707A, 19991201 (EF-V1)    PREVIOUS EDITION IS OBSOLETE.    74    2-3

**VI. RATER OVERALL ASSESSMENT**

- Acted as Aircraft Commander for several strategic airlift missions in support of Air Mobility Command
- Served for a period as Flight Commander for 10 junior pilots, providing mentoring and career guidance
- Capable officer; maintains standards for uniform/personal appearance and technical expertise
- While active in unit, maintained required flight and ground currency items, enhancing combat readiness
- Displayed questionable judgement during initial phases of the Anthrax Immunization program
  -- Inappropriately used leadership position in an attempt to influence other unit members to resist program
  -- Actively sought to foment discord and attempted to instill a culture of distrust for squadron leadership
- Displayed lack of military discipline by failing to respond to official correspondence from unit commander
  -- Repeatedly failed to provide unit with duty intentions resulting in repeated unexcused absences

Last performance feedback was accomplished on: _____ (consistent with the direction in AFI 36-2402.)
(If not accomplished, state the reason)

Verbal performance feedback was given but not documented.

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| JERALD L. BRUNZ, Lt Col, USAFR | Flight Examiner Pilot C-5 | | 10 Mar 2000 |
| 312th Airlift Squadron (AMC) | SSN | SIGNATURE | |
| Travis AFB  CA | 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 | *Jerald L Brunz* | |

**VII. ADDITIONAL RATER OVERALL ASSESSMENT**  ☒ CONCUR      NONCONCUR

- Flying skills and general airmanship are admirable; an accomplished aviator
- Questionable decision making ability; negatively impacted squadron and wing mission accomplishment
- Rebuffed numerous informal and official attempts by squadron senior leadership to ameliorate situation
- Poor officership; demonstrated lack of integrity allowed personal feelings to cloud professional judgement
- Comments from the ratee were requested but not received within the time period

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| FRANK J. PADILLA, Lt Col, USAFR | Commander | | 19 Apr 2000 |
| 312th Airlift Squadron (AMC) | SSN | SIGNATURE | |
| Travis AFB  CA | 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 | | |

**VIII. REVIEWER**    ☒ CONCUR      NONCONCUR

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| GERALD A. BLACK, Brig Gen, USAFR | Commander | | 19 May 2000 |
| 349th Air Mobility Wing (AMC) | SSN | SIGNATURE | |
| Travis AFB  CA | 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 | | |

**Instructions**

**All:** Recommendations must be based on performance and the potential based on that performance. Promotion recommendations are prohibited. Do not comment on completion of or enrollment in PME, advanced education, previous or anticipated promotion recommendations on AF Form 709, OER indorsement levels, family activities, marital status, race, sex, ethnic origin, age, or religion.

**Rater:** Focus your evaluation in Section IV on what the officer did, how well he or she did it and how the officer contributed to mission accomplishment. Write in concise "bullet" format. Your comments in Section VI may include recommendations for augmentation or assignment.

**Additional Rater:** Carefully review the rater's evaluation to ensure it is accurate, unbiased and uninflated. If you disagree, you may ask the rater to review his or her evaluation. You may not direct a change in the evaluation. If you still disagree with the rater, mark "NON-CONCUR" and explain. You may include recommendations for augmentation or assignment.

**Reviewer:** Carefully review the rater's and additional rater's ratings and comments. If their evaluations are accurate, unbiased and uninflated, mark the form "CONCUR" and sign the form. If you disagree with previous evaluators, you may ask them to review their evaluations. You may not direct them to change their appraisals. If you still disagree with the additional rater, mark "NONCONCUR" and explain in Section VIII. Do not use "NONCONCUR" simply to provide comments on the report.

| IX. ACQUISITION EXAMINER/AIR FORCE ADVISOR (Indicate applicable review by marking the appropriate box(es).) | | ACQUISITION EXAMINER (If applicable) | AIR FORCE ADVISOR (If applicable) |
|---|---|---|---|
| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | SIGNATURE | | DATE |
| | | | |

AF FORM 707A, 19991201 *(REVERSE) (EF-V1)*                    75    2-4



DEPARTMENT OF THE AIR FORCE
312 AS CC
511 WALDRON STREET
TRAVIS AFB CA  94535-2154

OFFICIAL BUSINESS

CERTIFIED

MAIL

Z 439 776 814

MAJOR MARC MILLIGAN
2540 CURLEW CIR
ANCHORAGE AK 99515-1353

76
2-5

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

MAJOR MARC J NILLIGAN
2540 CURLEW CIR
ANCHORAGE AK 99515-1353

2. Article Number (Copy from service label)
Z 439 776 814

PS Form 3811, July 1999        Domestic Return Receipt

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)    B. Date of Delivery

C. Signature
X                                    □ Agent
                                     □ Addressee

D. Is delivery address different from item 1?    □ Yes
   If YES, enter delivery address below:          □ No

3. Service Type
   ☒ Certified Mail    □ Express Mail
   □ Registered        ☒ Return Receipt for Merchandise
   □ Insured Mail      □ C.O.D.

4. Restricted Delivery? (Extra Fee)    □ Yes

Fold at line over top of envelope to the right of the return address.

102595-99-M-1789

OPENED BY LT. S. DITTSON
041800 @ 0913

77
2-6



**DEPARTMENT OF THE AIR FORCE**
AIR FORCE RESERVE COMMAND

19 DEC 99

MEMORANDUM FOR MAJOR MARC MILLICAN

FROM:  312 AS/CC
511 Waldron Street
Travis AFB CA 94535-2154

SUBJECT:  Letter Of Reprimand

1.  It has come to my attention that you have engaged in acts of a nature to cause discontent and undermine military discipline within this squadron.  Specifically, after the members of this squadron were notified of the requirement to undergo the anthrax immunization series, you sought out and spoke with members of this squadron advocating that they refuse to undergo the anthrax protocol.  Further, you actively encouraged other pilots to persuade additional members of your peer group (e.g. the pilot section) to defy official Air Force policy and refuse to undergo the anthrax immunization series.  In furtherance of your apparent intent to raise discontent and disloyalty, you sent electronic mail to members of this squadron advising them that I do not care about them and encouraging them to disregard my advice and directives.  On 2 September 1999, when I spoke with you by telephone regarding the anthrax immunization, you were also disrespectful to me in stating that I was not considering the best interest of the members of the squadron.  During this same conversation, you also issued an implied threat against me by stating, "you better protect yourself."  Finally, you attempted to persuade members of this unit to refrain from flying missions for the 301 AS, even though I had specifically requested such assistance be rendered due to their impacted manning levels.  Your actions appear designed to disrupt the effectiveness of not just this squadron, but the Wing as a whole.  For these actions, you are hereby reprimanded.

2.  As a C-5 pilot and an officer in this wing, I expect you to exhibit the judgment and professionalism attendant with your responsibilities.  I view your actions in encouraging discontent within the unit as a very serious breach in judgment and leadership.  You have greatly compromised your integrity by these actions, and have called into question your abilities and leadership as an officer in the United States Air Force.

3.  I intend to place this Letter of Reprimand in an Unfavorable Information File.

4.  Privacy Act Statement:  AUTHORITY: 10 U.S.C. 8013.  Purpose: To obtain any comments or documents you desire to submit (on a voluntary basis) for consideration concerning this action.  ROUTINE USES:  Provides you an opportunity to submit comments, or documents for

78

3-1

Page 2

consideration. If provided, the comments and documents you submit become a part of the action. DISCLOSURE: Your written acknowledgement of receipt and signature are mandatory. Any other comment or document you provide is voluntary.

5.  You are directed to acknowledge receipt of this Letter of Reprimand by signing below and returning the document to me in the enclosed envelope. If you desire, you may respond to this action in writing no later than (30) days from this date. Any written response will be considered by me and attached to this Letter of Reprimand. An additional copy has been provided for your records.

                                        FRANK J. PADILLA, Lt Col, USAFR
                                        Commander

LTR MAILED CERTIFIED RETURN RECEIPT REQUESTED

cc:  349 OG/CC
     312 AS/DO
     312 AS/DOP

1st Ind, Maj Millican

MEMORANDUM FOR 312 AS/CC

1.  I acknowledge receipt of this LOR, dated 19 DEC 99.

2.  I do/do not intend to submit matters for you to consider in evaluating this matter.

                                        MARC MILLICAN, Maj, USAFR

79
3-2

DEPARTMENT OF THE AIR FORCE
312 AS CC
511 WALDRON STREET
TRAVIS AFB CA 94535-2154

OFFICIAL BUSINESS

4/4 - 007

CERTIFIED
MAIL

P 114 800 645

U.S. POSTAGE
= 2.90 =

MAJOR MARC J MILLICAN
2540 CURLEW CIR
ANCHORAGE AK 99515-1353

4N
13/37

**SENDER:**
• Complete items 1 and/or 2 for additional services.
• Complete items 3, 4a, and 4b.
• Print your name and address on the reverse of this form so that we can return this card to you.
• Attach this form to the front of the mailpiece, or on the back if space does not permit.
• Write "Return Receipt Requested" on the mailpiece below the article number.
• The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

MAJOR MARC J MILLICAN
2540 CURLEW CIR
ANCHORAGE AK 99515-1353

4a. Article Number
P 114 800 645

4b. Service Type
☐ Registered          ☐ Insured
☒ Certified           ☐ COD
☐ Express Mail        ☒ Return Receipt for Merchandise

7. Date of Delivery  1-16

5. Signature (Addressee)

6. Signature (Agent)

8. Addressee's Address (Only if requested and fee is paid)

PS Form 3811, December 1991          DOMESTIC RETURN RECEIPT

Is your RETURN ADDRESS completed on the reverse side?

Thank you for using Return Receipt Service.

80
3-3



**DEPARTMENT OF THE AIR FORCE**
Air Force Reserve Command

13 Mar 00

MEMORANDUM FOR MAJOR MARC J. MILLICAN

FROM:   349 AMW/CC
        520 Waldron Street
        Travis AFB CA 94535-2100

SUBJECT:   Intent To Remove From Recommended Promotion List

1.  In accordance with AFI 36-2504, *Officer Promotion, Continuation And Selective Early Removal In The Reserve Of The Air Force*, I am recommending removal of your name from the FY 2000 Lieutenant Colonel promotion list.

2.  The specific reason for this action is your inappropriate actions during the latter half of CY1999 to foment discord within the 312 AS and to purposefully undermine the credibility of squadron leadership.  You have also attempted to disrupt the orderly operation of this unit and Wing by encouraging other unit members to disregard my directives.  Further, during this same period, as well as into early CY2000, you have demonstrated a total lack of regard for Air Force policies and procedures by failing to acknowledge no less than three official written communications requiring your response.  A Letter of Reprimand dated 19 Dec 99 covering much of this same behavior is attached.  Such actions are inconsistent with the standard of conduct and professionalism expected of a senior field grade officer.

3.  As a result, your promotion is delayed until the Secretary of the Air Force makes a decision on this recommendation.  You are not to assume the higher grade even if your name appears on a promotion order.  You may submit a statement on your behalf and include any supporting documentation you deem appropriate.  Acknowledge receipt and understanding of this notification and return the notification, with your statement and supporting documents, if any, to me no later than 20 calendar days from the date of this letter.

GERALD A. BLACK, Brig Gen (Select), USAFR
Commander

Attachments:
1.  LOR dated 19 Dec 99
2.  Return envelope

cc:  349 OG/CC (no attachments)
     312 AS/DO (no attachments)

*81*
4-1

1ˢᵗ Ind, Maj Millican

MEMORANDUM FOR 312 AS/CC

1.   I acknowledge receipt of this memorandum, dated 13 MAR 00, on _____ .

2.   I do/do not intend to submit matters for you to consider in evaluating this matter.


                                    MARC MILLICAN, Maj, USAFR

2

*8ᴓ
4-ᴓ



**DEPARTMENT OF THE AIR FORCE**
Air Force Reserve Command (AFRC)

13 MAR 00

MEMORANDUM FOR POSTMASTER
            Anchorage  AK  99515

FROM:  312 AS/CCQ
       511 Waldron Street
       Travis AFB  CA  94535-2154

SUBJECT:  Verification of Address - Marc J. Millican

1. Greetings from sunny California and the US Air Force Reserves.  I am requesting your
   assistance in verifying the official mailing address of a member of this unit, Major Marc J.
   Millican.  It is imperative we have this member's correct address to ensure timely delivery of
   military related communications.  Our records indicate Major Millican's address to be:
            2540 Curlew Circle
            Anchorage  AK  99515-1353

2. Please verify below the accuracy of this information and indicate below any updates required.
   A return envelope has been enclosed.

        ☑ The address listed above is correct.

        ☐ The address listed above is not correct.  The correct address is:

        _____

   Signed: _B. Harm_____   Title: _CARRIER____   Date: _3/21/00_

3. Thank you in advance for your assistance in this matter.  If you have any questions, please do
   not hesitate to contact me at 707/424-5484.

SAMUEL T. DICKSON, 1ˢᵗ Lt, USAFR
Operations/Administration Officer

Attachment:
1. Return envelope

83
5

**Mondragon Ralph A GS-09 HQ ARPC/DPBA**

| | |
|---|---|
| **From:** | Message Distribution System |
| **Sent:** | Tuesday, May 30, 2000 8:18 AM |
| **To:** | MDSCC; MDSDP |
| **Subject:** | PROPRIETY OF PROMOTION |

**Importance:** High



Audit.TXT          IMMEDIATE

O 261522Z MAY 00

FM 349MSS TRAVIS AFB CA//DPMSA//

TO HQ ARPC DENVER CO//DPJ//
HQ USAF WASHINGTON DC//REPS//
HQ AFRC ROBINS AFB CA//DP//
4 AF MARCH ARB CA//CC//
604RSG MARCH ARB CA//DP//

UNCLAS

SUBJECT: PROPRIETY OF PROMOTION

1. BRIGADIER GENERAL GERALD A. BLACK, 349 AMW/CC, HAS INITIATED AN
ACTION TO REMOVE MAJOR MARC J. MILLICAN, SSAN 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, FROM THE
FY00 LT COL PROMOTION LIST. MAJ MILLICAN IS CURRENTLY PROJECTED FOR
PROMOTION TO LT COL EFFECTIVE 22 JUN 00.

2. THE SPECIFIC REASON FOR THIS ACTION IS MAJOR MILLICAN'S
"INAPPROPRIATE ACTIONS DURING THE LATTER HALF OF CY 1999 TO FOMENT
DISCORD WITHIN THE 312 AS AND TO PURPOSEFULLY UNDERMINE THE
CREDIBILITY OF THE SQUADRON LEADERSHIP." ADDITIONALLY, HE "ATTEMPTED
TO DISRUPT THE ORDERLY OPERATION OF THIS UNIT AND THE WING BY
ENCOURAGING OTHER UNIT MEMBERS TO DISREGARD MY DIRECTIVES. FURTHER
DURING THIS SAME PERIOD, AS WELL AS INTO EARLY CY2000", MAJOR
MILLICAN "DEMONSTRATED A TOTAL LACK OF REGARD FOR AIR FORCE POLICIES
AND PROCEDURES BY FAILING TO ACKNOWLEDGE NO LESS THAN THREE OFFICIAL
WRITTEN COMMUNICATIONS" REQUIRING HIS RESPONSE. MAJOR MILLICAN
RECEIVED A LETTER OF REPRIMAND ON 19 DEC 99 AND SUBSEQUENTLY AN
UNFAVORABLE INFORMATION FILE. FINALLY, HE RECEIVED DIRECTED BY
COMMANDER REFERALL OPR WITH A CLOSEOUT DATE OF 29 FEB 2000.

3. THIS PROPRIETY OF PROMOTION ACTION WAS INITIATED 13 MAR 00 AND THE
OFFICER WAS NOTIFIED OF THIS ACTION THE SAME DATE, VIA CERTIFIED
MAIL. MEMBER HAS REFUSED DELIVERY OF THIS ACTION, AS WELL AS OTHER
CORRESPONDENCE TO DATE. CONFIRMATION OF ADDRESS WAS RECEIVED ON 21
MAR 00.

POINT OF CONTACT IS MSGT BONILLA, DSN 837-1664 OR SMSGT MATSUOKA, DSN
837-1668.

84
6



# DEPARTMENT OF THE AIR FORCE
## AIR FORCE RESERVE COMMAND

21 May 2000

MEMORANDUM FOR 349 MSS/DP
            520 WALDRON STREET
            TRAVIS AFB CA 94535-2181

FROM: 349 AMW/JA
      520 WALDRON STREET
      TRAVIS AFB CA 94535-2123

SUBJ: Legal Review of Removal from Promotion List Action:
      MAJOR MARC J. MILLICAN, 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, 312 AS, Travis AFB

1. IAW AFI 36-2504, Table 7.1, Step 9, I have reviewed the Propriety of Promotion - Removal from Promotion List action concerning Major Marc J. Millican, and I find the record to be legally sufficient to support this action. This file was received in our office on 21 May 2000 for review.

2. Lt Col Millican was selected for promotion to Lieutenant Colonel and is scheduled to assume that rank on 22 June 2000 . Lt Col Padilla, Major Millican's commander recommended that Major Millican be removed from the promotion list and sent a letter by registered mail to Major Millican dated 13 Mar 2000, this letter was left "unclaimed" by Major Millican. (IAW AFI 36-2504, para 7.3, the initiation of the action must be by the wing commander. When this requirement was discovered, the wing commander issued a letter initiating the action of the same date). Colonel Gerald Black, 349 AMW/CC initiated the removal from promotion list action on 13 March 2000 by letter sent certified mail to Major Millican. Major Millican has left "unclaimed" this correspondence and other correspondence sent to his home address by the 312 AS. Major Millican's address was verified as correct by the post office on March 21, 2000.

3. The reason for this action is detailed in the documents accompanying the Intent to Remove from Recommended Promotion List. In summary, the reason for the recommendation is that Major Millican refused to undergo the anthrax immunization series, and then became a vocal advocate against the anthrax immunization to the point of e-mailing members of the unit in July 1999 encouraging refusal, and then denigrating certain individuals who elected to undergo the immunizations. Major Millican's actions were directed at undermining the leadership of the command and aimed at disrupting the unit's operation. In particular, Major Millican made disparaging remarks about the leadership of Lt Col Padilla. On 19 December 1999, Lt Col Padilla issued a Letter of Reprimand to Major Millican for his conduct. This letter of reprimand

᠈85

7-1

was sent certified mail, return receipt requested and was returned unclaimed. Major Millican has left unclaimed or refused the following pieces of official correspondence from the Air Force:

a. 18 Nov 99 – regular mail – letter to Major Millican re: Involuntary Re-Assignment
b. 19 Dec 99 – registered mail – Letter of Reprimand to Major Millican
c. 13 Mar 00 – registered mail – Notification of Referral OPR
Notification of Intent to Remove from Promotion List
d. 21 Mar 00 – registered mail – Notification of Unfavorable Information File

Major Millican last performed any military duty with the 349th AMW in July 1999, and has accumulated unexcused absences since that time.

4. AFI 36-2504, para 7.2 provides that a commander may initiate a propriety of promotion action when there is cause to believe an officer is not mentally, physically, morally or professionally qualified to perform the duties of the higher grade. The actions and non-actions by Major Millican as detailed in the package support this action.

5. AFI 36-2504, para 7.4 states that the commander must inform the officer of the recommendation, either verbally or in writing, before the effective date of promotion. Note 3 to Table 7.1 of AFI 36-2501 provides that when an officer has a pending propriety of promotion action and does not acknowledge receipt of written notification, the postal receipt showing proof of mailing, or the return postal receipt indicating delivery will suffice as acknowledgement. In this case, the file contains the "unclaimed" envelope dated 15 March 2000 which was returned to the wing unopened. Accordingly, under these circumstances, the command has taken adequate action to inform Major Millican of this action.

6. Although I believe that the command has taken appropriate steps to notify Major Millican of this action, out of an abundance of caution, I recommend that the 19 Dec 99 Letter of Reprimand, the 13 Mar 00 Notification of Referral OPR, the 13 Mar 00 Notification of Intent to Remove from the Promotion List, and the 21 Mar 00 Notification of Unfavorable Information File be sent in an envelope, regular mail, to Major Millican's address, and a memo detailing this final mailing be included in this package.

7. I recommend that IAW AFI 36-2504, Table 7.1, step 10, that this action and record be transmitted from 349 AMW/CC to 4 AF/CC and to HQ USAFR for final action.

SAMUEL C. MULLIN III, Lt Colonel, USAFR
Staff Judge Advocate

Atch
Removal Action – Major Millican

86
7-2

REQUEST FOR — AUTHORIZATION FOR CHANGE OF ADMINISTRATIVE ORDERS
*(If more space is required, use reverse, identifying items by number)*

| TO: HQ ARPC/DPB,6760 E IRVINGTON PL #2000 DENVER CO 80280-2000 | FROM: HQ ARPC/DPBA, 6760 E IRVINGTON PL #2000 DENVER CO 80280-2000 | TELEPHONE DSN 926-6398 |
|---|---|---|

THE FOLLOWING ORDER IS: ☐ AMENDED AS SHOWN IN ITEM 5 / ☒ Rescinded ☐ Revoked ☒ Totally ☐ In Part)

IDENTIFICATION OF ORDER BEING CHANGED *(Issued by this Headquarters unless otherwise stated in item 6.)*

| 1. | | BASIC ORDER | | | | 2. PREVIOUSLY AMENDED BY | | |
|---|---|---|---|---|---|---|---|---|
| A. PARA | B. ORDER *(Type and Number)* | C. DATE | D. TED | ☐ PCS WITH PCA *(EDCSA)* ☐ PCS WITHOUT PCA | | A. PARA | B. ORDER *(Type and Number)* | C. DATE |
| | RO BA 1541 | 20000512 | | | | | | |

3. RELATING TO *(TDY, PCS, Short Tour of AD, etc.)*
PROMOTION

4. IDENTIFICATION OF INDIVIDUALS TO WHOM CHANGE ACTION PERTAINS

| A. GRADE | B. LAST NAME, FIRST, MIDDLE INITIAL | C. SSAN OR CIVILIAN POSITION TITLE | D. ORGANIZATION |
|---|---|---|---|
| MAJOR | MILLICAN, MARC J. 2540 CURLEW CIRCLE ANCHORAGE AK 99515-1353 | 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 | T81LFLPG |

5. AMENDMENT *(Identify item in order being amended)*

| A. ITEM | AS READS | IS AMENDED TO READ |
|---|---|---|
| B. ITEM | IS AMENDED TO READ *(Include) (Delete)* | |

6. REMARKS
PROPRIETY OF PROMOTION

7. ACCOUNTING CITATION

| 8. DATE | 9. ISSUING/APPROVING OFFICIAL *(Typed name, grade, and title)* | 10. SIGNATURE |
|---|---|---|
| 20000809 | RALPH A. MONDRAGON CHIEF,PROMOTION ELIGIBILITY DIVISION | *Ralph A. Mondragon* |

| 11. DESIGNATION AND LOCATION OF HEADQUARTERS DEPARTMENT OF THE AIR FORCE HEADQUARTERS AIR RESERVE PERSONNEL CENTER DENVER CO | 12. ORDER *(Type and Number)* RO BA - 388 | 13. DATE 20000809 |
|---|---|---|
| | 14. TDN FOR THE COMMANDER | |

| 15. DISTRIBUTION BA PLUS 349 MSS/DPMPS 520 WALDRON ST TRAVIS AFB CA 94535-2181 | 16. SIGNATURE ELEMENT OF ORDERS AUTHENTICATING OFFICIAL |
|---|---|
| | OFFICIAL DARRYL W. THOMPSON, Colonel, USAF Chief, Reserve of the Air Force Selection Board Secretariat |

AF FORM 973, 19831001 *(EF-V4)*   PREVIOUS EDITION WILL BE USED.

ARMS Retrieval Copy -- For Official Use Only

*82 8*



# DEPARTMENT OF THE AIR FORCE
### AIR FORCE RESERVE COMMAND

16 Jun 2000

MEMORANDUM FOR HQ AFRC/CV

FROM: HQ AFRC/JAM

SUBJECT: Legal Review of Propriety of Promotion Action (Removal) - Major Marc J. Millican, 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, 312th Airlift Squadron, Travis AFB CA

1. The subject action is legally sufficient. I recommend the removal of Major Millican from the FY00 Lieutenant Colonel promotion list.

2. CASE FILE.

    a. Major Millican was selected for promotion by the FY00 Air Force Reserve Line and Health Professions Lieutenant Colonel Promotion Selection Board with a promotion effective date of 22 Jun 00.

    b. In a memorandum dated 13 Mar 00, Brig Gen Black, 349 AMW/CC, notified Major Millican of his recommendation to remove him from the FY2000 Lieutenant Colonel promotion list. Brig Gen Black based his action on attempts by Major Millican to create discord within the 312 AS and to undermine the credibility of squadron leadership.

    c. Maj Gen Whaley, 4 AF/CC, concurs in the action.

    d. The notification memorandum was sent to Major Millican's home address in Anchorage, Alaska via certified mail. It was returned by the Postmaster as unclaimed. Address verification was requested and the Postmaster indicates that the address used is correct.

    e. Major Millican last performed military duty with 312 AS in Jul 99. He has accumulated unexcused UTA absences since that time.

3. DISCUSSION.

    a. This action is governed by AFI 36-2504, Chapter 7. In the subject case, all due process rights have been afforded to Major Millican. Although the AFI requires an officer to acknowledge receipt of the notification memorandum, Table 7.1, Note 3, states that a postal receipt indicating delivery will suffice as acknowledgment. Here, the case file contains such proof.

    b. A commander's recommendation to remove an officer's name from a promotion list automatically delays the promotion. AFI 36-2504, para 7.4.3.

88    9 - 1

c. Commanders initiate a propriety of promotion action when there is cause to believe that the officer is not mentally, physically, morally, or professionally qualified to perform the duties of the higher grade. A preponderance of the evidence proves that Major Millican is unfit to assume the grade of lieutenant colonel. The core of military readiness is the maintenance of good order and discipline. By his actions, Major Millican attempted to undermine this core.

(1) The case file contains a LOR, dated 19 Dec 99. It reprimands Major Millican for attempting to cause discontent and undermine discipline within the 312 AS. Specifically, Major Millican advised members of the squadron to refuse their anthrax inoculations. He also told members of the squadron via e-mail that the 312 AS/CC did not care about them and they should disregard his advice and directives. Moreover, he encouraged other pilots not to fly missions for the 301st Airlift Squadron in spite of 312 AS/CC's request to render assistance due to unit's impacted manning levels. The LOR was sent to Major Millican via certified mail, but it was returned as unclaimed.

(2) The case file contains a referral OPR. In it, Major Millican was downgraded for Leadership Skills, Professional Qualities, and Judgment and Decisions in Block V.

4. OPTIONS. Your options are:

a. Disapprove the action and return the case file through channels to Brig Gen Black.

b. Recommend approval of the action.

5. RECOMMENDATION. Based on the evidence, you should recommend approval of Major Millican's removal from the FY2000 Lieutenant Colonel promotion list.

P. CHRISTOPHER CLARK, Lt Col, USAF
Director, Military Law


Attachment
Case File



# DEPARTMENT OF THE AIR FORCE
### AIR FORCE RESERVE COMMAND

20 September 2000

MEMORANDUM FOR HQ AFRC/DPMB
ATTENTION: Ms Lowery

FROM: HQ AFRC/JAM

SUBJECT: Removal From Promotion List – Major Marc J. Millican

1. This responds to your 15 September request for a second review of the subject case to ensure the file "remains legally sufficient." By 349 AW/CC memorandum dated 31 July 2000, Maj Millican was granted an extension until 30 August 2000 to reply to the action. According to a 9 September 2000 memorandum from 349 AW/CC, the 31 July 2000 memorandum was sent by certified mail and was returned by the Postal Service on 31 August 2000 as unclaimed. Maj Millican submitted no reply to the action.

2. There has been no substantive change in the file as a result of the extension of time Maj Millican was given. Consequently, the file remains legally sufficient. However, because it predates the extension, the AFRC/CV memorandum dated 5 July 2000 should be withdrawn from the file and reaccomplished.

3. Although the 9 September 2000 349 AW/CC memorandum indicates a copy of the return notification on the certified mail was attached ("The certified package was returned unclaimed (Attachment 1) ..."), it is missing from the file. A copy of the envelope showing the reason the package was returned should be obtained an included in the file as was the case with the other mailings to Maj Millican in this case.

JOHN M. PELLETT, Lt Col, USAF
Director of Military Law

90    10

# DEPARTMENT OF THE AIR FORCE
### AIR FORCE RESERVE COMMAND

0 9 OCT 2000

MEMORANDUM FOR HQ USAF/RE

FROM: AFRC/CV
155 2d St
Robins AFB GA 31098-1635

SUBJECT: Propriety of Promotion, Major Marc J. Millican, 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

The attached case file pertaining to Major Marc J. Millican is forwarded in accordance with AFI 36-2504, Table 7.1. I recommend that Major Millican's name be removed from the FY00 Air Force Reserve Line and Health Professions Lieutenant Colonel Promotion Selection Board select list.

DAVID R. SMITH, Maj Gen, USAF
Vice Commander

Attachment:
Case File

91 11

# DEPARTMENT OF THE AIR FORCE
### REVIEW BOARDS OFFICE
### RANDOLPH AIR FORCE BASE TEXAS

**Office of the Assistant Secretary**

2 6 SEP 2003

Docket # BC-2003-02505

SAF/MRBR
550 C Street West Suite 40
Randolph AFB TX 78150

Maj MARC J MILLICAN USAFR Retired
2540 CURLEW CIRCLE
ANCHORAGE AK  99502-1653

Your case has been forward to the Air Force for Correction of Military Records (AFBCMR).  The attached advisory opinion(s) prepared by the office(s) of primary responsibility are forwarded for your review and comment, if desired.

### _THIS IS NOT THE DECISION ON YOUR APPLICATION_

You have 30 days from the date of this letter to comment on the advisory opinion(s) or provide additional evidence in support of your request to the AFBCMR.  If you need more time to comment, you must ask that your case be temporarily withdrawn until such time as you are able to proceed.  If you have nothing further to add, a response is not necessary.  **ALL FURTHER CORRESPONDENCE SHOULD BE SENT TO:**

> **AFBCMR**
> **1535 COMMAND DRIVE EE WING 3ᴿᴰ FLOOR**
> **ANDREWS AFB MD 20762-7002**

We cannot predict when your case will be decided, but assure you that it will be processed in its turn as rapidly as possible and will receive fair and objective consideration.  The AFBCMR staff will not provide further status, so the next correspondence you receive will normally be the decision on your case.

**Please address all correspondence to the AFBCMR at Andrews AFB MD at the above address.**
Include your social security/service number and your AFBCMR Docket Number on all correspondence.

For further information of a general nature, visit our web site at www.afpc.randolph.af.mil/safmrbr.

WILLIAM J ANDERSON, DAFC
Chief Review Boards Office
Air Force Review Boards Agency

Attachment
Advisory Opinion(s)

FL-1
Revised 1 Oct 01

92
EX D

Reply to:
32975 St. Moritz Drive
Evergreen, CO 80439
(303) 670-3825
Fax 670-1586

John A. Wickham, Esq.
Admitted in Virginia,
District of Columbia
& Military Courts

*CORRECTION



# John A. Wickham & Associates
## Attorneys-at-Law



17 November 2003

Air Force Board for Correction of Military Records (AFBCMR)
Department of the Air Force
Washington D.C. 20330-1430

Re:    Dkt. BC-2003-02505,
       MARC J. MILLICAN, Major, USAFR (Ret.) 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

*1 7 NOV 03* [FAXED stamp]

SUBJECT: 1.  Request for leave to file reply to advisory opinion (due 10 Nov)
         2.  Reply to advisory opinion

Board:
        Counsel for applicant respectfully requests leave to file his reply to the advisory opinion out of time by 8 days.  A letter from the BCMR dated 30 Oct 03 automatically denied the 30-day extension request and giving counsel 10 days to either reply, withdraw the application (by 10 Nov), or have the board act without a response.  Counsel understands the Congressional mandate to timely complete all BCMR applications but was unaware the AFBCMR (unlike the other service boards) refuses to grant extensions in every case.  Counsel believes the timeliness mandate does not limit the Board's discretion to allow exceptions due to hardship.
        Counsel in his extension request stated that his wife had recently given birth to twin boys after a problematic c-section, and is now suffering from a rare post-partum hyperclampsia (dangerously high blood pressure).  Counsel is taking temporary leave of absence from his law practice.  Counsel is a sole practitioner and cannot reassign the case to other counsel.  Counsel was first notified of the denial of the extension request by his office assistant on 13 Nov 2003.  Therefore, counsel requests the board grant leave of 7 days to permit consideration of the following reply to the advisory opinion.

RESPONSE TO ADVISORY OPINION, 5 SEP 2003

1.  The advisory opinion simply parrots various language within AF instructions offering little to address applicant's specific allegations against the LOR referral OPR, or to explain why his evidence should be dismissed as not credible.  Dickson v. Sec'y of Defense, 68 F.3d 1396, 1405 (BCMR's cursory language that merely parrots language from [regulation] without providing account of how it reached its results is inadequate basis for decision).
        A.  For example, the Adv.Op. quotes AFI 36-2410 that the "most effective evidence consists of statements from the evaluators."  The Opinion then offers a cursory statement that "applicant had no right to campaign against current policies."  But there is no analysis of applicant's evidence of policy statements from his evaluator, LTC Padilla: during the Anthrax cool-off period claiming "studies showed no long-term side effects," while encouraging unit members to "talk to people you know and trust" about the vaccine before you make a choice— a pandora's box.[1]  Applicant had just been selected for LTC, and trusted among his peers and subordinates.  Applicant returned from participating in Congressional hearings in Washington DC but learned that claims of safety studies were false and

---

[1] Supplemental Statement ¶ 3.

1



93
EX E

misleading. Applicant's participation as a witness in the hearings made him the trusted focal point of fellow unit members for information. Fueling this round-robin approach to military decision-making were applicant's reservist peers— civilians with aviation careers on the line with horror stories of health effects from an experimental vaccine. Applicant became a *de facto* whistle-blower.

    B.    The hearings were not a charade but caused a Presidential E.O. banning experimental drugs by DoD without voluntary consent. Congressional Committee chairmen then sent a letter to DoD to halt the Anthrax vaccines. A lawsuit was filed by other service-members. Although DoD curiously suspended the program for alleged shortages, this entire chronology backfired on Padilla's policy to encourage individual decision-making through computer chat-rooms. Applicant offered this public knowledge to his peers — not the diabolical mutiny his commander strains to portray in the LOR and OPR. The Adv.OP. does not dispute the reasonableness of applicant's actions responding to his commander's open-forum policy. Rather, the adverse documents and UIF were to single out a few— particularly Congressional witnesses— to end the discussion. In other words, trying to put the proverbial genie back in the bottle .

2.    With respect to the promotion delay statute, the advisory opinion is not a legal opinion, nor offers analysis of the <u>Rolader</u> case, nor why its regulatory spin on the law makes no sense. The Advisory Opinion claims that the promotion removal and delay statutes must operate separately, thereby implying that the Air Force (and any service) can delay any promotion forever under the "removal label" to circumvent the 18-month outer limit. But this completely guts § 14310, as the <u>Rolader</u> court pointed out. In fact, the Adv.Op. admits that applicant's promotion was delayed when a notice to HQ ARPC on 30 May 2000 "prompted an action to *withhold* applicant's promotion," so he was never promoted nor received LTC pay [italics added]. Accordingly, § 14310 was triggered and his orders for appointment effective 22 Jun 00 were rescinded. The Air Force had 18 months from his effective date of promotion to take final action. Because the Air Force believed it could ignore the delay limit, it had no need for suspense dates or moving forward with any alacrity.

    A.    Nor can regulatory exceptions be read into the delay statute to circumvent the 18-month outer limit (Adv.Op. claiming that AFI 36-2504 tacks on any delay "attributable to the officer." ).[2] Because the delay statute is not ambiguous on this point (and no legislative history suggests exceptions), the established legal rules for statutory construction leave no room for those who implement it to later conveniently insert exceptions or additions. Moreover, the opinion does not respond to case law that says no deference is due to a service's regulatory interpretation of a statute when other services implement it. It is hoped that an applicant's service BCMR has the professional integrity to take a reasoned, independent position on whether a service regulation is contrary to law, as opposed to a rubber-stamp process that forces reluctant service members into court. <u>Gonzalez v. United States</u>, 44 Fed.Cl. 764 (1999)(BCMR ignored federal law when its decision simply rubber-stamped Army regulation that denies reserve officers a pre-discharge hearing).

Respectfully submitted,

John A. Wickham, Esq.
Attorney for applicant

---

[2] Counsel notes that the Congressionally imposed 10-month time limit on processing BCMR cases, which was invoked by this Board, has been interpreted by the AFBCMR to *not* include any delay attributable to applicants— thereby denying any extensions to reply to advisory opinions.

94

Reply to:
32975 St. Moritz Drive
Evergreen, CO 80439
(303) 670-3825
Fax 670-1586

John A. Wickham, Esq.
Admitted in Virginia,
District of Columbia
& Military Courts



# John A. Wickham & Associates
## Attorneys-at-Law



22 December 2003

Air Force Board for Correction of Military Records (AFBCMR)
Department of the Air Force
Washington D.C. 20330-1430

Re:    Dkt. BC-2003-02505,
       MARC J. MILLICAN, Major, USAFR (Ret.) 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

SUBJECT:    New evidence, Doe v. Rumsfeld, No. 03-707 (D.D.C., 22 Dec 03),
            (preliminary injunction enjoining AVIP)

Board:
        Counsel for applicant submits new evidence discovered 22 December 2003 when the U.S.
District Court (D.D.C.), Doe v. Rumsfeld, No. 03-707, issued a preliminary injunction that ordered
the Department of Defense to stop inoculating service-members with the anthrax vaccine (AVIP),
without their consent. Although the case is not final, the injunction order states that "plaintiffs enjoy a
substantial likelihood of success on the merits" that the vaccine is an investigational drug because the
FDA has failed to provide the predicate "formal opinion as to [vaccine's] investigational status."
Attached Opinion at 28.
        Applicant Major Millican was disciplined with a LOR and promotion revocation for his alleged
"campaign against current policies," — policies that were forcing fellow units members to take
vaccine. Millican has always insisted that he was not disloyal but only responded to his commander's
ill-fated policy to "talk to people you know and trust" about the vaccine and make a choice. Moreover,
Padilla had spread false statements about the AVIP (now substantiated under Doe v. Rumsfeld) that it
was not investigational and long term studies showed its safety. Secondly, the case now shows
Padilla's order compelling the vaccine was illegal, because it violated the Executive Order that banned
investigational drugs without voluntary consent.
        Lastly, Millican under these unique circumstances had a protected First Amendment right of
association to educate his fellow unit members. Specifically, he had a constitutionally-protected
freedom of association because LTC Padilla first encouraged it, then unlawfully targeted Millican
because he merely argued the vaccinations were an illegal experimental drug. This is now
substantiated in Doe v. Rumsfeld. See also Brown v. Glines, 100 S.Ct., 594, n. 15 (1980)(service
members right to First Amendment freedom of association may not be curtailed when commander
action is irrational, invidious, or arbitrary); United States v. Wysong, 26 C.M.R. 29 (CMA 1958)(order
not to discuss case with persons was unconstitutional as overly broad).

                        John A. Wickham, Esq.
                        Attorney for Millican

Incl:
Doe v. Rumsfeld, No. 03-707 (D.D.C., 22 Dec 03),

95
EX F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE #1, *et al*,
                    Plaintiffs,

           v.               Civil Action No. 03-707 (EGS)

DONALD H. RUMSFELD, *et al*

                    Defendants.

## MEMORANDUM OPINION

Plaintiffs, members of the active duty and selected National Guardsmen components of the Armed Forces as well as civilian contract employees of the Department of Defense ("DoD") who have submitted or have been instructed to submit to anthrax vaccinations without their consent pursuant to the Anthrax Vaccine Immunization Program ("AVIP"), commenced this action against the Secretary of Defense (Donald Rumsfeld), the Secretary of Health and Human Services (Tommy Thompson), and the Commissioner of the Food and Drug Administration (Mark McClellan).

Because plaintiffs maintain that Anthrax Vaccine Adsorbed ("AVA") is an experimental drug unlicensed for its present use and that the AVIP violates federal law (10 U.S.C. § 1107), a Presidential Executive Order (Executive Order 13139), and the

1

96

DoD's own regulations (DoD Directive 6200.2), plaintiffs ask that
in the absence of a presidential waiver the Court enjoin the DoD
from inoculating them without their informed consent.  Plaintiffs
allege three causes of action against defendants: (1) violation
of the Administrative Procedure Act ("APA") by defendant DoD
based on the DoD's failure to follow federal law, a presidential
executive order, and DoD directive with respect to its AVIP; (2)
violation of the APA by defendant DoD for its intent to inoculate
plaintiffs with an unlicensed drug that is unapproved for its
intended use; and (3) violation of the APA by the defendants'
alteration of the licensed Federal Drug Administration ("FDA")-
approved schedule of vaccination which rendered AVA a drug
unapproved for its intended use.[1]

Defendants DoD and FDA maintain that the issues plaintiffs
present are non-justiciable and that plaintiffs fail to present
an evidentiary basis sufficient to support standing at the
preliminary injunction stage.  With respect to the merits, they
allege that, in seeking to prevent the DoD from inoculating them,
plaintiffs seek to undermine a key component of military
readiness and defense against battlefield use of biological
weapons.

Pending before this Court is a Motion for a Preliminary

---

[1] None of the plaintiffs alleged that their vaccination
schedule was altered, so the Court does not reach the third cause
of action.

2

Injunction.  The central question before this Court is whether
AVA is an "investigational" drug or a drug unapproved for its use
against inhalation anthrax.  Upon consideration of plaintiffs'
motion for a preliminary injunction, the opposition, the reply,
and oral arguments, as well as the statutory and case law
governing the issues, and for the following reasons, it is, by
the Court, hereby **ORDERED** that the Motion for a Preliminary
Injunction is **GRANTED**.  In the absence of a presidential waiver,
defendants are enjoined from inoculating service members without
their consent.

### I.   Background

### A. Factual Background

_____In 1970, the National Institutes of Health ("NIH"), the
agency then charged with licensing biologic drugs, _see_ 37 Fed.
Reg. 4004, 4004-04 (Feb. 25, 1972), licensed AVA for use against
anthrax.  _See_ 36 Fed. Reg. 8704, 8705 (May 11, 1971).  Two years
later, authority to approve biologic drugs was delegated to the
FDA.  37 Fed. Reg. 4004, 4004-05 (Feb. 25, 1972).

After the authority to license biologic drugs was delegated
to the FDA, the agency initiated a review of the safety,
effectiveness, and labeling of all licensed biologics.  21 C.F.R.
601.25.  The Federal Register published a proposed rule
containing the results of AVA's review on December 13, 1985.  In

3

98

that product review, the independent Biologics Review Panel

recommended that the vaccine be classified as safe, effective,

and not misbranded.  In their recommendations the panel discussed

the Brachman study[2] and stated that the vaccine's "efficacy

against inhalation anthrax is not well documented...no meaningful

assessment of its value against inhalation anthrax is possible

due to its low incidence."  Biological Products; Bacterial

Vaccines and Toxoids; Implementation of Efficacy Reviews, 50 Fed

Reg. 51,002 (Dec. 13, 1985)(to be codified at 21 C.F.R. pt. 610).

To date the AVA label does not specify which method of anthrax

exposure it protects against.  The Proposed Rule published in the

December 13, 1985, Federal Register has never been finalized.

---

[2] According to the December 13, 1995, Federal Register:
The best evidence for the efficacy of anthrax vaccine
comes from a placebo-controlled field trial conducted by
Brachman covering four mills processing raw imported goat
hair into garment interlining.  The study involved
approximately 1,200 mill employees of whom about 40
percent received the vaccine and the remainder received
a placebo or nothing.  The average yearly incidence of
clinical anthrax in this population was 1 percent.
During the evaluation period, 26 cases of anthrax
occurred.  Twenty-one had received no vaccines, four had
incomplete immunization and one had complete
immunization.  Based on analysis of attack rates per
1,000 person-months, the vaccine was calculated to give
93 percent (lower 95 percent confidence limit = 65
percent) protection against cutaneous anthrax based on
comparison with the control group.  *Inhalation anthrax
occurred too infrequently to assess the protective effect
of vaccine against this form of the disease.* (emphasis
added).  Biological Products; Bacterial Vaccines and
Toxoids; Implementation of Efficacy Reviews, 50 Fed Reg.
51,002 (Dec. 13, 1985)(to be codified at 21 C.F.R. pt.
610).

On October 5, 1995, the U.S. Army Medical Research and Material Command wrote the Michigan Department of Public Health ("MDPH"), the vaccine's manufacturer, that they were enclosing a plan "to expand the indication for use to include projections from aerosol exposure to B. anthraces spores." Pls.' Compl. Ex. G, Letter from Anna Johnson-Winegar to Robert Myers of October 5, 1995. The plan specifically asserts that "[t]his vaccine is not licensed for aerosol exposure expected in a biological warfare environment." Pls.' Compl. Ex. G, Attachment to Letter from Anna Johnson-Winegar to Robert Myers of October 5, 1995. The plan proposed was to amend the anthrax vaccine license through an Investigational New Drug ("IND") application submission.

On October 20, 1995 (as reflected in a November 13, 1995, memorandum from the Department of the Army Joint Program Office for Biological Defense) a meeting was held to discuss modifying the anthrax vaccine license "to expand the indication to include protection against an aerosol challenge of spores."[3]  Pls.' Compl. Ex. H, Mem. Regarding: Minutes of the Meeting on Changing the Food and Drug Administration License for the Michigan Department of Public Health (MDPH) Anthrax Vaccine to Meet

---

[3] At this meeting, Colonel Arthur Friedlander, Chief of the Bacteriology Division of the U.S. Army Medical Research Institute for Infectious Diseases, briefed meeting participants on (1) evidence for a reduction in the number of doses of anthrax vaccine, (2) evidence for vaccine efficacy against an aerosol challenge, and (3) progress toward an in vitro correlate of immunity.  SEALED.

Military Requirements from David L. Danley to Distribution List on November 13, 1995.

On July 2, 1996, the FDA held a meeting to consult with and provide guidance to the DoD and MDPH officials who were formulating the forthcoming September 1996 IND application.  The Army "presented a plan in progress to develop correlates in immunity in animals and then in humans vaccinated with MAVA in order to obtain a specific indication for inhalation anthrax." Pls. Reply Ex. 1, Summary of the Michigan Anthrax Vaccine Adsorbed (MAVA) Pre-IND Meeting with the FDA: Specific Indication for Inhalation Anthrax; Change in Schedule and Route at ¶ 5.

In September 1996, AVA's manufacturer submitted an IND application to the FDA in an attempt to get FDA approval for a modification of the AVA license to demonstrate the drug's effectiveness against inhalation anthrax.  The IND application is still pending and, to date, there is no indication for inhalation anthrax on the label or in the product insert.

In 1997, the Assistant Secretary of Defense "took...steps to confirm that AVA is approved for use against inhalation anthrax." Defs.' Opp'n at 10.  For instance, the Assistant Secretary of Defense (Health Affairs) wrote to the FDA's Lead Deputy Commissioner, stating that the "DoD has long interpreted the scope of the license to include inhalation exposure, including that which would occur in a biological warfare context" and

/ʊ/

inquiring "whether the FDA has any objection to our
interpretation of the scope of the licensure for the anthrax
vaccine." Defs. Opp'n. Ex. 3, Letter from Stephen Joseph to Mark
Friedman of March 4, 1997. The Lead Deputy Commissioner
responded "I believe your interpretation is not inconsistent with
the current label." Defs. Opp'n. Ex. 2 Attach. 3, Letter from
Mark Friedman to Stephen Joseph of March 13, 1997.

In a response to a citizen petition dated August 2002, the
FDA's Associate Commissioner of Policy noted that the FDA still
has yet to finalize the rule proposed in the December 13, 1985,
Federal Register. But here, contradicting the panel's position
regarding the Brachman study in the 1985 Federal Register, the
FDA stated that the Brachman study included inhalation anthrax.
Thus, the FDA concluded that "[t]he indication section of the
labeling does not specify the route of exposure and thus includes
both cutaneous and inhalation exposure." Pls.' Compl. Ex. D,
Resp. to Citizen Pet. Dated October 12, 2001 from Margaret Dotzel
to Russell Dingle on August 28, 2002.

The AVA product insert, which originally stated that the
adverse reaction rate to the vaccine was 0.2 percent, was
recently revised to reflect an adverse reaction rate between 5.0
percent and 35.0 percent. At least six deaths have been linked
to the vaccine and the vaccine's pregnancy use risk has been
upgraded from a Category C risk (risk cannot be ruled out) to a

7

Category D risk (positive evidence of risk.)

## B. Legal Background

In 1998, in response to concerns about the use of investigational new drugs during the 1991 Gulf War that may have led to unexplained illnesses among veterans, Congress signed into law 10 U.S.C. § 1107. This provision prohibts the administration of investigational new drugs, or drugs unapproved for their intended use, to service members without their informed consent. The consent requirement may be waived only by the President. In 1999, the President signed Executive Order 13139, pursuant to which the DoD must obtain informed consent from each individual member of the armed forces before administering investigational drugs and under which waivers of informed consent are granted only "when absolutely necessary." Exec. Order No. 13139, 64 Fed. Reg. 54,175 (September 30, 1999). In August, 2000, the DoD formally adopted these requirements in DoD Directive 6200.2.

In 1998, the DoD began a mass inoculation program using AVA as a preventative measure against inhalation anthrax for service members and civilian employees. The program was administered without informed consent or a presidential waiver. Plaintiffs contend that because AVA is not licensed for inhalation anthrax, its use by the DoD is not only investigational but it is also a drug unapproved for its intended use in violation of 10 U.S.C. §

8

/03

1107, Executive Order 13139, and DoD Directive 6200.2.  Tr. at 7-8.  Defendants maintain that they are not in violation of any law because AVA is not an investigational new drug and it is licensed for inhalation anthrax.

## II.  Standard of Review

_____When seeking a preliminary injunction, the movant must demonstrate to the Court that: (1) there is a substantial likelihood that plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction.  *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 361 (D.C. Cir. 1999).

## III.  Discussion

### A.  Justiciability

#### 1.  Jurisdiction in an Article III Court

The parties in this case dispute whether the threshold requirement of justiciability is met.  While plaintiffs maintain that the DoD's use of AVA in the AVIP is justiciable, defendants contend that the Article III case or controversy requirement is not met because (1) plaintiffs' claims are non-justiciable and (2) plaintiffs fail to present an evidentiary basis sufficient to

9

support standing for purposes of a request for preliminary injunction. Whether or not this Court can exercise jurisdiction over plaintiffs' claims depends on whether those claims fall within the narrow category of demands for equitable relief that are not barred under the D.C. Circuit's jurisprudence.

Courts have traditionally been hesitant to intervene in the conduct of military affairs. *See, e.g., United States v. Stanley,* 483 U.S. 669, 683-84 (1987); *Chappell v. Wallace,* 462 U.S. 296, 300 (1983). The general concern that courts are "ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have," *Chappell,* 462 U.S. at 305, is heightened when courts are called upon to intervene between soldiers and their military superiors. *See, e.g. Gilligan v. Morgan,* 413 U.S. 1, 10 (1973) (observing that the "complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments....."). Based on concerns surrounding judicial competence, the Supreme Court has declined to entertain service-related damages claims under the Federal Tort Claims Act, *see, e.g., Feres v. United States,* 340 U.S. 135 (1950), and *Bivens* actions "whenever the injury arises out of activity 'incident to service.'" *Stanley,* 483 U.S. at 681.

While claims for damages are nonjusticiable, the circuits

10

/05

are divided with respect to the viability of claims for
*injunctive relief* against the military.  The case of *Speigner v.*
*Alexander,* 248 F.3d 1292, 1296 (11th Cir. 2001), *cert denied,* 543
U.S. 1056 (2001), held that cases brought by enlisted personnel
against the military for injuries incident to service are
nonjusticiable, whether those claims request monetary or
injunctive relief.  In its decision, the Eleventh Circuit
surveyed the appellate decisions addressing the justiciability of
claims seeking injunctions against the military.  The court noted
that the Second, Fifth, Seventh, and Eighth Circuits had all
found suits by enlisted personnel against the military for an
injury incident to service nonjusticiable for injunctive relief
as well as for damages.  The *Speigner* court observed that the
minority of circuits have held that injunctive relief is
attainable against the military.  The First Circuit, for
instance, explicitly held that, "*Chappell* and *Stanley* make it
clear that intramilitary suits alleging constitutional violations
but not seeking damages are justiciable." *Wiggington v.*
*Centracchio,* 205 F.3d 504, 512 (1st Cir. 2000).  In *Jorden v.*
*Nat'l Guard Bureau*, the Third Circuit held that "*Chappell* itself
suggests that it leaves open claims for injunctive relief against
the military." 799 F.2d 99, 100 (3d Cir. 1986).

The United States Court of Appeals for the D.C. Circuit,
however, has not interpreted *Chappell* or *Feres* as embracing

/06

categorical rules.  In a recent opinion addressing the
justiciability of a service member's suit for equitable relief
the D.C. Circuit stated that the "Supreme Court has made
clear...that *Feres* does not bar all suits by service
personnel...." *Braanum v. Lake,* 311 F.3d 1127, 1130 (D.C. Cir.
2002).  The *Braanum* court rejected any distinction between facial
challenges and as applied challenges and noted that "some as
applied challenges are plainly permitted."  *Id.*  The court found
that Braanum's assertions that his due process and other rights
were violated by the military taking actions against him in
excess of its jurisdiction under the Military Code fell squarely
within the Supreme Court's decision in *Schlesinger v. Councilman.*
*See Braanum,* 311 F.3d at 1130 (citing 420 U.S. 738, 740 (1975)).
In *Schlesinger,* the Court held that Article III courts had
jurisdiction to entertain an Army captain's suit seeking an
injunction against pending court martial proceedings based on
conduct he claimed was non "service-related" and therefore
outside the court martial jurisdiction.  *Id.*

Plaintiffs in this case argue that district courts called
upon to review military decisions must employ the test adopted in
*Mindes v. Seamen,* 453 F.2d 197 (5th Cir. 1971), *affirmed on
appeal after remand,* 501 F.2d 175 (5th Cir. 1974).  *See* Pls.'
Mot. at 5; Pls.' Reply at 7.  The *Mindes* court held that a court
should only review internal military affairs if there is an

12

allegation that a constitutional right has been deprived or an
allegation that the military has acted in violation of applicable
statutes or regulations. *Mindes,* 453 F.2d at 201. The Fifth
Circuit determined that there are four factors a court must
analyze:

> (1) the nature and strength of the plaintiff's challenge to
> the military determination;
>
> (2) the potential injury to the plaintiff if review is
> refused;
>
> (3) the type and degree of anticipated interference with the
> military function;
>
> (4) the extent to which the exercise of military expertise
> or discretion is involved (courts should defer to
> superior knowledge and experience of professionals in
> matters such as military personnel decisions or other
> areas that relate to specific military functions.)

*Id.*

While plaintiffs concede that the D.C. Circuit has not
expressly adopted the *Mindes* test, they point out that it has not
rejected the test in circumstances such as those presented in the
case at bar. The case of *Kreis v. Secretary of the Air Force,*
866 F.2d 1508, 1512 (D.C. Cir. 1989), however, suggests to this
Court that the D.C. Circuit Court may not look particularly
favorably upon the *Mindes* analysis. In the *Kreis* case, an Air
Force major brought suit seeking retroactive promotion or, in the
alternative, correction of military records. The Court of
Appeals held that the major's claim for retroactive promotion was
a nonjusticiable military personnel decision and that his

13



alternative claims for correction of military records were
justiciable.  In holding that appellant's second claim was
justiciable as a request for review of agency action, the court
held that

> In dismissing this case, the district court considered
> neither *Chappell* nor our decisions relying upon it.
> Instead, the court concluded that appellant's entire
> complaint    is    nonjusticiable    based    solely    on
> *Mindes*...which, the district court noted, we cited in
> *Dilley v. Alexander,* 603 F.2d 914, 920 (D.C. Cir. 1979).
> Our reference to *Mindes,* however, was not intended to
> foreclose judicial review of decisions involving the
> correction of military records; indeed, in the same
> paragraph, we said that the federal courts may inquire
> whether the Secretary's action in this area is
> "arbitrary, capricious, or contrary to the statutes and
> regulations governing that agency." *Id.*  Nor did we adopt
> the *Mindes* court's four factor analysis, which, as the
> Third Circuit has pointed out, erroneously "intertwines
> the concept of justiciability with the standards to be
> applied to the merits of the case." *Dillard v. Brown,* 652
> F.2d 316, 323 (3d Cir. 1981).

*Kreis,* 866 F.2d at 1512.

As the above discussion highlights, there is no bright line
rule in the D.C. Circuit when it comes to establishing
justiciability.  What can be said with certainty is that this
Circuit has not ruled out the right of individuals to seek
injunctive relief against the military in civilian courts in all
cases.  Therefore, to assess the question of justiciability, this
Court examines: (1) whether a court martial was pending against
any of the plaintiffs, *see, e.g., Schlesinger,* 420 U.S. 738; (2)
the degree to which a ruling by this Court would interfere with

supervisory-subordinate relationships on the battlefield and/or personnel decisions, see, e.g., Chappell, 462 U.S. 296; and (3) the extent to which action by this Court would affect or disrupt the goals of discipline, obedience, and uniformity, see, e.g., Goldman v. Weinberger, 475 U.S. 503 (1986).

First, this lawsuit was not instigated in an attempt to thwart a pending court martial, as was the case in Schlesinger, 420 U.S. 738. Moreover, this Court has no reason to believe that any of the plaintiffs are currently facing a court martial. In fact, three of the plaintiffs have complied with the order to take the inoculation and are seeking review of the DoD's order in this Court. Tr. at 38. Further, two of the plaintiffs are civilian employees and could not be subjected to court martial proceedings. Tr. at 36. At most, only one plaintiff could potentially be facing a court martial and, in the event that the situation arose, the case could be permitted to proceed with regard to the other plaintiffs. Thus, there are no concerns that this lawsuit was an attempt to interfere with pending court martial proceedings or that a judgment in this case will interfere with a pending court martial against one of the plaintiffs.

Second, plaintiffs allege that the DoD acted arbitrarily and capriciously by failing to adhere to statutes and regulations governing its activities. Their claim is against the Secretary

15

of Defense about a decision made in headquarters, not about a tactical decision military supervisors made in the field.  Tr. at 13.  Similarly, because plaintiffs are a diverse class and include civilian individuals who are not in the employ of the military, the danger of disrupting discipline and/or supervisory-subordinate relationships is minimal at best.  Thus, a judgment in this Court would not interfere with a supervisory-subordinate relationship on the battlefield.

Third, while the Court is cognizant of the fact that allowing some service members to refuse inoculations at this stage could threaten the uniformity of the military, this case is not analogous to *Goldman,* where plaintiff sued to enjoin application of an Air Force regulation that forbade officers from wearing a yarmulke while on duty.  *Goldman*, 475 U.S. 503.  In *Goldman*, the Court recognized that importance of the appearance of uniformity for a effective functioning military.  *Id.* at 510 ("The Air Force has drawn the line essentially between religious apparel that is visible and that which is not, and we hold that those portions of the regulations challenged here reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity.")  Rather, here there will be no visible differences between persons who choose to receive the vaccine and those who choose not to receive the vaccine.  Thus, concerns about uniformity diminish and a judgment in this case

16

would not affect the uniformity of military personnel to any
substantial degree.


## 2. Availability of APA Review

Defendants maintain that Section 10 of the APA precludes
judicial review. Defs.' Opp'n at 20. Specifically, they point
to 5 U.S.C. § 701(b)(1)(G), which renders the APA's judicial
review provisions inapplicable to acts of "military authority
exercised in the field in time of war or in occupied territory."
In addition, they refer to 5 U.S.C. § 701(b)(1)(F), a provision
barring judicial review of "court martial and military
commissions." Finally, defendants aver that the APA "excludes
from its waiver of immunity...claims for which an adequate remedy
is available elsewhere." *Transhio Sav. Bank v. Director OTS,* 967
F.2d 598, 607 (D.C. Cir. 1992).

The Court finds 5 U.S.C. § 701(b)(1)(G) inapplicable to the
present situation. As plaintiffs note, the AVIP was announced in
December, 1997, implemented initially in March, 1998, and
implemented force-wide in May of that year. Due to the vaccine
shortages discussed above, few of the service members who fought
in Afghanistan in 2001-2003 were vaccinated at all. The
recommencement of the AVIP program was announced on June 29,
2002, - a date which predated Congressional authorization for the

17

use of force in Iraq by four months and the recent hostilities by almost eighteen months.  The plaintiffs in the instant case are not challenging military authority exercised in the field in a time of war or in occupied territory.  In fact, according to plaintiffs, "[n]one of the plaintiffs are presently in the 'field' or in 'occupied territory.'"  Pls.' Reply at 9. Moreover, the order for the program at issue in this case was given by the Secretary of Defense, not by commanders in the field.  Similarly, the Court finds 5 U.S.C. § 551(1)(F) inapplicable, as none of the plaintiffs in this case have asked this Court to review a court martial or military commission proceedings.

Finally, defendants submit that the proper forum for plaintiffs to raise their claims is in the military justice system *after* having refused orders to take the vaccine.  They cite the case of *New v. Cohen,* 129 F.3d 639 (D.C. Cir. 1997), as the principal authority in support of their proposition.  While this D.C. Circuit opinion does embrace comity principles and the exhaustion requirement, it explicitly states that, at the heart of the comity principle "is the general rule that a federal court must await the final outcome of court-martial proceedings in the military justice system before entertaining an action by a service member *who is the subject of the court-martial.*"  *New,* 129 F.3d at 642. (emphasis added.)  Similarly, the decision

18

*/13*

refers repeatedly to "pending" court martial proceedings, service members "charged" with crimes by military authorities, and the prohibition on "collateral review" of court-martials. *Id.* at 643. The language in *New* strongly suggests that its holding applies to cases in which alternative channels within the military justice system are already being pursued by, or against, the plaintiffs. The thrust of the *New* decision is clearly that Article III courts should not interfere with the proceedings of military tribunals. In the present case, the Court has no reason to believe that any of the plaintiffs are currently facing a court martial. Moreover, the civilian plaintiffs cannot be subjected to court martial proceedings. Thus, the Court finds no reason to stay its hand based on *New*.

Instead, this Court reads *New* for the proposition that the courts are another option for plaintiffs. As *New* stated:

> [u]pon receiving orders which he thought to be illegal,
> New had two options. He could have chosen to obey the
> orders and then sought judicial review of the military's
> policies. *Cf. Goldman v. Weinberger,* 475 U.S. 503 (1986)
> (suit to enjoin application of Air Force regulation that
> forbade officer from wearing yarmulke while on duty and
> in uniform). Or he could follow the path that he took:
> disobey the orders and challenge their validity in the
> subsequent disciplinary proceedings.

*New,* 129 F.3d at 647. At oral argument plaintiffs' counsel informed this Court that all six of the plaintiffs have been ordered to submit to the vaccine. Tr. at 38. Three of the

19

*114*

plaintiffs obeyed the order and now seek judicial review.  *Id.*
This Court finds that it is one of the proper forums for this
claim.


### 3.  Standing

A core element of Article III's case or controversy
requirement is that a plaintiff must establish that he or she has
standing to sue.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555,
561 (1992).  The "question of standing is whether the litigant is
entitled to have the court decide the merits of the dispute or of
particular issues."  *Allen v. Wright,* 486 U.S. 737, 750-51
(1984).  A plaintiff must meet three requirements in order to
establish Article III standing.  *See, e.g., Friends of Earth,
Inc. v. Laidlaw Environmental Serv. (TOC), Inc.,* 528 U.S. 167,
180-91 (2000).  First, she must demonstrate "injury in fact" - a
harm that is "concrete," "actual or imminent, not conjectural or
hypothetical."  *Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990);
*see also City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983).
Second, she must establish causation - a "fairly...trace(able)
connection between the alleged injury in fact and the alleged
conduct of the defendant."  *Simon v. Eastern Ky. Welfare Rights
Org.,* 426 U.S. 26, 41 (1976).  Third, she must demonstrate
redressability - a "substantial likelihood" that the requested

20

*115*

relief will remedy the alleged injury in fact.  *Id.* at 45.

A plaintiff seeking injunctive relief demonstrates the first two standing requirements only by showing that the defendant is likely to injure the plaintiff.  *Cone Corp. v. Florida Dep't of Transportation,* 921 F.2d 1190, 1205 (11th Cir. 1991).  "Mere allegations will not support standing at the preliminary injunction stage."  *Doe v. Nat'l Bd. Med. Exam'rs,* 199 F.3d 146, 152 (3rd Cir. 1999); *see also Nat'l Wildlife Fed. v. Burford,* 878 F.2d 422, 423 (D.C. Cir. 1989) *rev'd on other grounds sub non Lujan,* 497 U.S. 871 (burden of establishing standing at preliminary injunction stage is no less than for summary judgment).

In the present case, the government alleges that plaintiffs' claims of injury are purely speculative because adverse personnel actions against them for refusing inoculations may or may not occur.  However, the Court agrees with plaintiffs that the defendants' argument ignores the fact that when challenging an investigational drug under 10 U.S.C. § 1107 an inoculation without informed consent or a presidential waiver is the injury. Tr. at 32.  Because all six plaintiffs have been ordered to appear for the inoculation, and three of the six have already begun the series with more inoculations to follow, all plaintiffs have established that they will imminently suffer a harm that is actual, concrete, and inflicted at the hands of defendants unless

*116*

defendants are required to conform to 10 U.S.C. § 1107.

## II.  Likelihood of Success on the Merits

Having found that this claim is justiciable, the central question before the Court is whether AVA is being used as an investigational new drug or as a drug unapproved for its intended use.  At bottom, this inquiry turns on whether the FDA has made a final decision on the investigational status of AVA; and if not (1) whether the 1996 IND application establishes the vaccine's status as an investigational drug and (2) whether the DoD is using AVA in a manner inconsistent with its license and intended use.[4]

As indicated previously, defendants' position is that 10 U.S.C. § 1107 is inapplicable because the AVA's license covers use against inhalation anthrax.  Defs.' Opp'n Ex. 1, Goodman Decl. ¶ 11.  They argue that the FDA has interpreted the lack of specificity concerning inhalation anthrax as permitting use of the vaccine against any route of exposure.  While neither explaining the panel's finding in the December 15, 1985, Federal Register proposed rule stating that cases of inhalation anthrax

_____

[4] In light of the fact that, as defendants concede, a vaccine can be licensed for one purpose and investigational for another, plaintiffs are correct in asserting that whether or not the vaccine in question is "licensed" is not, in itself, dispositive.

in the Brachman study were too infrequent to assess the vaccine
against inhalation anthrax nor citing any additional studies of
inhalation anthrax, defendants aver that agency officials have
always considered the vaccine to include inhalation anthrax.  Tr.
at 92.  They further allege that the 1996 IND application was
submitted as a result of a dispute between underlings (Tr. at 92-
93) and state that while the application is still technically
pending, it is not longer being actively pursued.  Tr. at 119.
In addition, defendants point to a 1997 letter written by the
Assistant Secretary of Defense stating that the IND application
in no way suggests an official position that the DoD believed the
approved label did not already encompass inhalation exposure.
See Defs.' Opp'n at 31.  Defendants note that such
interpretations by an agency within its area of expertise are
entitled to substantial deference.  In support of their position,
they cite several cases, including Thomas Jefferson Univ. v.
Shalala, 513 U.S. 504, 512 (1994) and Trinity Board of Fla., Inc.
v. FCC, 211 F.3d 618, 625 (D.C. Cir. 2000), standing for the
proposition that an agency is entitled to deference with respect
to the interpretation of the statutes it is tasked with
administering.

    While defendants' arguments concerning deference are
correct, the dispute in this case has not focused on the language
of a particular DoD statute.  Rather, it is the FDA's term

<center>23</center>

/18

"investigational" that is at the heart of the dispute.  Title 10

U.S.C. § 1107 and the attendant DoD regulation apply only if the

FDA determines that AVA is an investigational drug or a drug

unapproved for its present purpose.  As plaintiffs note, the

letters and declarations defendants cite are not "formal FDA

opinion(s)."  See 21 C.F.R. § 10.85(k)(2000).  Under 21 C.F.R. §

10.85(k)

> A statement made or advice provided by an FDA employee
> constitutes an advisory opinion only if it is issued in
> writing under this Section.  A statement or advice given
> by an FDA employee orally or given in writing but not
> under this section or § 10.90 is an informal
> communication that represents the best judgment of that
> employee at the time, but does not constitute an advisory
> opinion, does not bind or otherwise obligate or commit
> the agency to the views expressed.

Similarly, the personal opinions of FDA officials as expressed in

a series of letters are not entitled to any particular deference.

See Christensen, et al v. Harris County, et al., 529 U.S. 576

(2000) (holding that an agency statutory interpretations

contained in opinion letters are entitled to respect but only to

the extent that interpretations have power to persuade.)  The

apparent change in position from the December 1985 proposed rule

and the cryptic use of a double negative (i.e. "it is not

inconsistent"), fail to persuade this Court that the view

expressed in the 1997 letter is the FDA's formal opinion.  Given

that finding, the FDA has failed to provide any formal opinion

vis a vis AVA's investigational status and the Court must

24

119

consider plaintiffs' arguments.[5]

In 1996, the manufacturer of the AVA, the Michigan Department of Public Health, filed an Investigational New Drug Application that remains open today.  The manufacturer's stated purpose for filing the application was "to conduct clinical investigations designed to investigate changes in the approved labeling for the licensed product.  The potential labeling would affect the specific clinical indication, route and vaccination schedule for AVA."  Pls.' Compl. Ex. J, Letter from MDPH to Dr. Kathryn C. Zoon of October 20, 1996.  The Introductory Statement to the 1996 IND application similarly provided that "[t]he ultimate purpose of this IND is to obtain a specific indication for inhalation anthrax and a reduced vaccination schedule."  Pls.' Compl. Ex. K, Introductory Statement to the 1996 IND Application of September 20, 1996.

The source of the dispute concerns whether current use of the AVA for inhalation anthrax is licensed in light of the drug's present status and the IND application.  Plaintiffs contend that,

---

[5] At the oral argument, the government argued that the Citizen Petition states that the drug is licensed for inhalation anthrax and that is the agency's official position.  Tr. at 86. However, the Court is persuaded by plaintiffs' arguments that the Citizen Petition addressed the licensing issue by merely relying on the 1997 Friedman letter and did not do the in-depth analysis as would be appropriate to make that kind of a determination or to contradict the opinion it expressed concerning the Bachman study in the 1985 Federal Register.  *See* Tr. at 125.

as there has been insufficient study of the vaccine, its license does not incorporate inhalation anthrax. They rely on a 1985 panel that found that the license for anthrax was not broad enough to include inhalation anthrax. The panel findings were based partially on the Brachman Study, which noted that there were too few cases of inhalation anthrax to determine the efficacy of the vaccine. *See* Brachman and Friedlander, Vaccines 736 (eds. Plotkin and Mortimer)(1999). The Brachman Study observed that there have been "no controlled clinical trials in humans of the efficacy of the currently licensed U.S. vaccine." *Id.*[6] Plaintiffs correctly note that there have been no subsequent human studies on the efficacy of the vaccine against inhalation anthrax since that time. In addition, plaintiffs submit that defendants' own documents support their position that a vaccine is investigational if it is used in a manner, or for a purpose, identical to that set forth in the IND application. In this regard, plaintiffs cite a number of documents, including the October 5, 1995, letter by the U.S. Army Medical Research and Material Command, the November 13, 1995, memorandum from the Department of the Army's Joint Program Office for Biological Defense, and information provided by the Army at the July 2, 1996, FDA-sponsored meeting, chronicling the government's

---

[6] *See* Pls.' Reply at 13 n. 12 for relevant congressional testimony.

/121/

statements that the AVA lacked licensure for protection against inhalation anthrax.

Plaintiffs conclude that, because there is insufficient scientific evidence demonstrating that the anthrax vaccine protects against anthrax inhalation exposure, the government's claims violate fundamental precepts of drug law. Specifically, plaintiffs submit that the government claim violates 21 C.F.R. § 201.56(c), detailing general requirements on content and format of labeling for prescription drugs, which provides:

> The labeling shall be based whenever possible on data derived from human experience. No implied claims or suggestions of drug use may be made if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness. Conclusions based on animal data but necessary for safe and effective use of the drug in humans shall be identified as such and included with human data in the appropriate section of the labeling, headings for which are listed in paragraph (d) of this section.

Moreover, plaintiffs contend that 21 C.F.R. § 201.57 (c)(2) is violated. That section provides that "All indications shall be supported by substantial evidence of effectiveness based on adequate and well-controlled studies." *Id.* Plaintiffs assert that the government cannot identify "substantial evidence of effectiveness based on adequate and well-controlled studies" for the anthrax vaccine with respect to protection against inhalation anthrax.

While the issues presented to the Court are complex, and the

27

evidence somewhat contradictory, the Court is ultimately persuaded that plaintiffs enjoy a substantial likelihood of success on the merits for the following reasons. The FDA, the only agency that this Court could properly defer to in determining AVA's status as an investigational drug, has failed to provide a formal opinion as to AVA's investigational status. Having made that determination, the Court is required to make its own inquiry and determination regarding AVA's investigational status. The Court looked at the labeling requirement, 21 C.F.R. § 201.56, which mandates that "[n]o implied claims or suggestions of drug use may be made if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness." In the case of AVA, the 1985 panel found insufficient data to license the drug for use against inhalation anthrax. To date, no additional studies have been performed and AVA's label does not specify use of the vaccine for this purpose. Moreover, the Court is persuaded that the 1996 IND application remains pending today. The introduction to the application expressly states that one objective of the application is to obtain a specific indication for use of AVA against inhalation anthrax. While the government states that the inhalation anthrax aspect of the IND is no longer active, the documents submitted to this Court under seal suggest otherwise.[7] Finally, statements made by DoD officials suggest

---

[7] SEALED.

28

*123*

that the agency itself has, at some point at least, considered
AVA experimental with respect to inhalation anthrax.  Given all
these factors, the Court would be remiss to conclude that the
original license included inhalation anthrax.  Having reached
that conclusion, the DoD's administration of the inoculation
without consent of those vaccinated amounts to arbitrary action.

### III. The Public Interest

Plaintiffs maintain that Executive Order 13139, Department
of Defense Directive 6200.2, and especially 10 U.S.C. § 1107,
were enacted to protect soldiers from involuntarily serving as
"guinea pigs" in a mass use of investigational medicine.  Pls.'
Mot. at 23.  In their view, defendants' disregard of the
violations has already caused half a million members of the armed
forces to be experimental subjects without their consent.

Defendants base their public policy argument on the idea
that requiring compliance with informed consent would render it
infeasible to continue the AVIP for current military operations
in Iraq or in conjunction with the war on terrorism.
Essentially, defendants argue that the harm to the public
interest would include disrupting the smooth functioning of the
military, hampering military readiness, and reducing the
military's ability to protect its service members.  Should those
individuals who have refused anthrax vaccinations be injured by

29

anthrax, their injuries or deaths would have a detrimental effect
on the military and its operation at large.  Defs.' Opp'n at 37.
Plaintiffs counter by observing that if the risks of anthrax
injuries were so manifestly present, the State Department, as
well as the coalition forces of Britain and Australia, would have
taken similar steps to protect their employees.  Plaintiffs
refute the government's argument concerning the cumbersome
administrative results that could ensue from the granting of a
preliminary injunction by stating that the DoD was able to comply
with similar administrative proceedings in only three weeks
between adoption of the predecessor of 10 U.S.C. § 1107 and the
start of the Gulf War in 1991.  Plaintiffs conclude by remarking
that "if the danger articulated by the government is so
clear...there should be little difficulty in convincing the
President...to sign off on the required paperwork to make the
AVIP mandatory...which is all plaintiffs can ask."  Pls.' Reply
at 24.

     The Court is persuaded that the right to bodily integrity
and the importance of complying with legal requirements, even in
the face of requirements that may potentially be inconvenient or
burdensome, are among the highest public policy concerns one
could articulate.  Moreover, the Court is not convinced that
requiring the DoD to obtain informed consent will interfere with
the smooth functioning of the military.  However, if obtaining

30

informed consent were to significantly interfere with military
function, defendants are free to seek a presidential waiver.  If
the Executive branch determines that this is truly an exigent
situation, then obtaining a presidential waiver would be an
expeditious end to this controversy.

## IV.   Irreparable Harm

Plaintiffs argue that their injuries from non-consensual
inoculations would be irreparable.  They note that the informed
consent documents provided to civilians as a result of the
anthrax laden letters in the Fall of 2001 identify side effects
such as Guillain-Barre Syndrome, multiple sclerosis, angiodema,
aseptic meningitis, severe injection site inflammation, diabetes,
and systemic lupus erythmatosis.  In addition, the pregnancy risk
assessment has, as noted above, been recently upgraded.  Pls.'
Mot. at 15.  It is impossible to tell with any certainty what the
long-term effects of the vaccination will be.  Regardless,
plaintiffs submit that no monetary award can adequately
compensate individuals whose right to informed consent has been
violated.

Defendants' position is that harm in the form of potential
side effects is "hypothetical or, at best, unlikely to occur."
Defs.' Opp'n at 40.  Defendants refer to a *de minimis* risk of
serious adverse reactions and report 105 serious adverse

126

reactions from AVA in over 830,000 recipients. *Id.* They stress that AVA has been used effectively in civilian industry for over 30 years.

Having found that AVA is an investigational drug under 10 U.S.C. § 1107, the Court is persuaded that requiring a person to submit to an inoculation without informed consent or the presidential waiver is an irreparable harm for which there is no monetary relief.

### Conclusion

The Court has considered Plaintiff's Motion for a Preliminary Injunction, the Response and Reply thereto, counsel's representations at oral argument, and the relevant statutory and case law. In sum, because the record is devoid of an FDA decision on the investigational status of AVA, this Court must determine AVA's status for itself. This Court is persuaded that AVA is an investigational drug and a drug being used for an unapproved purpose. As a result of this status, the DoD is in violation of 10 U.S.C. § 1107, Executive Order 13139, and DoD Directive 6200.2. Thus, because the plaintiffs are likely to prevail on the merits, defendants will not face substantial harm by the imposition of an injunction, the public interest is served, and plaintiffs face irreparable harm, the Court finds that the plaintiffs meet the requirements for a Preliminary Injunction.

The women and men of our armed forces put their lives on the line every day to preserve and safeguard the freedoms that all Americans cherish and enjoy.  Absent an informed consent or presidential waiver, the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs.

An appropriate Order accompanies this Opinion.

33

128

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                )
JOHN DOE #1, et al,             )
                                )
                Plaintiffs,     )
                                )
        v.                      )  Civil Action No. 03-707 (EGS)
                                )
DONALD H. RUMSFELD, et al       )
                                )
                Defendants.     )
                                )
```

### ORDER

Pursuant to Fed. R. Civ. P. 65 and for the reasons stated by the Court in its Memorandum Opinion docketed this same day, it is this 22nd day of December, 2003, hereby

**ORDERED** that the Motion for a Preliminary Injunction is **GRANTED**. In the absence of a presidential waiver, defendants are enjoined from inoculating service members without their consent; and it is

**FURTHER ORDERED** that defendants are directed to file responsive pleadings by January 30, 2004; and it is

**FURTHER ORDERED** that an Initial Scheduling Conference is scheduled for **March 9, 2004 at 10:00 a.m.** Pursuant to LCvR 16.3 of the Local Rules and Fed. R. Civ. P. 26(f) counsel shall meet and confer by no later than February 24, 2004 and submit their Report addressing all topics listed in LCvR 16.3(c) by no later than March 2, 2004.

**Signed:    Emmet G. Sullivan**
**            United States District Judge**
**            December 22, 2003**

34

*/ɔ5*



**DEPARTMENT OF THE AIR FORCE**

OFFICE OF THE CHIEF OF STAFF

WASHINGTON, DC

14 January 2004

MEMORANDUM FOR AFBCMR

FROM:  HQ USAF/JAA
　　　　1420 Air Force Pentagon
　　　　Washington D.C. 20330-1420

SUBJECT:  Application for Correction of Military Records - Marc J. Millican (AFBCMR
　　　　　　03-02505)

　　　　This is in response to your request for our review and comment on subject application.  The
applicant requests that his retired grade be changed from major to lieutenant colonel and that the
adverse Officer Performance Report, Letter of Reprimand and promotion propriety action he
received while as a member of the United States Air Force Reserves be set aside.  He also
requests that the administrative consequences deriving from the above actions be rescinded and
that he be given constructive service credit and retroactively placed in an active participation
status through 30 June 2003, along with back pay and allowances for the UTAs he missed since
1999.  A brief recital of the factual background of this case may aid the Board in its review.

　　　　The applicant was a C-5 pilot assigned to the 312th Airlift Squadron, Travis AFB, California.
The 312 AS/CC informed him in February 1999 that all squadron personnel were required to
begin receiving anthrax shots before flying on any airlift missions and in no case later than 1 July
1999, in accordance with the DoD Anthrax Immunization Vaccine Program (AVIP).  The
applicant refused to participate in the program, citing his belief that the shots were experimental
and could cause severe medical problems.  In May and June 1999, the commander reaffirmed his
previous statement that the shots were mandatory and that failure to participate in the anthrax
program would prevent those members from participating in UTAs.  In June 1999, the 349th
Wing Commander rated the applicant as a "definitely promote" on his Promotion
Recommendation Form.  The FY 2000 Air Force Reserve Line Selection Board subsequently
selected the applicant for promotion to lieutenant colonel in July 1999.  His effective date of
promotion was to be 22 June 2000.

　　　　In July 1999, the applicant participated in various Congressional hearings involving the
anthrax program.  The case file does not clearly indicate what he discussed, but it appears he
provided information to the panels concerning pilots who suffered medical problems, ostensibly
due to the anthrax shot.  On 26 July 1999, the commander sent the applicant a letter informing
him that because he had not started the anthrax regimen, he was no longer eligible to perform
UTAs.  The applicant again refused to comply with the AVIP requirements and on 15 November
1999, the commander notified the applicant of his intention to have the applicant involuntarily
transferred to the Standby Reserve.  The basis for the transfer was the applicant's unsatisfactory
participation in UTAs for calendar year 1999.  The applicant did not respond to the notice and
the commander forwarded his recommendation to the 349 AMW/CC on 19 December 1999,
recommending the applicant be reassigned to ARPC.

EX G 130

On 19 December 1999, the applicant received a letter of reprimand from the squadron commander stating that he (the applicant) had "engaged in acts of a nature to cause discontent and undermine military discipline within this squadron." The specific bases for the reprimand was the applicant's efforts to actively seek out squadron members and encourage them to defy Air Force policy by refusing to undergo the anthrax immunization series. The commander also noted that the applicant attempted to disrupt the wing's effectiveness by trying to persuade members of the 312 AS to refuse to fly missions for another squadron even though the commander had specifically requested such assistance due to impacted wing manning levels. The LOR was placed in a UIF. The applicant declined to reply to the LOR. On 10 March 2000, the applicant received a referral OPR based upon the applicant's efforts to "foment discord and attempting to instill a culture of distrust for squadron leadership." The applicant was informed of his right to respond to the OPR, but chose not to provide comments.

On 13 March 2000, the 349 AMW/CC recommended the applicant's name be removed from the FY 2000 lieutenant colonel promotion list. The basis for this recommendation was the applicant's efforts to purposefully undermine the credibility of the squadron leadership and his attempt to disrupt the orderly operation of the unit and wing by encouraging others to disregard the commander's directives. The commander concluded that such actions were inconsistent with the standards of conduct and professionalism expected of a senior field grade officer. The applicant was informed that he could not assume the higher grade until a decision was made on the removal action. The applicant did not respond to the removal notification letter and on 7 January 2002, the Deputy Secretary of Defense concurred with the promotion propriety action and forwarded the package to the President who approved the removal recommendation on 17 April 2002. On 1 April 2003, the applicant was transferred to the Retired Reserves as a result of being twice non-selected for promotion to lieutenant colonel.

The applicant contends that he acted in good faith in refusing to take part in the anthrax program because he believed there was sufficient evidence showing the drug was investigational or experimental and therefore required his voluntary and informed consent in order to undergo the immunization regimen. He states that his commander gave no indication that refusal to participate would result in "punitive action." He complains that the commander's order placed him in a predicament. He had 19 years in the Reserves and risked "forfeiting this investment" if he refused to take the shots. On the other hand, he had 18 years toward retirement as a civilian airline pilot which could be forfeited if he had an adverse reaction to the anthrax shots. He believes he was unfairly required to choose between the two alternatives to his detriment. The applicant denies trying to entice other pilots to refuse to participate; rather he claims he was following the commander's guidance and invitation to discuss the pros and cons of the program. He argues that the commander has overstated the applicant's role in discussing the issue with other pilots and the actions taken against him were a "damage-control knee-jerk response" by the commander. He asks that he be allowed to retire as a lieutenant colonel, along with receiving corresponding back pay and benefits. He further requests that all adverse administrative actions be rescinded from his personnel records.

The applicant's complaints are unfounded and his request to have his military records amended should be rejected by the Board. Despite his arguments to the contrary, the applicant was not "punished" for "expressing his First Amendment rights" to the members of the

/3/

squadron, nor was he reprised against for making a statement to a Congressional subcommittee. All of the administrative consequences that occurred were as a direct result of the applicant's actions and decisions. Throughout this process, the squadron commander acted in accordance with established DoD guidelines and within the bounds of his discretion as a commander. The commander was responsible for ensuring that all military personnel under his command received the immunizations. He did not have the authority to allow members to voluntarily refuse to get the shots because they disagreed with the program.

The commander notified the applicant on several occasions that his refusal to begin taking the vaccine would render him ineligible to perform UTAs and would result in his being administratively sent to the Standby Reserves. The applicant cannot now argue that the commander's action in reassigning him to the Standby Reserves was unexpected. The applicant was fully aware of the consequences of his actions and he made a knowing and deliberate decision to refuse participation in AVIP. The applicant alone bears the responsibility for the outcome he now complains about.

In this case the commander reproached the applicant not for refusing the anthrax shot, but for inciting disloyalty and mistrust within the squadron. The applicant sought out and spoke with members of the squadron, advocating that they refuse to undergo the anthrax protocol. He sent out e-mails to other pilots stating that the commander did not care about them and encouraged them to disregard the commander's advice and directives. While the applicant is entitled to his own viewpoint concerning the efficacy of AVIP, he was not at liberty to actively persuade other squadron members to refuse to participate. Moreover, he was certainly not permitted to undermine the authority of the squadron commander by encouraging other pilots to refuse to fly scheduled missions for a sister squadron. The applicant used his position of leadership within the squadron to influence others to defy the commander, causing discord within the unit. Such conduct strikes at the heart of good order and discipline and cannot be tolerated. The squadron commander was clearly within his authority to reprimand the applicant for his inappropriate conduct.

Likewise, the resulting referral OPR was a direct reflection of the applicant's failure to meet required standards in leadership, professional qualities and judgment and decisions. The applicant's immediate supervisor determined that the applicant had engaged in conduct designed to "foment discord within the organization." Both the squadron commander and the wing commander independently concurred with the supervisor's evaluation. As noted by ARPC/DPB, the basic premise of evaluation reports is that they are accurate and objective and presume the integrity of the raters. There should be strong evidence to overcome the report's presumed validity. AFI 36-2401 acknowledges that the most effective evidence consists of statements from the evaluators or from other individuals in the rating chain when the report was signed. The applicant has provided no evidence showing that the referral OPR was inaccurate. In fact, he refused to even provide comments when given the opportunity in 2000. While he may disagree with the evaluation, his argument that he is being made a "scapegoat" by the commander is without merit. The OPR accurately reflects the applicant's negative impact on mission readiness, good order and discipline.

We also note that the applicant's request to rescind the referral OPR should be rejected as untimely. By law and regulation (AFI 36-2603, paragraph 3.5.), an application must be filed within three years after an error or injustice is discovered, or with due diligence, should have been discovered. In the applicant's case, his OPR closed out on 19 May 2000. He did not file his petition for redress with the Board until 21 July 2003. Despite being given sufficient opportunity to contest the validity of the OPR, the applicant chose not to respond. There is no evidence suggesting that the applicant could not have filed his AFBCMR petition within the three-year statutory deadline. We recommend the Board reject his appeal as not being timely.

The wing commander's decision to recommend the applicant's removal from the lieutenant colonel promotion list was justified and neither arbitrary or capricious. As with the LOR and OPR, the promotion propriety action was based on the applicant's attempt to cause dissension within the squadron. His actions were inconsistent with the standard of conduct and professionalism required for a lieutenant colonel. The standard for removing an officer's name from the promotion list is very broad. AFI 36-2504 instructs commanders to initiate a propriety of promotion action when there is cause to believe that the officer is not mentally, physically, morally or professionally qualified to perform the duties of the higher grade. There is certainly sufficient evidence to substantiate the wing commander's recommendation. Every member of the applicant's chain of command, to include the Secretary of the Air Force and Deputy Secretary of Defense concurred in the removal action. Ultimately, the President made an independent determination that the applicant's conduct made him unfit for the higher grade. There is no evidence indicating that the applicant was singled out due to his personal views on the anthrax program.

The applicant asserts that he is entitled to be retroactively promoted because the President did not sign the removal action within 18 months from the time the applicant was notified of the commander's initiation of the propriety action. The applicant improperly attempts to combine the statutory provisions involving promotion delays and promotion removals to support his argument. The two actions are distinct and must be interpreted as such. While a promotion may be delayed for a maximum of 18 months pursuant to 10 USC § 14311, the President may remove an officer's name from the promotion list at any time before the date on which the officer is promoted. There is no statutory deadline under 10 USC § 14310 for the President to make the removal decision. AFI 36-2504 also recognizes the difference between a removal and a delay action and requires different procedures depending on which promotion propriety action is initiated.

The applicant's reliance on *Rolader v. United States*, 41 Fed.Cl 783 (1999), to support his argument that a promotion removal must occur within 18 months is flawed. *Rolader* involved an officer whose promotion was initially delayed pending the outcome of an internal investigation. Ultimately, a decision was made to remove the officer's name from the promotion list, but only after the promotion delay had expired. The *Rolader* court determined that the Air Force failed to follow its own regulatory guidelines in processing the removal action, and because the Air Force did not initiate the removal action until after the officer's effective date of promotion, the officer was promoted by operation of law. The *Rolader* decision does not govern in the applicant's situation. No member of the applicant's chain of command sought to delay the promotion; rather it was always processed as a removal action from the onset and the removal was initiated prior to the applicant's established promotion date. The wing commander's instruction to the applicant

*133*

not to pin on lieutenant colonel after his promotion date was not a delay action, but rather a notification that the promotion removal action had been initiated and the applicant was not eligible to be promoted until a final decision was made. Because the applicant's promotion was processed as a removal action rather than a delay, the 18-month deadline discussed in 10 USC § 14311 does not apply and the *Rolader* decision is not dispositive.

There are no grounds for the Board to set aside the applicant's second non-selection for promotion. His promotion record was considered by a properly convened Selection Board that determined the applicant was not qualified for promotion. There is no evidence to the contrary. The same facts that led to the applicant's LOR, OPR and removal from promotion were present when the Board non-selected him for promotion. Their decision was justified based on the applicant's conduct. Therefore, the applicant's request to be promoted to lieutenant colonel effective 30 June 2000, along with back pay and allowances, is not warranted.

If the Board determines an error or injustice occurred requiring correction of the applicant's military record, we urge the Board not to grant his request for direct promotion to the grade of lieutenant colonel. The law mandates promotion nominations be preceded by recommendations from selection boards convened under 10 U.S.C. § 14101 or from special selection boards (SSBs) under 10 U.S.C. § 14502. If the Board deems any remedial action necessary, we recommend the applicant's record be referred to a SSB for its determination whether he should be recommended for promotion.

With respect to the applicant's request to set aside his automatic transfer to the Retired Reserves on 1 April 2003, we note that such an action was statutorily mandatory upon his second non-selection for promotion and is not a basis for relief.

The applicant's argument that he was the victim of reprisal for testifying before Congress is baseless. The various disciplinary and administrative actions that were taken were as a direct result of the applicant's conduct and his impact to mission readiness and good order and discipline. Such measures would have occurred regardless of whether the applicant had spoken to members of Congress. The applicant's argument fails the acid test for reprisal and therefore should be discounted.

Finally, the applicant has provided materials from a recent federal district court decision (*Doe v. Rumsfeld*, (D.D.C., 22 Dec 03)) wherein the judge issued a preliminary injunction against inoculating service members without their informed consent until such time that the FDA made a written declaration concerning the effectiveness of the vaccine against inhalation anthrax. The applicant now argues that in granting the injunction, the judge accepted the plaintiff's assertion that the anthrax vaccine is an investigational drug and the commander's order for all squadron members to receive the vaccine was illegal. This argument is invalid, as the same judge has now lifted the injunction after the FDA made a written determination that the anthrax vaccine is safe and effective against all forms of anthrax.

/34

In conclusion, the applicant has failed to demonstrate the existence of any error or present facts and circumstances supporting an injustice. The applicant bears the responsibility of the consequences of his actions. Accordingly, we recommend applicant's request for relief be denied because it is both untimely and not valid on the merits.

HARLAN G. WILDER
Chief, Administrative Law Division
Office of The Judge Advocate General

Attachment:
Case File

**DEPARTMENT OF THE AIR FORCE**

WASHINGTON, DC

JAN 2 0 2004

Office of the Assistant Secretary

AFBCMR
1535 Command Drive
EE Wing 3rd Floor
Andrews AFB, MD 20762-7002

Major Marc J. Millican, USAFR, Retired
c/o Mr. John A. Wickham
32975 St. Moritz Drive
Evergreen, CO 80439-3825

Dear Major Millican

The attached additional advisory opinion is provided for your review and comments. **THIS IS NOT THE DECISION OF THE AFBCMR ON YOUR APPLICATION** (AFBCMR Docket No. BC-2003-02505).

You have 30 days from the date of this letter to respond and/or submit additional matters in support of your request. If no response is received during this period, we will assume you do not wish to provide further comments and your case will be scheduled for consideration by the AFBCMR. If you need more time to comment, it is suggested that you request that your application be temporarily withdrawn until you are prepared to proceed. Your comments and/or submission of additional documentation should be addressed to:

AFBCMR
1535 Command Drive
EE Wing, 3rd Flr
Andrews AFB, MD 20762-7002

Please include your social security account number and/or your service number, and your AFBCMR docket number on all correspondence.

DONNA PITTENGER
Chief Examiner
Air Force Board for Correction
of Military Records

Attachment:
Ltr, HQ USAF/JAA, dtd Jan 14, 2004

cc:
Mr. John A. Wickham

136

EX H

Reply to:
**32975 St. Moritz Drive**
**Evergreen, CO 80439**
**(303) 670-3825**
**Fax 670-1586**

**John A. Wickham, Esq.**
**Admitted in Virginia,**
**District of Columbia**
**& Military Courts**



# John A. Wickham & Associates
## Attorneys-at-Law

17 February 2004

Air Force Board for Correction of Military Records (AFBCMR)
Department of the Air Force
Washington D.C. 20330-1430



Re:     Dkt. BC-2003-02505,
        MARC J. MILLICAN, Major, USAFR (Ret.) 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

SUBJECT: Reply to advisory opinion forwarded 20 JAN 2004, Office of JAG

Board:

         Counsel for applicant submits his reply to the third advisory opinion ("3Adv.Op.") dated 14

JAN 2004 and forwarded to applicant by memorandum dated 20 JAN 2004.

1.      <u>Violation of promotion delay statute</u>, 10 U.S.C. § 14311

         The 3Adv.Op. repeats the allegation in the previous 2Adv.Op. dated 5 Sep 03 at ¶ d. (delay and

removal statutes "provide two distinct processes."). The 3 Adv.Op. states,

> The applicant improperly attempts to combine the statutory provisions involving promotion
> delays and promotion removals. . . .The two actions are distinct and must be interpreted as such.
> 3Adv.Op. at page 3.

         However, the issue is whether the Air Force may validly argue that the two statutes operate

independently when AFI 36-2504 Chapter 7, defines a removal action as a "promotion delay" within

the meaning of the delay statute § 14311(d)(delay for lack of qualifications). Provisions within 7.8

must also be read together so that ¶ 7.8.4 allows automatic delay but that ¶ 7.8.7 terminates the delay

at 18 months. Therefore, 3 Adv.Op. misreads it own regulation because a removal action can only be

initiated as part of a promotion delay. Once a delay is invoked, the next issue is whether the Air Force

can lawfully enforce its own infinite delay provision that selectively ignores the statutory due process

requiring Secretarial extensions beyond 6 months and maximum length of delay to 18 months.

1

*137*
*EX I*

No court has agreed with the Air Force departure from the statutory delay procedure, while the Rolader court noted it was "unenforceable." Although its holding in that case did not require it to strike down the Air Force's dubious interpretation,[1] it took the unusual step of going beyond its holding to warn the Air Force in future cases:

> Although not necessary to its result, the court notes that it has serious misgivings about the enforceability of the automatic delay provision of AFR 36-89. The effect of that regulation is to allow a relatively subordinate officer to initiate delay that continues indefinitely. This seems inappropriate when one considers that a six-month delay extension [in § 14311(d)] requires the approval of the Secretary.

Rolader at 787. The court was pointing to cases like Major Millican's where BG Black on 13 March 2000— not the SAF— unilaterally extended his promotion of 22 June 2000 indefinitely. Neither the SAF or his delegated Assistant Secretary extended the delay when the 6 months expired on 22 December 2000, as required by statute § 14311(d)(no delay beyond six months "unless the Secretary concerned specifies a further period of delay," up to 18 months).

The Rolader court also found it "worth noting that the other services have not construed [the two statutes] to permit a removal recommendation to indefinitely extend the time. . . .They construe [both statutes] as operating in tandem. . ." Id at 785-86 (Navy and Army require removal actions as delays subject to Secretarial extension and 18 months limit). This follows the well established canons of statutory construction where the removal and delay laws to be given full effect must be read together as part of a statutory scheme on the same subject, under Title 10, Chapter 1405 (promotions of reserve officers).[2] An otherwise narrow focus on the removal statute read in isolation and torn from the structure and policy of Chapter 1405 as a whole is a "formula for disaster" that may nullify another statute on the same subject. Smith v. Brown, 35 F.3d 1516, 1522-23 (Fed.Cir.1994). By giving full reference to certain laws that fit most logically and comfortably into in the context of the whole body of

---

[1] Rolader at 786 (plaintiff asking court to strike down automatic delay provision).

[2] Chapter 1405 contains §§ 14301 to 14317.

*138*

law, Smith relied on Supreme Court decisions on how to interpret both clauses within one statute, and statutes on the same subject:

> The court will not merely look to a particular clause. . .but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give it such a construction as will carry into execution the will of the legislature.

Smith at 1523. That court rejected the government's statutory interpretation that sliced up phrases while ignoring their context because it left the remainder "mere surplusage, entirely without meaning." Smith at 1524, quoting Marbury v. Madison, 5 U.S. 1 (1803). The 3 Adv.Op. omits the part of Rolader warning and explanation why the other services read the delay and removal statutes as operating in tandem. This omission is to avoid the compelling canons of statutory construction against argument that removal and delays actions are unrelated.

The Rolader *dicta* was taken to the next step recently in the promotion delay and removal case of Barnes v. United States, 57 Fed.Cl. 204 (2003) (promotion removal action after scheduled promotion date was invalid where Navy failed to meet statutory delay procedures and the time expired). Interpreting Rolader, the Barnes court stated that "because that officer was not removed from the promotion list on the date his promotion delay expired, the court found Lt.Col. Rolader was promoted by operation of law." Id at 209-210 [emphasis added]. In Barnes, the court found that the Navy regulations should be interpreted so that the delay and removal statutes be read together. Barnes at 207, 218 ("an officer may be removed from a promotion list only during a period of delay."). 3Adv.Op did not mention Barnes.

The court in Barnes found the Navy's later removal action was invalid because it had not complied with the criteria of the delay statute. Id at 218-19 (statute's clear language is that a promotion "shall" occur unless there is compliance with the delay provisions). The court made clear it was not promoting the officer, but only "recognizing the promotion had occurred. Id at 213-14.

Air Force regulation interprets the removal and delay statutes as operating together and not as distinct processes. AFI 36-2504 at ¶ 7.2, states that a propriety of promotion action, including list removal, is initiated when a commander "has cause to believe an officer is not. . .morally or professionally qualified to perform the duties of the higher grade. " This "for cause" language is taken

*135*

verbatim from the promotion delay statute, § 14311(b)(delay for lack of qualifications).   This language reappears in the SJA legal review of 16 June 2000, at ¶ 3c, of BG Black's removal recommendation.

Secondly, AFI 36-2504 at ¶ 7.5 (Involuntary Delay) states that "a delay also occurs if an action begins to remove an officer from a promotion list."   This sentence is followed by

> the MAJCOM/FOA commander is the approval authority for delaying a promotion up to 6 months from the DOR.   After 6 months, the SAF must approve a delay up to 12 additional months.

This totals the 18 month outer limit appearing in ¶ 7.5.4 (do not delay more than 6 months unless the SAF specifies a longer time.   Do not delay more than 18 months).   This is consistent with <u>Barnes</u> where the Navy was allowed to initiate a removal action only during a delay.   <u>Id</u> at 218.

Instructive here is that the <u>Barnes</u> court rejected the Navy's argument that the removal statute operated independently of any failure to properly delay the officer's promotion.   <u>Id</u> at 218 (government position is that the SECNAV may remove the name of any officer from a promotion list at any time even if it was delayed without compliance with statutory procedure).   The Court found that position "conflicts" with its regulatory and statutory constraints that removal action be initiated during a delay. <u>Id</u> at 218-219 (adding that statute's clear language is that a promotion "shall" occur unless there is compliance with the delay provisions).   Therefore, the Navy could not suddenly divorce its removal action from the delay action.   The court cited <u>McCarthy v. United States</u>, 7 Cl.Ct. 390, 394-95, 397 (1985), where the court rejected the Air Force's argument that a commander's removal action with its indefinite delay always supercedes the outer limits on a pending delay period.

The Air Force regulation conflicts internally, and renders the delay statute meaningless.   It calls a removal action "a delay" that is subject to MAJCOM extension up to 6 months and SAF approval thereafter.   This clearly invokes the delay statute's procedural due process.   Having invoked the delay statute's constraints, the regulation suddenly jettisons them all by allowing any subordinate commander to extend the delay indefinitely without intervention by a MAJCOM or SAF.   ¶ 7.8.4 (commander's recommendation to remove delays promotion until SAF makes decision).   The regulation cannot define a removal a delay that is subject to § 14311 then cherry-pick what provisions it prefers.

<p style="text-align:center">4</p>



In any event, the ¶ 7.8.4 does not specifically state that a delay from a commander's removal action is exempt from the 18 month outer limit. In fact, ¶ 7.8.7 qualifies ¶ 7.8.4 by repeating the 18 month limit, thus explaining the overall intent of ¶ 7.8 (removing an officer). This is consistent with the canon rules of regulatory interpretation to not "slice up" phrases removed from their context on the same subject. Smith at 1523 (canon rules apply to both agency regulations and statutes). This is exactly what the 3 Adv.Op. tries to do by arguing it can slice up ¶ 7.8 to read ¶ 7.8.4 in isolation from ¶ 7.8.7.

Nevertheless, ¶ 7.8.7, then conveniently injects new terms into the delay statute's plain language to extend the 18 months limit for any delay "attributable to the officer." However, ¶ 7.4.2 only states that a "reasonable opportunity" to reply is offered. The statute draws no exceptions and is very clear on what must occur within the 18 months. It provides "notice" to an officer and an "opportunity" to respond and the Secretary's consideration thereof. § 14311(c). The statute at ¶ (d) entitled "maximum length of delay" plainly states that a "promotion may not be delayed more than 18 months from the date the officer would have been promoted [emphasis added]." This language is not ambiguous to allow agency second-guessing. Skinner v. Brown, 27 F.3d 1571, 1574 (Fed.Cir.1994) ("only the most extraordinary showing in legislative history allows courts to disregard the plain meaning of a statute") quoting Garcia v. United States, 105 S.Ct. 479. (1984).

Lastly, it was Millican's commander, COL Rubeor, who "purely on my own discretion as Wing Commander" went beyond the regulation to give Millican another reply opportunity, and then acknowledged ¶ 7.4 only grants one chance. This is certainly not time attributable to Millican. Applicant's Exhibit F (9 Sep 00 letter from COL Rubeor). Applicant did not refuse the removal correspondence as a dilatory tactic. He is a United Airlines commercial pilot living from Alaska but constantly travels (and temporarily resides) throughout the continental United States,. Thus, U.S. postal parcels are often returned that demand immediate release signatures. It appears the command dragged out the process by not alternatively relying on the provisions of ¶ 7.4 allowing prompt "verbal" notice and reply deadline.

5

*141*

According to ¶ 7.5 and the delay statute, only MG Smith, Vice Commander, Air Reserve Command, was authorized as a MAJCOM to delay Millican's promotion date of June 2000 for up to 6 months to December 2000. But this did not occur before the promotion effective date in June 2000 because MG Smith approved the recommendation to remove, and concurrent delay, in October 2000. Because no extension was in effect as of June 2000, Millican's promotion occurred by operation of law. Alternatively, neither the SAF nor his delegate, the Assistant Secretary for Reserve Affairs, authorized any delay beyond December 2000. 10 U.S.C. § 8016(b0(2)(Assistant Secretary of Manpower and Reserve Affairs is delegated duty of "overall supervision over reserve components"); Barnes at 216-17 (Assistant Secretary of Navy for Manpower and Reserve Affairs was proper authority to extend the delay). Millican's promotion then occurred by operation of law on December 2000 so that the President's removal on 7 January 2002 had no effect. Alternatively, because the President did not remove Millican's name from the list until well after the 18 month delay expired, Millican's promotion occurred by operation of law in June 2000.[3]

2.    **Whether Millican's alleged disloyalty was based upon the unlawful order of his commander for unit members to take the Anthrax vaccine.**

The 3 Adv.Op crudely argues that this argument is invalid because the court "lifted the injunction after the FDA made a written determination that the vaccine is safe." This is unhelpful to the Board because it misrepresents Doe v. Rumsfeld, No. 03-707 (D.D.C.), by implying the judge's injunction was later declared invalid. However, a simple understanding of the case shows that Millican's commander back in 1999 had no authority to order unit members to take the Anthrax vaccine, and thus no authority to discipline those who allegedly instigated others to refuse the shots.

Any courts-martial for other service-members that may have found the orders legal, are irrelevant. The U.S. District Court (D.D.C.) has jurisdiction as a collateral federal appeal of military convictions. That is why DoD immediately halted its entire AVA program after the Court's preliminary injunction, and why the FDA was forced to publish a Final Rule on the vaccine.

---

[3] Because the promotion occurs automatically by operation of law under § 14311, 3Adv.Op at page 4, erroneously argues that only a special selection board can make a promotion recommendation.

The Doe court issued a preliminary injunction after finding that the AVA was illegal as currently administered because it violated "fundamental precepts of drug law." Doe Memorandum and Opinion at 27. This was based upon the court's factual finding that no final FDA rule had been published *to date* on the pending license application whether the vaccine was even safe and effective for use against inhalation anthrax. The court determined that prior informal advice or personal opinions of FDA officials as expressed in a series of letters was inadequate. In other words, DoD's claim that the vaccine was safe and effective for its troops was premature by shortcutting the FDA approval process. Mem. at 23-24 ("the FDA has failed to provide any formal opinion vis-a-vis AVA's investigational status"). In the absence of any published opinion in the Federal Register, the court proceeded to determine for itself that the AVA was investigational. Mem. At 28 ("having failed to provide a formal opinion as to AVA's investigational status, the court is required to make it own inquiry"). In fact, the lack of any final rule compelled the court's to find the AVA's status was investigational requiring member's informed consent. The court then stated,

> Given all these factors, the Court would be remiss to conclude that the original license included inhalation anthrax. . . .The DoD's administration of the inoculation without informed consents of those vaccinated amounts to arbitrary action. Mem. at 29.

. The next day on December 23, 2003, the FDA issued a Final Rule on the anthrax license review, published in the Federal Register, stating that the vaccine was safe and effective for use against inhalation anthrax. At this point, DoD was permitted to claim AVA was not an investigational drug. See attached Applicant's Ex. A (excerpt *of FDA Final Rule and Final Order, 21 CFR Parts 201 and 610),* as an exhibit to Defendant's Emergency Motion to Vacate Preliminary Junction and for Stay, attached here as Applicant's Exhibit C.[4] Of importance is that the Final Rule's "effective date" is not retroactive but 23 December 2004 (365 days after the date of publication). It is noteworthy that the DoD did not appeal the Court's injunction of December 22, to otherwise argue that a FDA Final Rule on the AVA was unnecessary to follow the law. This is a tacit admission that DoD did bypass the federal law requiring a drug's safety for another purpose to first be formally FDA approved. Moreover, the Court on 22 December 2003 rejected the DoD's argument that the inconvenient FDA process is

---

[4] To vacate is "to render an act void. . . it is not synonymous with suspend which means to stay the enforcement." Black's law Dictionary at 1388 (5th Ed. 1979).

*143*

less important than military readiness in the war on terrorism:

> [T]he right to bodily integrity and importance of complying with legal requirements, even in the face of requirements that may be inconvenient or burdensome, are among the highest public policy concerns one could articulate. Mem. at 30.

Although the FDA published its Final Rule, the Court refused to vacate (void) its injunction. It only temporarily stayed (suspended) its application to non-parties, until the court ruled on whether to make the preliminary injunction permanent or lift it entirely:

> Although the timing of the issuance of the rule is arguably highly suspicious, the rule has nevertheless, been issued and the principle reason for the issuance of the injunction has been addressed * * * The government is entitled to a stay of the Court's injunction pending further order of the Court.  See attached Applicant's Ex. D at 1-2. (Order).[5]

Of importance, the court's refusal to vacate the injunction was a rejection of the government's argument that the final order had simply "confirmed" or "reaffirmed" prior data. See attached excerpt of DoD brief (Defendant's Memorandum In Support at 1-2).  The DoD brief was putting "spin" on the Declaration of Mr. Winkenwerder, Assistant Sec'y of Defense (Health Affairs), see attached excerpt Applicant's Exhibit B at ¶ 13 ("The FDA endorsed the conclusion of the independent Institute of Medicine that AVA is an effective vaccine [to protect against inhalation anthrax]").  The DoD was attempting to bootstrap its motion to vacate by making it appear that the FDA Final rule was somehow retroactive or unnecsasary. But their legal brief admits that

> The FDA order marks the culmination of extensive agency consideration finalized in the week prior to Court preliminary injunction.  See DoD Brief at 2.

Moreover, Mr. Winkenwerder conceded that before 2003 the DoD's vaccine program had not properly relied on a well-considered FDA formal opinion, but DoD simply rushed on the informal advice from a private lab.  The DoD through its subordinate officers can not substitute's their judgment on the vaccine for the lawful exercise of the FDA process.  In sum, the court's stay only means that the DoD, as of the publishing date of the FDA order, now has temporary authority to order service members to take the vaccine, pending a further court ruling.  Therefore its wholly inaccurate for

---

[5] Although the court suspended the injunction for non-parties, the FDA action applied DoD wide to remove the legal barrier to inoculating all service members. Mem.Op. at 32-33 (original inunction applies to all persons and members of the Armed Forces).

*147*

3Adv.Op. to argue that "the squadron commander acted in accordance with established DoD guidelines and within the bounds of his discretion.' Id at 3 (top paragraph).

The next issue is straightforward. Because the FDA Final Rule was issued in December 2003 declaring the AVA is not an investigational drug and is safe and effective for inhalation anthrax, then Millican asserts a genuine defense in 1999 to any alleged mutinous or disloyal acts against the AVA made by his commander, Lt.Col. Padilla. The defense is undisputed when the DoD did not appeal the Court's injunction and the FDA agreed to publish the Final Rule. Therefore, any discipline arising from the unlawful order is converted to an unlawful reprisal under 10 U.S.C. § 1034 (whistleblower statute).

This unlawful order defense is sufficient to set aside the resulting Letter of Reprimand, OPR (98-00), PRF, and promotion removal action. Moreover, Millican upon his return to his unit after Congressional hearings in July 1999, only e-mailed his findings to certain interested peers. He also "answered questions from a few members, but never told or ordered any subordinate or contemporary not to take the vaccine, and was never present in the unit after July 1999." [6] United States v. Gray, 6 C.M.A. 615, 20 C.M.R. 331 (1956)(order is unlawful if official giving the order was without authority to do so); Brown v. Glines, 100 S.Ct., 594, n. 15 (1980)(service members right to First Amendment freedom of association may not be curtailed when commander action is arbitrary). The Doe court determined that in the absence of an FDA published opinion, the AVA was arbitrary action.[7]

It is well established even in international military law that soldiers have no right to mutiny when lawful orders are issued.[8] To underscore this rule in Anglo-American law, a recently famous example is a bill that was defeated in March 2000 before the United Kingdom Parliament seeking to set

[6] Applicant Millican specifically told his undersigned counsel to reaffirm this statement in this reply.

[7] 3Adv.Op. offers a nit-picking argument that the request to rescind the OPR was untimely as 60 days over the 3 year limit. However, in the interim, the AVIP was temporarily suspended in 2001, Congress was involved in further hearings, a promotion removal was pending, Bates v. Rumsfeld was filed in 2002, and related Doe was filed January 2003.

[8] The LOR alleged an acts of a nature to cause discontent, disloyalty and undermine military discipline in the squadron).

aside the guilty verdicts of nearly 100 British soldiers in WWII who refused to obey orders. See attached Applicant's Exhibit E (proceedings of UK Parliament 12 June 1990, and 22 March 2000). In the so-called "Salerno Mutiny of 1943," nearly 300 soldiers volunteered from convalescent leave to return to their own regiment, but the orders were mixed up and they were ordered instead to become replacements in an unfamiliar front-line unit in Italy. After 100 of the soldiers refused to move from their assembly area, they were convicted by courts-martial for mutiny and sentenced to years of hard labor with three sergeants sentenced to death. When the orders mix-up was discovered the sentences were suspended but not set aside, and they were denied military pensions. In 1990 when their military court records were finally de-classified, a bill was introduced in Parliament to grant pardons for all the soldiers and restore back pay. Ex. E at 1 (Salerno Incident, 1943; asking Minister of Defense to pardon soldiers). A book was published in 1995 of their account urging pardons. Saul David, *Mutiny at Salerno: An Injustice Exposed* (Brassey's UK; 1995). When the bill was finally debated in Parliament in 2000, the British Minister for the Armed Forces, John Spellar, refused to grant any pardons, stating,

> We fully understand the strong loyalties to former units felt by the men, but as General Montgomery suggested, those could not override *lawful orders*. . . and did not give them the right to mutiny [emphasis added]. Ex. E at 12.

### 3.    Alleged unsatisfactory attendance or compelled non-participation in UTAs

Finally, 3Adv.Op. argues that Millican did not satisfactorily participate in UTAs. This alleged issue is a red herring. The 3Adv.Op. admits that Padilla told unit members,

> failure to participate in the anthrax program would *prevent* those members from participating in UTAs. . . .The commander sent applicant a letter informing him that because he had not started the anthrax regime, he was no longer eligible *to perform* UTAs [italics added].

Unsatisfactory participation thus becomes a hollow charge when AVA refusal compels such members to not participate without a medical excuse from AVIP. It is a *de facto* order by a local commander to temporarily reassign such members for cause to inactive status pending formal transfer. 10 U.S.C. § 12642 (reserve officers failing to attain requisite number of annual drill points or conform to other standards, shall be transferred to inactive status until retired); See 2Adv.Op. at 6 ¶ g1 ("had applicant accepted the Anthrax or accepted a non-flying position he could have continued to participate").

/46

However, applicant was never offered a non-flying job, but told by his commander that AVIP refusal was the end of the road— no more active status.

In any event, Lt.Col. Padilla's formal request to transfer Millican to inactive status for the unsatisfactory attendance was denied by ARPC. Instead, ARPC converted the past alleged unsatisfactory participation from AVIP refusal into a non-participating status in the Standby Reserve. Finally, the participation question was never mentioned in the LOR, PRF, or a basis to remove him from the promotion list by BG Black, dated 13 March 2000. See 2Adv.Op at 6 ¶ g1 ("nonparticipation was not the foundation" for the removal).

John A. Wickham, Esq.
Attorney for Millican

Incl:

Applicant's Reply Exhibits A-F

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Food and Drug Administration**

**21 CFR Parts 201 and 610**

**[Docket No. 1980N–0208]**

**Biological Products; Bacterial Vaccines and Toxoids; Implementation of Efficacy Review**

AGENCY: Food and Drug Administration, HHS.

ACTION: Final rule and Final Order.

---

SUMMARY: The Food and Drug Administration (FDA) is amending the biologics regulations in response to the report and recommendations of the Panel on Review of Bacterial Vaccines and Toxoids with Standards of Potency (the Panel). The Panel reviewed the safety, efficacy, and labeling of bacterial vaccines and toxoids that have standards of potency, bacterial antitoxins, and immune globulins. On the basis of the Panel's findings and recommendations, FDA is classifying these products as Category I (safe, effective, and not misbranded), Category II (unsafe, ineffective, or misbranded), or Category IIIB (off the market pending completion of studies permitting a determination of effectiveness).

DATES: This rule is effective [*insert date 365 days after date of publication in the* **Federal Register**]. The final order on categorization of products is effective [*insert date of publication in the* **Federal Register**].

FOR FURTHER INFORMATION CONTACT: Astrid Szeto, Center for Biologics Evaluation and Research (HFM–17), Food and Drug Administration, 1401 Rockville Pike, suite 200N, Rockville, MD 20852–1448, 301–827–6210.



*148*

EXHIBIT ___A___

**40**

## PART 610—GENERAL BIOLOGICAL PRODUCTS STANDARDS

■ 3. The authority citation for 21 CFR part 610 continues to read as follows:

**Authority:** 21 U.S.C. 321, 331, 351, 352, 353, 355, 360, 360c, 360d, 360h, 360i, 371, 372, 374, 381; 42 U.S.C. 216, 262, 263, 263a, 264.

■ 4. Amend § 610.21 to revise the entry "Tetanus Immune Globulin (Human), 50 units of tetanus antitoxin per milliliter" under the heading "ANTIBODIES" to read as follows:

**§ 610.21    Limits of potency.**

\*    \*    \*    \*    \*

ANTIBODIES

\*    \*    \*    \*    \*

Tetanus Immune Globulin (Human), 250 units of tetanus antitoxin per container.

\*    \*    \*    \*    \*

Dated: December 23, 2003.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 03–????? Filed ??–??–03; 8:45 am]

**BILLING CODE 4160–01–S**

*145*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE #1, et al.,<br>　　　　　Plaintiffs,<br><br>　　　　v.<br><br>DONALD H. RUMSFELD,<br>SECRETARY OF DEFENSE, et al.,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)　　1:03-cv-00707 (EGS)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF WILLIAM WINKENWERDER, JR., M.D.

1.     I am William Winkenwerder, Jr., M.D.  I am the Assistant Secretary of

Defense (Health Affairs), having served in this position since October 16, 2001.  In this

capacity, I am responsible for overall supervision of the health and medical affairs of the

Department of Defense (DoD).

2.     Before coming to the Pentagon, I served in a variety of executive leadership

positions in the healthcare industry.  These included Vice Chairman, Office of the Chief

Executive, and Executive Vice President of Health Care Services for Blue Cross Blue

Shield of Massachusetts; Associate Vice President for Health Affairs and Vice President

of Emory Healthcare at Emory University; Vice President and Chief Medical Officer for

Southern Operations for Prudential Healthcare based in Atlanta; and Associate Medical

Director at the Southeast Permanente Medical Group of Kaiser Permanente in Atlanta.  I

am a board certified internist, and my training includes two years of study in health

services research and clinical epidemiology.  Prior to serving in the above positions, I had

an active practice in primary care medicine.  I have written numerous articles on a broad

array of health policy issues and have been published in both the New England Journal of



Food and Drug Administration, the Centers for Disease Control and Prevention, the
Surgeons General of the Army, Navy, and Air Force, and, to the best of my knowledge,
the weight of opinion beyond a reasonable doubt in the non-Federal public health
community.

13.    On December 30, 2003, the FDA issued a final order on the license review
for AVA. The FDA concluded that AVA was safe, effective, and not misbranded. The
FDA further concluded that AVA "is indicated for active immunization against Bacillus
anthracis, independent of the route of exposure." The FDA rule further endorsed the
conclusion of the independent Institute of Medicine that AVA, as licensed, is an effective
vaccine to protect humans against anthrax, including inhalation anthrax.

14.    If the use of AVA for protection against inhalation exposure required
compliance with Investigational New Drug requirements of the Federal Food, Drug, and
Cosmetic Act, it would be extraordinarily difficult to continue the program in relation to
current military operations against Iraq or the continuing Global War on Terrorism. In
DoD's experience with INDs for force health protection, including several in relation to
current events, the development of a detailed IND protocol, approval through necessary
channels, approval by an Institutional Review Board, submission and discussions with
the FDA, FDA's 30-day review period, training of principal and associate investigators,
education of recipients of the IND, execution and storage of consent forms, and other
steps required by 21 CFR Part 312, is a several- month undertaking, even with a generous
allotment of personnel to implement it. The additional labor required to diligently execute
an IND protocol would be massive (as shown by CDC's more-limited efforts in
December 2001) and divert scarce labor from other defense missions.  Were the Secretary

7

/ 5 /

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of December, 2003.

                         /s/ William Winkenwerder, Jr.
                         William Winkenwerder, Jr., M.D.
                         Assistant Secretary of Defense (Health Affairs)

IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE #1, et al.,          )
Plaintiffs,                   )
                              )
          v.                  )        1:03-cv-00707-EGS
                              )
DONALD H. RUMSFELD,           )
SECRETARY OF DEFENSE, et al., )
Defendants.                   )
                              )

## DEFENDANTS' EMERGENCY MOTION
## TO VACATE PRELIMINARY INJUNCTION AND FOR STAY

For the reasons stated in the accompanying memorandum, Defendants Donald H.

Rumsfeld, Tommy Thompson, and Mark B. McClellan hereby move the Court to vacate its

preliminary injunction entered on December 22, 2003, and to stay its injunction as to all service

members but the six Doe Plaintiffs in this matter while considering this motion. In the

alternative, Defendants request that the Court stay its preliminary injunction pending an appeal.

Pursuant to Local Civil Rule 7.1(m), counsel for Plaintiffs was contacted concerning the

motion and has indicated that Plaintiffs do not consent to the requested relief. A proposed Order

accompanies this motion.



EXHIBIT ___C___

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

ROSCOE C. HOWARD, Jr.
United States Attorney

SHANNEN W. COFFIN
Deputy Assistant Attorney General


  /s/ Ronald J. Wiltsie, II
JOSEPH H. HUNT
VINCENT M. GARVEY
RONALD J. WILTSIE, II (D.C. Bar # 431562)
Civil Division
United States Department of Justice
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 307-1401

Counsel for Defendants

December 30, 2003

154

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE #1, et al.,<br>Plaintiffs, | )<br>)<br>) |
| v. | )<br>)  1:03-cv-00707-EGS |
| DONALD H. RUMSFELD,<br>SECRETARY OF DEFENSE, et al.,<br>Defendants. | )<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION
## TO VACATE PRELIMINARY INJUNCTION AND FOR STAY

On December 22, 2003, this Court preliminarily enjoined Defendants from inoculating

service members with Anthrax Vaccine Adsorbed ("AVA") without either their consent or a

Presidential waiver of the consent requirement.[1]  The preliminary injunction was premised on the

Court's conclusion that the Food and Drug Administration ("FDA") had not approved the

anthrax vaccine as safe and effective protection against inhalation anthrax.

The Defendants respectfully ask this Court to vacate its injunction in light of an FDA

Order issued December 30, 2003 that confirms and conclusively determines that AVA is safe and

effective to protect humans against inhalation anthrax.  See Biological Products; Bacterial

Vaccines and Toxoids; Implementation of Efficacy Review, Food and Drug Administration,

Health and Human Services, Final Rule and Final Order, December 30, 2003 ("FDA Order,"

---

[1]  Although in Defendants' view the Court's injunction properly may apply only insofar as
the six Plaintiffs are concerned, out of an abundance of caution the Department of Defense
("DoD") stopped giving anthrax vaccinations to service members as if the Court's preliminary
injunction order were intended to apply to all service members.  On December 24, 2003,
Defendants filed a Motion For Clarification Or In The Alternative For Reconsideration ("Motion
For Clarification") as to the scope of the Court's preliminary injunction.

155

Exhibit 1). The FDA Order, which marks the culmination of extensive agency consideration and completion of the notice and comment process referred to by the Court in its Memorandum Opinion (p. 4), was finalized in the week prior to the Court's preliminary injunction and was signed by the responsible FDA official without substantive changes two days after the Court issued its preliminary injunction order. The Order was issued on, and placed on public display as of, December 30, 2003.[2] The FDA Order addresses data discussed in this Court's preliminary injunction decision as well as more recent findings, concluding that both the earlier and more recent data support a formal categorization of the vaccine as safe and effective regardless of the route of exposure, including inhalation anthrax. Accordingly, in formally categorizing AVA as safe and effective, the FDA did not mandate any change in the labeling requirements for the anthrax vaccine. Instead, it reaffirmed the label, concluding that "the indication section of the labeling for AVA does not specify the route of exposure, and the vaccine is indicated for active immunization against *Bacillus anthrasis*, independent of the route of exposure." FDA Order at 13 (footnote omitted).

There can be no doubt that the FDA Order removes the legal basis upon which relief was sought and granted in this case. The statute that forms the basis of this lawsuit, 10 U.S.C. § 1107, applies only to those drugs and uses that have <u>not</u> been approved as safe and effective. The FDA has approved the anthrax vaccine as safe and effective to protect humans against inhalation anthrax, and the Court therefore should vacate its preliminary injunction.

---

[2] Given the significance of this FDA Order, Defendants regret that it was not issued and placed on public display in advance of the Court's decision and preliminary injunction order.

156

In light of the serious threat to service members and military readiness presented by the preliminary injunction, Defendants ask not only that the Court dissolve its injunction on an expedited basis but also that it immediately stay the injunction pending disposition of this motion with respect to all but the six Doe Plaintiffs. As discussed in Defendants' Motion For Clarification, even if the views of the merits underlying the preliminary injunction were correct, the injunction could not properly control the United States' conduct with respect to persons who are not parties in this litigation.[3]

The urgency of the matter is clear. In response to the Court's injunction, DOD has temporarily stopped anthrax vaccinations to service members on a program-wide basis. The longer such an injunction remains in place, the greater is the danger to the men and women of our armed forces and to our military preparedness. Prolonged cessation of the inoculation program would gravely threaten the safety of more and more service members and would significantly undermine military readiness. Indeed, until the injunction, approximately 30,000 new troops per month were beginning the anthrax vaccination series. See Declaration of William Winkenwerder, Jr., M.D. ("Winkenwerder Decl."), ¶ 9 (Exhibit 2). There is no basis for putting the health of service members at risk when the only issue in this case has been resolved — — particularly inasmuch as the Court could not properly preclude vaccinations with respect to service members who are not even plaintiffs in this suit.

---

[3] For the same reasons that justify expedited consideration of this motion, Defendants respectfully request that the Court give expedited consideration to the Motion For Clarification. Defendants, therefore, will separately file a motion asking that the Motion For Clarification be disposed of on an expedited basis.

If the Court believes that it can neither vacate the injunction on an expedited basis nor stay the injunction with respect to all persons but the six Doe Plaintiffs pending disposition of this motion, we respectfully ask that it issue a stay pending appeal with respect to all persons but those Plaintiffs.[4]  The stay will avoid significant delays in the vaccination of service members deploying to hazardous duty overseas while the Defendants pursue an expedited appeal.

I.     **THE COURT SHOULD VACATE ITS PRELIMINARY INJUNCTION IN LIGHT OF THE FOOD AND DRUG ADMINISTRATION'S APPROVAL OF THE ANTHRAX VACCINE AS SAFE AND EFFECTIVE**

As Defendants explained in opposing Plaintiffs' motion for a preliminary injunction, the AVA label does not limit its use to any particular route of anthrax exposure.  The label does not distinguish among individuals who may be infected by anthrax spores entering the body through skin contact, ingestion, or inhalation.  Accordingly, DoD and FDA have interpreted the label to encompass inhalation exposure.

In issuing a preliminary injunction, this Court nonetheless concluded that the Food and Drug Administration had not approved AVA as safe and effective for use in preventing inhalation anthrax.  The Court emphasized that "[t]he FDA, the only agency that this Court could properly defer to in determining AVA's status as an investigational drug, has failed to provide a formal opinion as to AVA's investigational status."  Memorandum Opinion at 28.

The FDA's December 30 Order makes clear that the AVA label encompasses all types of anthrax exposure, whether through inhalation or other means.  Therein the FDA declared that

_____

[4]  We respectfully ask that the Court rule on this motion and the related Motion for Clarification by Tuesday, January 6, 2004, so that the Defendants will have a timely opportunity to seek a stay from the D.C. Circuit if necessary.

-4-

/58

"the indication section of the labeling for AVA does not specify the route of exposure, and the vaccine is indicated for active immunization against *Bacillus anthracis*, <u>independent of the route of exposure.</u>" FDA Order at 13 (emphasis added).  Accordingly, in formally categorizing AVA as safe and effective for use in preventing all forms of anthrax exposure, the agency mandated no change to the existing labeling.

The FDA Order considered the recommendation of the FDA's Panel on Review of Bacterial Vaccines and Toxoids with Standards of Potency that AVA be categorized as safe and effective.  The Panel based its evaluation on two studies.  The first was "[a] well controlled field study conducted in the 1950s, 'the Brachman study.'" The second was "an open-label safety study conducted by the National Center for Disease Control." FDA Order at 11.

In granting the preliminary injunction, the Court suggested that these studies do not support the view that AVA is effective in preventing inhalation anthrax, <u>see</u> Memorandum Opinion at 28, based in part on its view that the FDA had not formally addressed the data reflected in these studies.  The FDA Order specifically concludes that the data on which the Panel relied "support the safety and efficacy of the vaccine." <u>Ibid</u>.  The FDA Order, which is entitled to "'a high level of deference,'" <u>Serono Laboratories, Inc. v. Shalala</u>, 158 F.3d 1313, 1320 (D.C. Cir. 1998) (citation omitted), establishes, consistent with the Defendants' previous submissions, that the data do not support the distinctions in efficacy urged by Plaintiffs and accepted by the Court in issuing its preliminary injunction.[5]

---

[5] In the face of some evidence supporting the FDA's determination, this Court is not to undertake de novo review and substitute its judgment for that of the FDA.  <u>Bristol-Myers Squibb Company v. Shalala</u>, 923 F. Supp. 212, 216 (D.D.C. 1996).  Instead, the FDA is to be accorded deference when it is evaluating scientific data within its technical expertise.  <u>FPC v. Florida</u>

(continued...)

-5-

*159*

The FDA also relied on the recent findings of the Institute of Medicine, a component of the National Academy of Sciences, which performed a congressionally mandated study of AVA and published a report in March 2002.  As the FDA explained, the Institute of Medicine "reviewed all available data, both published and unpublished, [and] heard from Federal agencies, the manufacturer [of AVA], and researchers."  FDA Order at 14.  The Institute's report concluded that "AVA, as licensed, is an effective vaccine to protect humans against anthrax including inhalation anthrax."  Ibid.  The FDA declared its "agree[ment] with the report's finding that studies in humans and animal models support the conclusion that AVA is effective against *B. anthracis* strains that are dependent upon the anthrax toxin as a mechanism of virulence, regardless of the route of exposure."  Ibid.[6]

The FDA Order removes any basis for the Court's preliminary injunction.  Plaintiffs' claims in this suit are premised on a statute (10 U.S.C. § 1107) that applies only to drugs and uses that have not been approved as safe and effective.  This Court's injunction was based on its conclusion that the FDA had not, in fact, approved AVA as safe and effective for use in preventing inhalation anthrax.  The FDA Order reaffirms that AVA's label has always authorized

---

[5](...continued)
Power & Light Co., 404 U.S. 453 (1972); International Fabricare Inst. v. EPA, 972 F.2d 384, 389 (D.C. Cir. 1992); Tri-Bio Laboratories, Inc. v. United States, 836 F.2d 135, 142 (3d Cir. 1987), cert. denied, 488 U.S. 818 (1988).

[6] This finding also thus contradicts another argument put forth by Plaintiffs and accepted by the Court –– namely, that since 1985 no additional studies of the efficacy and safety of AVA have been performed.  Memorandum Opinion at 26.  To the contrary, the IOM report details various studies that support its conclusions and those contained in the FDA Order.  Exhibit 3, Institute of Medicine, "The Anthrax Vaccine:  Is it Safe?  Does it Work?" National Academy Press, 2002, Ch. 3.

160

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE #1, *et al*,       )
                           )
            Plaintiffs,    )
                           )
       v.                  )  Civil Action No. 03-707 (EGS)
                           )
DONALD H. RUMSFELD, *et al* )
                           )
            Defendants.    )
                           )

## ORDER

On December 22, 2003 the Court issued a Preliminary
Injunction enjoining the defendants from inoculating service
members without their consent.  The Court was persuaded that the
record evidence before the Court was devoid of an FDA final
decision on the investigational status of Anthrax Vaccine
Adsorbed ("AVA").  Within days of the Court's injunction, the
Food and Drug Administration ("FDA") published a final rule
categorizing AVA as safe and effective for use against inhalation
anthrax.  Although the timing of the issuance of the rule is
arguably highly suspicious, nevertheless, the rule has been
issued and the principle reason for the issuance of the
injunction has been addressed by the government.  Accordingly,
upon consideration of the government's Motion to Stay the
Injunction as Applied to Persons Other than the Named Parties,
the Response and Reply, hereto, and pursuant to the proceedings

1



EXHIBIT D

/6/

held in open court on January 7, 2004, it is hereby

    **ORDERED** that the government is entitled to a stay of the

Court's injunction pending further order of the Court and further

challenges to the government's final rule; and it is

    **FURTHER ORDERED** that the Motions Hearing previously

scheduled for January 14, 2004 at 10:00 a.m. in Courtroom One has

been converted to a Status Hearing.


**Signed:**    **Emmet G. Sullivan**
                 **United States District Judge**
                 **January 7, 2004**

2

Case 1:06-cv-01582-GK   Document 17   Filed 12/19/2007   Page 166 of 203



security and sustain our responsibilities overseas with lower force levels and less cost.

### RAF Biggin Hill

**Sir John Hunt :** To ask the Secretary of State for Defence what are the current estimates for the building of the additional accommodation required at RAF Cranwell following the closure of the officer and aircrew selection centre at RAF Biggin Hill.

**Mr. Archie Hamilton :** The estimated cost of the new facilities required at RAF Cranwell amounts to some £7.5 million at current prices. This figure now allows for VAT and current levels of inflation in the construction industry.

**Sir John Hunt :** To ask the Secretary of State for Defence what are the current estimates for the likely level of capital receipts from the disposal of the site at present occupied by RAF Biggin Hill.

**Mr. Archie Hamilton :** Estimates of expected receipts are commercially confidential, but we expect income from disposals at Biggin Hill to more than cover the cost of reproviding facilities for the officer and aircrew selection centre at RAF Cranwell.

**Sir John Hunt :** To ask the Secretary of State for Defence what is the anticipated demand for officers'

---

### Column 141

married quarters in the Greater London area over the next five years ; and whether accommodation is to be provided at RAF Biggin Hill to meet this demand.

**Mr. Archie Hamilton :** Present plans envisage that the requirement for officers' married quarters in the Greater London area will, over the medium to long term, be reduced. It is our intention to dispose of all the officers' married quarters at RAF Biggin Hill when the station closes. Present plans anticipate that the various elements of the Biggin Hill site will become available for disposal towards the end of 1992, excluding the memorial chapel enclave which will be retained.

### Salerno Incident, 1943

**Mr. Menzies Campbell :** To ask the Secretary of State for Defence how many representations he has received in the last 12 months concerning the incident at Salerno on 20 September 1943 which resulted in the court martial of 91 soldiers of the 51 Highland Division and 50 Northumbrian Division ; and if he proposes to take the steps necessary to obtain a free pardon for them.

**Mr. Archie Hamilton :** My noble Friend the Under-Secretary of State for the Armed Forces will write to the hon. and learned Member.

### Radar

**Mr. Nicholas Bennett :** To ask the Secretary of State for Defence if he will make a statement on developments in the detection by radar of missile attacks.

**Mr. Alan Clark :** Steady progress has been made in developing the ability of radar to detect missile





Search    G

Advanced Sear

Home    Glossary    Index    Contact Us    Parliament Live    section...    Go

## This Table of Contents lists column numbers, headings, time lines and names of Members in the Commons Hansard Debates text for Thursday 22 Mar 2000

### Clicking on an item will fetch the appropriate file and position it with the item at the top of the screen.

---

### Westminster Hall Debates for 22 Mar 2000

## Column: 189WH

### East Midlands Economy [22 Mar 2000]

9.30 am

Gillian Merron (Lincoln)

## Column: 190WH

## Column: 191WH

## Mr. Andrew Robathan (Blaby)

## Gillian Merron

## Column: 192WH

## Column: 193WH

## Column: 194WH

9.53 am

Mr. Andrew Robathan (Blaby)

## Mr. Andrew Reed (Loughborough)

## Mr. Robathan

*168*

*2*

## Column: 238WH

12.47 pm

**The Parliamentary Under-Secretary of State for Education and Employment (Ms Margaret Hodge**

## Column: 239WH

**Mr. Evans**

## Column: 240WH

## Ms Hodge

## Column: 241WH

**Mr. Evans**

## Ms Hodge

## Madam Deputy Speaker (Mrs. Gwyneth Dunwoody)

## Column: 242WH

**Salerno Mutineers [22 Mar 2000]**

1 pm

Miss Anne Begg (Aberdeen, South)

## Column: 243WH

## Column: 244WH

## Column: 245WH

## Column: 246WH

1.17 pm

The Minister for the Armed Forces (Mr. John Spellar

## Column: 247WH

## Miss Begg

## Mr. Spellar

*165*

*3*

## 22 Mar 2000 : Column 242WH

### Salerno Mutineers

**1 pm**

**Miss Anne Begg (Aberdeen, South):** Almost two years ago, a constituent of mine, Bill Bradbrook, contacted me about what he saw as an injustice that occurred in 1943, during the second world war. He thought that now was the time to forgive, and to set the record straight. Mr. Bradbrook contacted me not on his own behalf, but on behalf of his friend, another constituent, Hugh Fraser. Mr. Bradbrook brought his friend to my surgery and I sat and listended to Hugh Fraser's story. It was the story of a young man who had proudly joined the Cameron Highlanders to fight for his country and had risen to the rank of corporal; a young man who had fought bravely with the 8th Army in the desert campaign and was of undoubted high moral integrity. It was the story of a retired man who, despite having achieved much as an inspector of police in Aberdeen, could not shake off a black stain on his character.

As I listened to the story I found myself getting caught up in the events in north Africa and Italy more than 50 years ago. Despite having been a history teacher, this was the first time that I had heard of the mutiny at Salerno, in Italy. Since that day, I have become increasingly fascinated by the events surrounding the largest war-time mutiny in British military history.

What had motivated 191 men all to make the same decision to disobey an order to fall in in a field near Salerno on 20 September 1943? Why had these men, when told that their action constituted mutiny and that mutiny was a capital offence, remained where they were? Why did so many of them do this? Not all of them could have decided that they did not want to fight any more. Surely something must have gone wrong with the line of command for so many men to refuse to obey the same order. The more I have studied the details of what happened to those men, including my constituent, Hugh Fraser, the more convinced I have become that a great injustice was done, which should now be put right. I called for this debate to highlight what happened to those men in 1943, and afterwards, and to ask my right hon. Friend the Secretary of State for Defence to give serious consideration to awarding the men, who were convicted of mutiny, a free pardon.

*166  L!*

What went wrong at Salerno? The Highland and Tyne Tees divisions had fought bravely with Montgomery and the 8th Army in north Africa and he promised them that he needed them for only one more action. One reason Montgomery was so successful as a military commander was the loyalty that he generated among his men. As essential part of the north Africa campaign had been the esprit de corps that Montgomery had fostered. If a man was separated from his unit, he was to do everything in his power to get back to it.

When the 8th Army crossed over to Sicily, many of the men were wounded or ill, often with dysentery. After all, they had taken part in the long desert campaign. This group of men who were to become the Salerno mutineers were sent back to hospital in Tripoli. From there they were taken to transit camp 155, which was also in Libya.

During that time, Major-General Douglas Wimberley, who commanded the 51st Highland Division, of which my constituent, Hugh Fraser, was a

## 22 Mar 2000 : Column 243WH

member, visited camp 155 and said that his men should be returned to their units. There is no doubt that the men believed that they would be. This is confirmed by a number of men who were in camp 155 at the time--especially the camp duty sergeant-major, Sergeant-Major Green who gave evidence for the defence in the subsequent court martial. My constituent remembers Green telling him that he would be going back to his own unit.

In the belief that they were to rejoin their units, the men agreed to join the draft that was called on 14 September 1943. They did not know exactly where their units were; they knew only that they were somewhere in Italy. No one told them that they were going anywhere else: their true destination was kept secret.

Where were the men going? At the time, things were not going well for the American 5th Army in Salerno, so reinforcements were sent for, and three light cruisers dispatched. The American commander had expected the reinforcements to come from what was then Philippeville, in Algeria, which was the official reinforcement camp for Salerno, and also the closest.

There was some confusion over signals and a draft was called at camp 155 instead. The men from the Highland and Tyne Tees divisions readily volunteered, even though many of them were far from fully recovered from their wounds or illnesses. These were the men who had fought so bravely along with Montgomery and they believed that they were rejoining their comrades-in-arms. At no time were they told that they were rejoining the 46th division that was fighting alongside the US 5th Army at Salerno.

Montgomery did not know what was happening to his men either. He wrote on 10 April 1944 to Sir Ronald Adam, the Army's senior administrative officer, saying that, had he been consulted, he would have said no. Montgomery was angry and

blamed the whole confusion on Major-General Charles Miller, the man in charge of Army administration in Africa, whom he described as

the real culprit in this case.

The first that the men knew of their true destination was off the coast of Italy when the message came over the ship's Tannoy system. Many of the men did not believe what they were hearing. They had been told that they were to join their own units. When the men disembarked, the new recruits who had accompanied them were marched away and the veterans of the 8th Army were herded into a nearby field. There they stayed for three days. The men at this time were convinced that if they only stuck together, someone, somewhere, would realise that there had been an administrative error and sort it out. They genuinely believed that right was on their side and that good sense would prevail. Unfortunately, it did not.

After another two days they were told to parade. That was on 20 September 1943. The corps commander, Lieutenant-General Richard McCreery arrived and admitted that there had been, in his words, "a cock-up" which he would sort out when the men joined the new unit. He said that there could be no compromise and that they had to obey orders. If they disobeyed it would be mutiny, which was a capital offence. The order was

## 22 Mar 2000 : Column 244WH

then given. The men were told to pick up their kit and fall in by Captain Albert Lee. The order was repeated three times. Some of the men moved off the field at that time, but 191 did not. They knew that they had disobeyed an order in wartime. They knew that that could be construed as mutiny but they did not feel that they were mutineers. They were not refusing to fight. They just wanted to fight with their own comrades.

All 191 were placed under arrest and marched to a nearby prisoner of war camp. By that time, ironically, the reinforcements were no longer needed at Salerno, as the crisis had passed, but it had not passed for the 191. The mutineers were shipped back to Africa where they were held in a prison near Constantine in Algeria for five weeks before their trial. The whole affair had been an embarrassment for the British Army and so was kept very hush hush.

On 22 October 1943, the defence team for the mutineers met at Constantine for the first time. Captain Hugh Quennell took control. They had six days to prepare a defence, which was an impossible task. They did not even have time to interview the men. Moreover, as this was at least a month after the men had been arrested, they did not know how ill many of the men had been at the time of their arrest.

The court martial opened on 29 October in the gymnasium of the local French school, the only place big enough to hold all the defendants. The men were each given a number to hang round their necks to identify them; my constituent, Hugh Fraser, was given the number 111. The transcript of the trial has only recently been released and it shows that it proved impossible for the defence team to call

the witnesses that it needed, as many of the men were then on active duty. Those witnesses would have spoken up for the men and proved that they were following orders in insisting that they should return to their own units. The only witness called was Sergeant-Major Green from camp 155, who confirmed that the men had been told that they were returning to their own units; that there was an order from GHQ, which confirmed that; and that the men had not had the necessary medical to determine their fitness to return to active duty.

The trial lasted for five days, but not one of the mutineers was called to the witness stand. Even so, they were found guilty. As a corporal, Hugh Fraser was kept in solitary confinement and passed his time--when he was not breaking rocks--reading the New Testament and polishing his mess tin, which he says became the shiniest in the British Army. On 15 November he was told his sentence: 10 years' penal servitude, and to be reduced to the ranks. He could not believe what he had heard.

The next day, 16 November, the three sergeants involved in the mutiny found out their fate: they were sentenced to death. Luckily, two weeks later, that was commuted to 12 years' hard labour. However, fortunately for the mutineers, on 15 November, Adjutant-General Sir Ronald Adam, the second most senior man in the British Army, arrived in north Africa. He asked to see the papers relating to the mutiny. He was horrified by what he read and demanded that the men be released. Their sentences were therefore suspended, but the men's misery did not end there. They were released but were sent to join the units they had refused to join in September. Many were treated

## 22 Mar 2000 : Column 245WH

harshly, and 80 of them subsequently absconded. That fact has been used in the past by the Ministry of Defence to refuse the men a free pardon. John McFarlane was one of those men and he was stripped of the medal that he won before the mutiny for his bravery in the desert campaign. Unfortunately, he is now dead, but that he absconded twice has been given as the reason to his family why his medal cannot be reinstated. I pay tribute to the work of my hon. Friend the Member for Motherwell and Wishaw (Mr. Roy) who raised John McFarlane's case with the Minister.

My constituent, Hugh Fraser, was not one of the abscondees. Even so, he still says:

> What I would like more than anything is for John McFarlane's military medal to be returned to his wife. It is a sin to take back a gallantry medal after it has been awarded. It broke his heart and the hearts of his wife and family.

Most of the research into the events leading up to and after the mutiny at Salerno was conducted by the historian Saul David, and I recommend his book "Mutiny at Salerno--an injustice exposed" to anyone who is interested in the subject.

In January this year, Saul David submitted new evidence to my right hon. Friend the Secretary of State for Defence from Eric Griffin, who came across two men,

/69

whom he called the Tunis mutineers, in the summer of 1944 when he was serving as a clerk to the command psychiatrist, Major O'Hanlon, based in Naples. There is no doubt that the two men were Salerno mutineers. The men's commanding officer had been told that the mutineers' original sentences had been commuted to continuous duty in the front line and, as his unit was being taken out of the line for a rest, so these men could not go with them, he sent them to the psychiatric unit. There is no such punishment in British military history; but if that unofficial vindictiveness was widespread, it is little wonder that the men absconded, as they had been left with little choice.

I shall sum up the reasons why the men who disobeyed an order on that fateful day of 20 September 1943 now deserve a free pardon. They should never have been in Salerno; they were the wrong men from the wrong transit camp. The men genuinely believed that they were lied to about their destination. It is certainly true that those officers who knew that they were going to join the 46th division did not tell the men before embarkation.

The men should not have been put in the position where they had to decide whether to obey the order to fall in or not. Sir Richard McCreery admitted that there had been an error. He should have sorted it out and not insisted that the men joined the new units, especially as, by that time, they had lost faith in the officers who were dealing with them. The men may have disobeyed one order, but they believed that they were carrying out the orders of the one commander whom they trusted, the one who had led them through the desert campaign--General Montgomery. He had told them that, come what may, they were to try to get back to their own units at all costs. The court martial was not thorough in its investigation and the defence was cursory in the extreme.

New evidence now suggests that the men were victimised subsequently in their new units and forced to stay on active front-line service, even when the new units

## 22 Mar 2000 : Column 246WH

were given leave. Perhaps that helps to explain why so many men absconded. I hope that my hon. Friend the Minister will carefully consider the evidence that I have presented to him and that he will reach the same conclusion as me: that the time has come to make reparation for the injustice that was done to the Salerno mutineers. I am asking for a free pardon, not to say that the men were innocent--they all admit that they disobeyed an order in wartime--but to allow them or their families to collect their campaign medals.

The men were not cowards. They did not refuse to fight. It is time for the Army to put its embarrassment at the sorry incident behind it and admit that the men were victims of a failure of command and should not have been put in such a situation. We all like to think that, when tested, we will stand up for our principles. That is what men such as my constituent, Hugh Fraser, did. I shall leave the last words to him, a man who, after the war, rose to the rank of inspector of police, a man of undoubted high moral integrity. He said:

/70

Given the same circumstances, I would do the same again. It was purely and simply a matter of principle.

**1.17 pm**

**The Minister for the Armed Forces (Mr. John Spellar ):** I congratulate my hon. Friend the Member for Aberdeen, South (Miss Begg) on securing a debate on a matter that has aroused the sympathy of many hon. Members over the years. The events surrounding the Salerno mutiny of 1943 have been carefully examined by the legal authorities and the Ministry of Defence, including Ministers, on several occasions. The examinations included consideration of points raised by hon. Members as well as several researchers, particularly in the past 20 years.

Many misunderstandings and erroneous claims surround the Salerno mutiny. Let it be understood at the outset that there is not, and never has been, any suggestion by the authorities that the men were cowards or traitors. Nor was the value of their previous service or strong regimental and divisional loyalty ever denied or ignored by the authorities. Nevertheless, I must refer to the key point that has been overlooked in many discussions on the subject. It has long been a basic tenet of military life--it was during the second world war, and it is today--that a solider has no defence in military law that allows him to choose which lawful orders he will obey and which he will not. My hon. Friend mentioned the letter of 10 April from General Montgomery, who wrote:

The men refused to go into battle, which is of course quite inexcusable--and cannot be condoned.

In September 1943, after an opposed landing on the Italian mainland at Salerno, the allies had gained a precarious foothold. The main British element of the 5th Army force consisted of the 46th and 56th divisions that were not part of the 8th Army. However, fierce German resistance inflicted heavy casualties, primarily on the infantry and General Alexander, the senior commander, arranged for several drafts of infantry reinforcements to be moved as quickly as possibly to Salerno. Among those was a draft of 1,500 men moved on 15 September by Royal Navy warships from a transit camp at Tripoli, holding primarily 8th Army soldiers awaiting posting. Among that draft were, as my hon. Friend said, some

## 22 Mar 2000 : Column 247WH

300 men formerly with two 8th Army formations, the 50th Northumbrian and 51st Highland divisions. Those two divisions were resting in Sicily and had been earmarked soon to return to the UK to prepare for the D-Day landings in June 1944.

The use of those men from Tripoli was not, as is often claimed, an administrative error by the staff at higher headquarters. Contemporary signals show that the relevant headquarters was made aware that those reinforcements from Tripoli would include men previously with 8th Army formations in Sicily, rather than men already earmarked for the 5th Army, who could not be moved in time.

*121*

**Miss Begg** : I do not know whether my hon. Friend agrees, but there is evidence that there were conflicting signals that day. One signal was apparently sent to what was then Philippeville, and another to camp 155. That confusion resulted in the Salerno mutineers volunteering for a draft for which they should not have been asked to volunteer; there were already plenty of men at Philippeville and they, in normal circumstances, would have been called to assist the 46th division.

**Mr. Spellar** : My hon. Friend points to evidence that, contrary to what I described, there was an order from headquarters to transfer those troops. Areas of confusion often arise in such circumstances. The key issue, to which I hope to come if there is time, is that when a matter is resolved by a legitimate order, it is not within the duties of soldiers to resist and refuse it.--[*Interruption.*] My hon. Friend may intervene, but I will not be able to go through the whole case.

**Miss Begg** : Will my hon. Friend confirm that the men of the 8th Army, of the Highland and Northumbrian divisions, need not have volunteered for that draft?

**Mr Spellar** : As I said, headquarters ordered the movement of troops because of an emergency in Salerno and heavy casualties taken by the infantry division; other units that might have been used were not thought to be able to get there in time, and there was therefore a legitimate order for the troops to be transported. Indeed, such cross-posting of men to new units and formations was justifiable, lawful and not at all uncommon in emergencies.

**Miss Begg:** How common was it, in such cross-transfers, for men to be returned to active duty after an illness without a medical examination to determine their fitness?

**Mr. Spellar** : I could go into the research on those areas, but we are dealing with a military emergency, an invasion of Italy, unexpected but heavy losses at Salerno and the order to send in reinforcements. My hon. Friend reiterated the usual allegation that the men were misled about their destination and did not know where they were going. I am sure that hon. Members will understand that operational security meant--and often mean--that the destination of an emergency draft was not announced so that only a handful of more senior

## 22 Mar 2000 : Column 248WH

people in the camp actually knew. That is standard security procedure. Until the destination was announced during the voyage to Salerno, some men assumed that they were returning to their units.

Much emphasis has been placed on whether the men were needed when they arrived. The mutineers' testimony shows that, even while at sea, when they had no knowledge of the situation at Salerno, there was already a conspiracy to refuse to serve there.

With the benefit of hindsight, it is clear that German attacks peaked on 16

September. However, commanders had to plan for the continuing, immediate threat. A further important factor often overlooked is that such had been the casualties among the British infantry that non-infantry troops from the Royal Engineers and the beach administration companies at Salerno were already fighting at the front as infantry. Even on 16 September, a further 400 Royal Artillerymen were posted as temporary infantry reinforcements. Clearly, replacements for the non-infantrymen in the front-line were needed, and these non-infantry troops were needed to resume their normal tasks. The inevitable difficulties of operating a beachhead under attack had been exacerbated by their removal, which might explain some of the feelings of chaos among the new arrivals.

After landing at Salerno on 16 September, some 1,200 of the 1,500 reinforcements went, without any protest, to join the troops at the front. The remaining 300, largely from the 50th and 51st divisions, refused to move, saying they would serve only with their own units and divisions.

As the men's refusal became clear, the operational situation was explained to them a number of times, but to no avail. The men were personally addressed by the corps commander, who explained why they were needed. He was aware of their grievance at being cross-posted, so he promised that, provided that they complied with current necessary orders, they would be given the opportunity to re-join their previous units once the emergency was over. There is evidence that that promise was kept.

Finally, a formal parade was held at which an explanation was again given of the seriousness of the 300 men continuing on the same course, including the reading of the relevant parts of the applicable legislation. About 100 of the group obeyed the commands and joined units at Salerno. However, 192 stood fast and refused to obey the orders. They were again told of the serious nature of the crime of mutiny, and were allowed time for further reflection before the order was repeated. As my hon. Friend suggested, those who failed to comply were arrested and subsequently charged with mutiny at a court martial at the allied base in north Africa.

It shall speak about the conduct of the court martial and the actions of the defence team. Eleven extenuating circumstances were properly presented. No evidence was submitted by the defending officers to say that the men had been unfit to fight by the operational standards of the time, nor did the men choose to give evidence themselves and be cross-examined. The court subsequently found all but a few of the men guilty of mutiny.

The court heard all the defence statements of

## 22 Mar 2000 : Column 249WH

extenuating circumstances in mitigation before passing sentence; they reflected the responsibility

Case 1:05-cv-01662-CKK    Document 10    Filed 12/19/2007    Page 9 of 9

expected according to rank. Three sergeants were initially sentenced to death, but that was subsequently commuted to 12 years' imprisonment; the corporals received sentences of 10 years and the remainder received sentences of seven years. However, all sentences were subsequently formally suspended, thus offering the men a chance to redeem themselves; the sentence would be activated only if there was later misconduct.

The conviction for mutiny led to the loss of campaign medals but no gallantry medals were forfeited automatically on conviction. Of the two military medals held, only one was forfeited later, following the subsequent conviction of the holder for another offence.

Following suspension of sentence, the men were posted to other units in the Mediterranean theatre. Retaining the men there, rather than posting them back to their own units--by then in the United Kingdom--was lawful and probably understandable. It could hardly be expected that men who had broken military law should be allowed to achieve the objective of their unlawful action, and the bonus of a return to the UK.

We fully understand the strong loyalties to former units felt by the men, but, as General Montgomery suggested, those could not override lawful orders based on operational necessities and did not give them the right to mutiny. General Montgomery was in no doubt: he could not condone their action in refusing, when called upon, to provide operationally necessary reinforcements for the battlefield. The inescapable fact remains that the men mutinied on active service in the battlefield. By any account, that is a serious offence. To grant a pardon for that offence would be a disservice to the many men, including other 8th Army veterans, who obeyed orders, whether they liked them or not, and fought on. It would be a particular slight to those who gave their lives as a result.

Many who took part in the mutiny--

**Madam Deputy Speaker (Mrs. Gwyneth Dunwoody)** : Order.

Next Section                    Index                    Home Page

12
124



## DEPARTMENT OF THE AIR FORCE
AIR FORCE RESERVE COMMAND

9 Sep 00

MEMORANDUM FOR HQ AFRC/DPM

FROM: 349 AMW/CC
520 Waldron Street
Travis AFB CA 94589-2100

SUBJECT: Intent to Remove From Recommended Promotion List
Marc J. Millican, Maj, 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, 312 AS

Ref: (a) 349 AMW/CC Ltr, dtd 31 Jul 00, Intent to Remove from Recommended Promotion List
(b) Major Millican's Ltr, dtd 4 Jul 00, Letter dated 26 May 00 (Adverse Personnel Action)
(c) 349 MSS/DPM Ltr, dtd 26 May 00, Adverse Personnel Actions

1. This memorandum is to confirm that Major Millican was offered an additional opportunity to respond to the above identified action to remove his name from the recommended promotion list for Lieutenant Colonel. Two separate packages were mailed to Major Millican on 2 Aug 00. The first package was mailed via certified mail with return receipt requested and the other package via regular first class mail. The certified package was returned unclaimed (Attachment 1) on 31 Aug 00 and the other package was not returned and can be presumed to have been delivered to Major Millican. The address to which the packages were mailed was the same address provided by Major Millican in his 4 Jul 00 letter and corresponding to the address in his official Personnel record.

2. Per AFI 36-2504, paragraph 7.4., an officer is entitled to one opportunity to respond. Such an opportunity was previously provided to Major Millican on 13 Mar 00 (Attachment 2). This second opportunity was purely on my discretion as the Wing Commander and in response to Major Millican's letter of 4 Jul 00 (Attachment 3). His failure to avail himself of this second opportunity to respond does not change my recommendation to remove his name from the Lieutenant Colonel Recommended Promotion List .

3. If you have any questions pertaining to this issue, please contact my Director of Military Personnel, Lt Col Stevens, at DSN 837-1620.

JAMES T. RUBEOR, Colonel, USAFR
Commander

Attachments:
1. 349 AMW/CC Ltr, dtd 31 Jul 00, Intent to Remove from Recommended Promotion List
2. 349 AMW/CC Ltr, dtd 13 Mar 00, Intent to Remove from Recommended Promotion List
3. Major Millican's Ltr, dtd 4 Jul 00, Letter dated 26 May 00 (Adverse Personnel Action)
4. 349 MSS/DPM Ltr, dtd 26 May 00, Adverse Personnel Actions



F/25

Reply to:
32975 St. Moritz Drive
Evergreen, CO 80439
(303) 670-3825
Fax 670-1586

John A. Wickham, Esq.
Admitted in Virginia,
District of Columbia
& Military Courts



# John A. Wickham & Associates
## Attorneys-at-Law



23 March 2004

Air Force Board for Correction of Military Records (AFBCMR)
Department of the Air Force
Washington D.C. 20330-1430



Re:   Dkt. BC-2003-02505,
       MARC J. MILLICAN, Major, USAFR (Ret.) 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

SUBJECT:    New evidence in support:
             <u>Wright v. US Army</u> — F.Supp.2d — 2004 WL 439956 (D.Az. 2004)(attached)


       Counsel for applicant submits a recently published federal court case issued March 9, 2004, relevant to applicant-Millican's argument that the disciplinary actions taken against him (reprimand, OPR, and promotion list removal), were in retaliation for expressing his First Amendment free speech rights against the Anthrax vaccine.
       In <u>Wright v. US Army</u> the court in 2004 issued a preliminary injunction against the Army preventing any adverse personnel actions against Captain Wright including "discharge, demotion, or security clearance revocation." <u>Id</u> at 9.  The court had found in its prior 2002 decision (with the Army agreeing) that the Army could not revoke CPT Wright's security clearance based on events occurring before a statute was enacted in 2000 that permitted clearance revocations.  10 U.S.C. § 986(a)(Smith Amendment permitting revocation after October 2000 for criminal convictions).  However, the Army in 2003 after the litigation initiated a discharge board proceeding for Wright's alleged lying about his prior conviction when he was commissioned in 1997.  In other words, the court found the discharge action violated his First Amendment right (to bring litigation in 2002) when the Army's agreed then that reliance on § 986 was unlawful.
       The relevance to Millican's case is that his discipline was retaliation for expressing First Amendment free speech concerning an unlawful use of an experimental and unsafe vaccine *before* the FDA had formally issued a required Final Rule in December 2003.  In the absence of this formal rule, Millican in 1999 had free speech protection to allege the vaccine was not safe and unlawful.  Because the final rule was not retroactive (similar to the Smith Amendment), there can be no retaliation for his free speech events occurring before December 2003.


                                      John A. Wickham, Esq.
                                      Attorney for Millican


Incl:

<u>Wright v. US Army</u>  WL 439956 (D.Az. 2004)

176
EX 5

# Westlaw.

Sign Off


**Wright v. U.S. Army**
**2004 WL 439956**
**D.Ariz.,2004.**
**March 9, 2004.**

--- F.Supp.2d ---

Only the Westlaw citation is currently available.

United States District Court,
D. Arizona.
Andrew Keith WRIGHT, Plaintiff,
v.
U.S. ARMY, et al., Defendants.
No. CIV. ◄02-967►-PHX-EHC.
March 9, 2004.

**Background:** Captain sued United States Army, alleging Fifth Amendment and due process violations. Following Army's representation that it would not take action to void captain's status, dismissal of case as moot, revocation of captain's security clearance, and grant of captain's motion to re-open case, captain asserted First Amendment retaliation claims and moved for preliminary injunction.

**Holdings:** The District Court, Carroll, J., held that:
(1) Smith Amendment did not authorize Army to revoke captain's security clearance;
(2) preliminary injunction would issue to require reinstatement of security clearance; and
(3) Army would be enjoined from initiating proceedings to discharge captain based upon alleged pattern of lies and misrepresentations that occurred prior to issuance of prior preliminary injunction enjoining Army from dropping him from Army rolls.

Motion granted.

[1]

᳓ 212 Injunction
᳓ 212k0 k.

To obtain a preliminary injunction, a movant must show either the likelihood of success on the merits and the possibility of irreparable injury or, alternatively, the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor.

[2]

᳓ 212 Injunction
᳓ 212k0 k.

A preliminary injunction may issue when the movant shows either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.

[3]

*/77*

92 Constitutional Law
92k0 k.

There are three ways for a public employee's claim of retaliation for exercising speech rights to have merit: first, a plaintiff can show such a close proximity between the adverse employment action and the protected speech as to create an inference of retaliation; second, a plaintiff can show his employer was opposed to his protected speech; and, third, a plaintiff can show that his employer's proffered explanations for such retaliation were false and pretextual. U.S.C.A. Const.Amend. 1.

[4]

92 Constitutional Law
92k0 k.

Because soldiers must show a respect for duty and a discipline without counterpart in civilian life, a soldier's free speech rights must yield somewhat to meet certain overriding demands of discipline and duty. U.S.C.A. Const.Amend. 1.

[5]

34 Armed Services
34k0 k.

Because the military's right to command and the duty to obey must be unquestioned, the military, for purposes of a soldier's free speech claim, must possess substantial discretion over its internal discipline. U.S.C.A. Const.Amend. 1.

[6]

34 Armed Services
34k0 k.

The Smith Amendment provisions prohibiting the Department of Defense, after a certain date, from granting or renewing the security clearance of a person convicted of a crime and sentenced to imprisonment of over one year, do not apply to security clearance revocations. 10 U.S.C.A. § 986(a), (c)(1).

[7]

92 Constitutional Law
92k0 k.

The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases brought by public employees; the goal is to prevent, or redress, actions by a government employer that chill the exercise of protected speech rights. U.S.C.A. Const.Amend. 1.

[8]

92 Constitutional Law
92k0 k.

A time period of three to eight months between a public employee's protected speech and the employer's adverse action is not too lengthy a time to support an inference of retaliation in a First Amendment action. U.S.C.A. Const.Amend. 1.

[9]

92 Constitutional Law
92k0 k.

*178*

Smith Amendment, which prohibited Department of Defense, after certain date, from granting or renewing security clearance of person convicted of crime and sentenced to imprisonment of over one year, was not unconstitutional ex post facto law, inasmuch as it did not permit revocation of existing security clearance. U.S.C.A. Const. Art. 1, § 9, cl. 3; 10 U.S.C.A. § 986(a), (c)(1).

[10]

92 Constitutional Law
92k0 k.

An "ex post facto law" is a law that applies retroactively, especially in a way that negatively affects a person's rights, as by criminalizing an action that was legal when it was committed. U.S.C.A. Const. Art. 1, § 9, cl. 3.

[11]

34 Armed Services
34k0 k.

Smith Amendment, which prohibited Department of Defense, after certain date, from granting or renewing security clearance of person convicted of crime and sentenced to imprisonment of over one year, did not authorize Army to revoke captain's security clearance due to his commission of felony, inasmuch as Amendment applied to captain only upon expiration of his security clearance. 10 U.S.C.A. § 986(a), (c)(1).

[12]

34 Armed Services
34k0 k.

The Smith Amendment gives the Department of Defense broad discretionary power to grant or renew security clearances. 10 U.S.C.A. § 986(d).

[13]

34 Armed Services
34k0 k.

The Smith Amendment confers upon the Secretary of Defense the ability in a meritorious case to abrogate, entirely at his discretion, the prohibition against granting or renewing the security clearance of a person convicted of a crime and sentenced to imprisonment of over one year. 10 U.S.C.A. § 986(a), (c)(1), (d).

[14]

34 Armed Services
34k0 k.

Exceptions to the Smith Amendment's prohibition against granting or renewing the security clearance of a person convicted of a crime and sentenced to imprisonment of over one year are not to be issued lightly. 10 U.S.C.A. § 986(a), (c)(1), (d).

[15]

34 Armed Services
34k0 k.

In passing the Smith Amendment, Congress' concern stemmed from the idea that too many convicted felons were receiving security clearances, not that some convicted felons may unjustly be denied a security clearance. 10 U.S.C.A. § 986(a), (c)(1), (d).

*179*

[16]

 · · 92 Constitutional Law
 ⌣ 92k0 k.

It is a violation of the First Amendment to enable a public official to determine which expressions of view will be permitted and which will not, or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute. U.S.C.A. Const.Amend. 1.

[17]

 ⸱ ·92 Constitutional Law
 ·· 92k0 k.

A statute which, on its face, is so vague and indefinite as to permit the punishment of protected free speech is anathema to the Fourteenth Amendment concept of liberty. U.S.C.A. Const.Amend. 14.

[18]

 :~212 Injunction
 ⌣212k0 k.

Army captain showed possibility of success on merits of his claim that Army revoked his security clearance in retaliation for him exercising his free speech rights through litigating claims against Army, and preliminary injunction thus would issue to require reinstatement of clearance, where Army mistakenly applied Smith Amendment, just three weeks after District Court had dismissed captain's claims based upon Army's representation that it would not take action to void captain's status. U.S.C.A. Const.Amend. 1; 10 U.S.C.A. § 986 (a), (c)(1), (d).

[19]

 ⸦⸺212 Injunction
 ⸱⸗212k0 k.

Army would be enjoined from initiating proceedings to discharge Army captain based upon alleged pattern of lies and misrepresentations that occurred prior to issuance of prior preliminary injunction enjoining Army from dropping him from Army rolls, where District Court had dismissed captain's claims as moot based upon Army's representation that it would not take action to void captain's status, and, thus, Army had waived its right to rely, in any subsequent effort to discharge captain, on events prior to issuance of prior preliminary injunction.
Andrew Keith Wright, Goodyear, AZ, pro se. for Plaintiff.
Arthur G. Garcia, Esq, James C. Hair, Jr, Esq, US Attorney's Office, Phoenix, AZ, for Defendants.

ORDER

CARROLL, District J.
*1 Pending before the Court is Plaintiff's 1) Motion for Preliminary Injunction [Dkt. 75-3]; 2) Motion for Declaratory Relief [Dkt. 75-4]; and 3) Motion to Find Defendants in Contempt [Dkt. 75-5].
Attached as an Appendix to this Order is a chronology of events involving Plaintiff's military career from May 24, 2002, the date Plaintiff filed his initial Complaint, to date.
*Relevant Procedural History*
On July 12, 2002, the Court entered a Preliminary Injunction enjoining the U.S. Government and any of its agencies having jurisdiction over Plaintiff's military status from 1) dropping Plaintiff from the rolls of the Army; and 2) terminating his active duty status as a Captain prior to December 20, 2002. Defendants did not appeal the Order granting the Preliminary Injunction.
On December 23, 2002, Defendants filed a Motion to Dismiss [Dkt. 54] and submitted an exhibit ("Letter") to their Motion to Dismiss, which stated:
Based on the reasoning of the U.S. District Court in issuing the preliminary injunction, this command does not intend to take action to void Andrew Wright's status as a captain, U.S. Army Reserve, on or after 20 December

2002.

Captain Wright is currently serving on a tour of extended active duty. Future actions after 20 December 2002 to extend that active duty tour or to allow that tour to terminate on its end date with Captain Wright's release to the Individual Ready Reserve will be in accordance with all laws and regulatory standards applicable to similarly situated officers of the U.S. Army Reserve who are serving on active duty.

[Dkt. 57, p. 2; Dkt. 54, Exh. 1]. [FN1]

On January 17, 2003, despite the attestations in the Letter one month earlier and without filing with the Court, the Department of the Army Central Personnel Security Clearance Facility Plaintiff issued an "Intent to Revoke" Memorandum, which notified Plaintiff that a preliminary decision had been made to revoke his security clearance pursuant to the Smith Amendment. [Dkt. 67, Exh. 6-5].

In its Order dated February 28, 2003, the Court granted Defendants' Motion to Dismiss [Dkt. 54] because "Plaintiff ha[d] received the relief he requested." [Dkt. 57, p. 4]. [FN2] The Court dismissed the case as moot based on Defendants' representations in its December 2002 Motion to Dismiss. [FN3] [Dkt. 57, p. 4].

On March 23, 2003, Defendants revoked Plaintiff's ten-year security clearance after only seven years, which Plaintiff alleges operated to "negate the ability of the Plaintiff to continue to serve on Active Duty with the Army or obtain an assignment in the Army Reserve." [Dkt. 75, p. 2, filed February 2, 2004]. On February 2, 2004, Plaintiff filed a "Motion to Re-Open case, Motion for Temporary Restraining Order and Preliminary Injunction, Motion for Declaratory Relief, and Motion to Find Defendants in Contempt." [Dkt. 75].

On February 3, 2004, Defendants notified Plaintiff, by Memorandum, of an upcoming hearing to take place at the Armed Forces Reserve Center in North Little Rock, Arkansas, on February 18, 2004. The "subject" of the Memorandum was listed as "Notification of Show Cause Board." The Memorandum, issued by the Department of the Army, stated that "[t]he hearing [is] to consider CPT Andrew K. Wright... for administrative separation [FN4] for intentional misstatement of facts in official statements or records, for the purpose of misrepresentation and conduct unbecoming an officer..."

*2 On February 12, 2004, the Court granted Plaintiff's Motion to Re-Open the case to consider actions the U.S. Army took subsequent to the Court's Order of February 28, 2003, which dismissed Plaintiff's claims because he had received the relief requested. Further, the Court granted Plaintiff's Motion for Temporary Restraining Order and enjoined Defendants, or any division thereof, from taking any action to discharge, demote, or otherwise voiding or suspending Plaintiff's status on inactive duty as a Captain in the U.S. Army Reserve for a period often (10) days from the date of the Order or as extended by the Court.

Plaintiff claims the U.S. Army is now "attempt[ing] to achieve indirectly what the Court has ruled they were estopped from doing" based on an alleged misrepresentation in July 2003, discussed *infra*. [Dkt. 75, p. 2]. At issue is whether the Court acted based on representations that Plaintiff had received the relief requested in granting Defendants' Motion to Dismiss, and if so, whether events subsequent to the Court's Order of February 28, 2003, have occurred which justify Plaintiff's dismissal, or whether Defendants are retaliating against Plaintiff. The pending, although now-postponed, military proceedings to terminate Plaintiff, considering that the U.S. Army "[did] not intend to take action to void Andrew Wright's status as a captain, U.S. Army Reserve, on or after 20 December 2002" [Dkt. 54, Exh. 1], are arguably impacted by prior proceedings in this case.

On February 20, 2004, the Court held an evidentiary hearing to determine whether the U.S. Army had acted in contravention to its representations, *supra*, in its Motion to Dismiss, and whether to issue a preliminary injunction.

*Legal Standard--Preliminary Injunction*

[1] In order to obtain a preliminary injunction, a movant must show either the likelihood of success on the merits and the possibility of irreparable injury *or*, alternatively, the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor. *Mai Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516 (9th Cir.1993).

[2] In other words, a preliminary injunction may issue when the movant shows " 'either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.' " *Immigrant Assistance Project of Los Angeles Cty. Federation of Labor (AFL-CIO) v. I.N.S.*, 306 F.3d 842, 873 (9th Cir.2002)(quoting *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1517 (9th Cir.1992)).

*Discussion*

*Plaintiff's Allegations*

Plaintiff is proceeding pro se. Plaintiff argues that Defendants, in their December 2002 Motion to Dismiss [Dkt. 54], misrepresented their position to the Court. Plaintiff contends that the Order dismissing his claims, based on Defendant's representations, requires the U.S. Army to reinstate his security clearance. Further, Plaintiff alleges that the revocation of his security clearance on March 23, 2003, was in retaliation for his legal actions against the U.S. Army. [FN5] Specifically, Plaintiff "contends that several actions committed by the Defendants are indirect [sic] contempt of this Court and in violation of an agreement submitted in writing in this Court to 'treat the

Plaintiff as any other Officer' and to take no action to 'divest him of his status as an Officer in the U.S. Army Reserve." ' [Dkt. 67, p. 2]. Plaintiff's referral to "several actions" stems from the revocation of his security clearance [FN6] and his scheduled hearing in Arkansas before the involuntary separation Board to consider involuntary discharge. Plaintiff argues that any misrepresentation as to the status of his security clearance on an application for voluntary deployment to Honduras by Plaintiff was due to Plaintiff's reliance on the Court's Order, which he believes required reinstatement of his security clearance.

*3 Additionally, Plaintiff alleges he has been a reliable and dutiful soldier. Plaintiff submitted a letter from Lieutenant Colonel Scott A. Westley, dated February 25, 2003, which states "I highly recommend approval of this waiver request and that CPT Wright's security clearance be restored. CPT Wright has served with this unit for over two years and I have personally worked with him for eight months of that period. I do not doubt his loyalty to our country or his willingness to serve our Army." [Dkt. 67, Exh. 4-12] . [FN7]

*Defendants' Allegations*
Defendants argue that the Court, if it accepts Plaintiff's argument, may be erecting "an impenetrable shield against any subsequent adverse personnel actions" against Plaintiff. [Dkt. 78, p. 5].
During the evidentiary hearing on February 20, 2004, Defendant argued that Plaintiff intentionally misrepresented his security clearance status on his application, dated July 10, 2003, which was submitted for voluntary deployment with Joint Task Force Bravo to Honduras. Plaintiff represented his security clearance as "Secret." [Hearing Exh. 29, p. 8].
A Memorandum issued on December 7, 2003, and signed by Major General James A. Sholar, referenced the July 2003 application, and advised Plaintiff that:
Your misrepresentation of your clearance status to deploy to Honduras continues a *pattern of misrepresentation* previously documented by a January 27, 2003, Reprimand issued to you by MG Michael D. Rochelle, Commander, U.S. Army Recruiting Command. This Reprimand states that you committed various acts of fraud and deceit against the U.S. Army, including submitting a false statement in August, 1997, on a [Standard Form 86] security questionnaire [FN8] regarding a previous suspension of your clearance.
[Dkt. 67, Exh. 1-1; See Dkt. 9, p. 29](emphasis added).
Defendants allege that his recent representation involving his security clearance continues a pattern of dishonesty perpetrated by Plaintiff over the past fifteen years, and warrants an administrative separation hearing.
Defendants refer to the last paragraph in the Letter (Dkt.54, Exh. 1), which states, in part:
Future actions after 20 December 2002 to extend that active duty tour or to allow that tour to terminate on its end date with Captain Wright's release to the Individual Ready Reserve will be in accordance with all law and regulatory standards applicable to similarly situated officer of the U.S. Army Reserve who are serving on active duty.
As such, Defendants claim that they retained the right, pursuant to the above paragraph, to terminate Plaintiff for conduct prior to and known as of December 20, 2002, even though the Court dismissed the case as moot based on the fact that Plaintiff received the relief he requested.

*Reopening of the Case*
The Court reopened this case for the limited purpose of deciding whether *new* events had occurred subsequent to the Order dismissing Plaintiff's claims to justify terminating Plaintiff's status in the Ready Reserve. Despite Defendants claim that Plaintiff had an alleged "history" of misrepresentations, Defendants agreed in December 2002 to take no action to void Plaintiff's status as a captain. However, Defendants revoked Plaintiff's security clearance just twenty-three (23) days after the Court's Order, and later scheduled an administrative hearing, now postponed, for February 18, 2004, to determine his status as an officer in the U.S. Army Reserve.

*Scope of the Court's February 28, 2003 Order*
*4 In its February 28, 2003 Order, the Court addressed mootness because Plaintiff "ha[d] received the relief he requested" with respect to his claims of Fifth Amendment and due process violations. However, the Court advised Plaintiff that any First Amendment retaliation claims "is properly brought in a separate action." [Dkt. 57, p. 4]. On March 24, 2003, Plaintiff filed a separate action (CIV 03-555) [FN9], which the Court consolidated with this action (CIV 02-0967) pursuant to an Order dated February 12, 2004.
Plaintiff has not received the "relief he requested" with respect to his First Amendment claims because the claims had not been resolved by dismissal of the case. Therefore, Plaintiff's First Amendment retaliation claim is before the Court at this juncture. The Court will determine whether Defendants' contention that it did "not intend to take action to void Andrew Wright's status as a captain, U.S. Army Reserve, on or after 20 December 2002" represented that the U.S. Army did not intend to pursue dismissal, or take any action leading to dismissal, based upon Plaintiff's alleged pattern of dishonesty and misrepresentations occurring prior to December 20, 2002. If Defendants' intent is determined as such by the Court, then any adverse employment action against Plaintiff for his alleged dishonesty and misrepresentations are suspect absent non-pretextual reasons for such action.
Defendants argued at the hearing on February 20, 2004, that Plaintiff's recent misrepresentation on July 10, 2003, concerning the status of his security clearance after the clearance had been revoked on March 23, 2003,

precipitated the scheduling of a discharge hearing to be held on February 18, 2004. However, Plaintiff's evidence at the hearing reflected that the revocation process was initiated by the Army Litigation Division via a Memorandum sent to Maria Di Marco ("Di Marco"), Adjudications Chief at the Central Personnel Security Clearance Facility on June 24, 2002, regarding his 1987 criminal conviction. Plaintiff has submitted Army correspondence, including the Memorandum to Di Marco, which states that the reasons for the revocation of Plaintiff's security clearance is his criminal conviction. [Dkt. 67, Exh. 4-6]. Further, Defendants continue to maintain that a *pattern* of dishonesty, occurring long prior to December 22, 2002, will be presented at the discharge hearing rather than merely the most recent events, thus resurrecting the very issues resolved by the Court's February 2003 Order.

*First Amendment Retaliation--Revocation of Security Clearance*

[3] There are three (3) ways for a retaliation claim to have merit. First, a Plaintiff can show such a close proximity between the adverse employment action and the protected speech as to create an inference of retaliation. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir.2003). Second, a Plaintiff can show his employer was opposed to his protected speech. *Id.* Third, a Plaintiff can show that his employer's proffered explanations for such "retaliation" were false and pretextual. *Id.*

*5 It is widely accepted that non-frivolous litigation is constitutionally- protected free speech. *See, e.g., Lytle v. Wondrash*, 182 F.3d 1083, 1090 (9th Cir.1999); *Redish v. City of Tacoma*, 123 F.3d 1216, 1222-23 (9th Cir.1997).

In the Order dismissing Plaintiff's claims, and noting that any First Amendment claim be brought in a separate action, the Court stated:

Plaintiff contends the administrative actions taken against him are in retaliation for his previous legal actions against Defendants and are an attempt to harass him and remove him from the Army. As such, Plaintiff's claims are... brought under... the First Amendment as retaliation claims.

Unlike due process claims, First Amendment retaliation claims do not require a final agency action or a liberty or property entitlement. Rather, the action of which a plaintiff is complaining must only be sufficiently adverse to deter the exercise of First Amendment rights. *Power v. Summers*, 226 F.3d 815, 820- 21 (7th Cir.2000); *see also Nunez v. City of Los Angeles*, 147 F.3d 867, 875 n. 11 (9th Cir.1988); *Hyland v. Wonder*, 972 F.2d 1129, 1134-35 (9th Cir.1992). Thus, Plaintiff arguably may assert First Amendment retaliation claims even if the Army has discretion in whether to take these administrative actions against Plaintiff, assuming Plaintiff's First Amendment interests outweigh the Army's need to maintain morale and discipline. *See Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

[Dkt. 57, p. 3].

The Supreme Court has determined that:

While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it. *Parker v. Levy*, 417 U.S. at 760, 94 S.Ct at 2563.

[4][5] As such, "even if there are marginal applications to which [a statute] would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct.' ' Id. (citing *United States Civil Svc. Comm'n v. Nat'l Assn. of Letter Carriers*, 413 U.S. 548, 580-81, 93 S.Ct. 2880, 2898, 37 L.Ed.2d 796 (1973)). Soldiers must show a respect for duty and a discipline without counterpart in civilian life. *See Brown v. Glines*, 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980). Therefore, a soldier's rights "must yield somewhat to meet certain overriding demands of discipline and duty..." Id. (quoting *Parker v. Levy*, 417 U.S. at 758, 94 S.Ct. at 2563) (internal quotations omitted). Because the military's right to command and the duty to obey must be unquestioned, the military must possess substantial discretion over its internal discipline. Id. at 357, 601.

*6 [6] Here, the specific First Amendment right that Plaintiff claims was violated is the prohibition of retaliation for free speech. As will be addressed, *infra*, the statute on which Defendants rely, namely the Smith Amendment, does not apply to security clearance revocations. As such, Defendants will not be afforded the liberal application of the statute that the Supreme Court envisioned.

Procedurally, Plaintiff states a claim of retaliation that fits into the first prong of the *Coszalter* test, *supra*, by alleging that the U.S. Army initiated proceedings to revoke his security clearance just a few weeks after the Army's assurance that they had no intention of taking any action to void Plaintiff's status as Captain, and by relying on a statute that has no application to Plaintiff at this time.

[7][8] "The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is to prevent, or redress, actions by a government employer that chill the exercise of protected First Amendment rights." *Coszalter*, 320 F.3d at 974-75 (9th Cir.2003) (internal quotations omitted). Further, a time period of three (3) to eight (8) months after the protected speech is not too lengthy a time to support an

*183*

inference of retaliation. [FN10] *See id.* at 977.

Here, the U.S. Army's issuance on January 17, 2003, of the "Intent to Revoke" Memorandum, notifying Plaintiff that a preliminary decision had been made to revoke his security clearance pursuant to the Smith Amendment, and the ultimate revocation of Plaintiff's security clearance just three (3) weeks after the Court's Order of February 28, 2003, supports an inference of retaliation.

*The Smith Amendment (10 U.S.C. § 986)*

[9][10] The Smith Amendment provides that "[a]fter October 30, 2000, the Department of Defense may not grant or renew a security clearance for a person to whom this section applies who is described in subsection (c)." 10 U.S.C. § 986(a). Section (c) provides, in relevant part, that "[a] person is described in this subsection if any of the following applies to that person: (1) The person has been convicted in any court of the United States of a crime and sentenced to imprisonment for a term exceeding one year." 10 U.S.C. § 986(c)(1). [FN11] The statute does not provide for the revocation of an existing security clearance.

[11] Here, Plaintiff was charged with a felony in 1987 and sentenced to eighteen months for his conviction. [FN12] As such, the Smith Amendment applies to Plaintiff and his security clearance, but only upon the expiration of his security clearance. [FN13]

[12][13][14][15] The Smith Amendment gives the Department of Defense and, therefore, Defendants in this case, broad discretionary power to grant or renew security clearances. *Nickelson v. United States,* 284 F.Supp.2d 387, 392 (E.D.Va.2003). Section (d) allows, in a meritorious case, for "Secretary of Defense or the Secretary of the military department concerned [to] authorize an exception to the prohibition in subsection (a) for a person described in... subsection (c)." 10 U.S.C. § 986(d). As such, Section (d) "confers upon the Secretary the ability in a 'meritorious case' to abrogate this prohibition, entirely at his discretion." *Nickelson,* 284 F. Supp.2d at 392. These exceptions, however, are not to be issued lightly. *Id.* In passing the Smith Amendment, Congress' concern stemmed from the idea that too many convicted felons were receiving security clearances, not that some convicted felons may unjustly be denied a security clearance. *Id.* at 392-93.

*The Smith Amendment Vis-a Vis the First Amendment*

*7 [16][17] "It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either *by use of a statute providing a system of broad discretionary licensing power* or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute." *Cox v. State of Louisiana,* 379 U.S. 536, 557-58, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965)(emphasis added). Further, a statute which, on its face, is so vague and indefinite as to permit the punishment of protected free speech, is anathema to the Fourteenth Amendment concept of liberty. *Id.* at 552, 463. The Supreme Court has "recognized that the lodging of such broad discretion in a public official allows him to determine which expressions of view will be permitted and which will not." *Id.* at 557, 466. Thus, "[i]t is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups... by use of a statute providing a system of broad discretionary licensing power..." *Id.*

Here, the military arguably could, in meritorious cases, renew the security clearances of persons with convictions and imprisonments of more than one year, but choose to renew only when those who exercised protected free speech did so with actions advocated by the military. Such an implementation of the statute would clearly be unconstitutional. While the revocation, or non-renewal, of a soldier's security clearance, or fear of same, would not prevent the speech at issue here, namely litigation, the possibility of revocation or non-renewal could severely discourage, and be retaliation for such speech, regardless of whether the revocation or non-renewal was in accordance with the Smith Amendment.

[18] Although the Smith Amendment does not permit Defendants to revoke Plaintiff's security clearance, Plaintiff still has the burden of showing that the U.S. Army revoked his security clearance to retaliate against him. The U.S. Army catalogued a history of alleged lies and misrepresentations by Plaintiff, committed by falsifying applications for active duty. However, Defendants waived objections in December 2002 to Plaintiff's alleged history, pursuant to the Letter, *supra,* and indicated no intention of discharging Plaintiff based on that history. They assert an entirely different posture now. There is sufficient evidence to support the inference that Defendants' mistaken application of the Smith Amendment, just three weeks after the Court's Order dismissing his claims as moot, was in retaliation for Plaintiff's litigation.

The U.S. Army's revocation of Plaintiff's security clearance twenty-three (23) days after the Court's Order supports an inference of retaliation that Defendants have failed to rebut. Further, Plaintiff has offered evidence of his exemplary service, including a letter of recommendation from Lieutenant Colonel Scott A Wesley praising Plaintiff's service in to the Army, and recommending the reinstatement of Plaintiff's security clearance. Accordingly, the Court will order reinstatement of Plaintiff's security clearance effective the date of this Order.

*Discharge Proceedings*

*8 [19] Defendants' argument that an alleged pattern of lies and misrepresentations for over a decade can be forgiven, as it was in December 2002, yet his action on July 10, 2003, which Plaintiff contends was based on a

*189*

false assumption concerning his security status, is grounds for a show cause hearing to terminate his status, is unpersuasive. First, Defendants fail to offer a credible reason for revoking Plaintiff's security clearance *before* his July 2003 representation occurred. Second, Defendants offer no evidence as to what occurred between February 28, 2003, the date of the Court's Order dismissing Plaintiff's claims as moot, and March 23, 2003, the date Defendants revoked Plaintiff's security clearance, to warrant such a revocation. Third, Defendants offer no basis, aside from the July 2003 alleged misrepresentation, to proceed with a separation hearing.

The Court dismissed Plaintiff's claims on February 28, 2003, in reliance on the U.S. Army's intent not to pursue discharge proceedings against Plaintiff as stated earlier in this Order. The Court found that Plaintiff had received the relief requested. The U.S. Army effectively and knowingly waived its right to rely upon the alleged pattern of lies and misrepresentations by Plaintiff prior to December 2002 in any subsequent effort to discharge him. The Court does not erect an "impenetrable shield" for Plaintiff for significant misdeeds in the future, as Defendants suggest, but it does foreclose the U.S. Army from considering the same alleged pattern of lies and misrepresentations that Defendants agreed not to pursue in the Letter of December 2002, and from relying on the Smith Amendment until after the expiration of Plaintiff's security clearance.

During the evidentiary hearing, Army counsel argued that Plaintiff's misrepresentation of the status of his security clearance on July 10, 2003, in voluntarily seeking deployment, is "all it takes to require an officer to show cause for retention." However, Defendants, in their December 7, 2003 letter, *supra* at page 6, to Plaintiff, contend that, in addition to the Smith Amendment, other reasons existed to revoke Plaintiff's security clearance, such as "submitting false documents, submitting false information and your fraudulent enlistment in the Texas Army National Guard" on June 27, 1996. [Dkt. 67, Exh. 6-1].

Based on the Court's Order of February 28, 2030, Defendants may not initiate discharge proceedings based upon the alleged pattern of lies and misrepresentations that occurred prior to December 2002.

*Legal Standard--Contempt*

" 'The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." ' *In re Dyer,* 322 F.3d 1178, 1190-91 (9th Cir.2003)(quoting *In re Bennett,* 298 F.3d 1059, 1069 (9th Cir.2002)). "The burden then shifts to the contemnors to demonstrate why they were unable to comply." *F.T.C. v. Affordable Media,* 179 F.3d 1228, 1239 (9th Cir.1999).

*Revocation of Security Clearance as Contempt*

**\*9** The Court finds that Defendants' revocation of Plaintiff's security clearance was in contravention to the Court's Order of February 28, 2003. However, while Defendants' reliance on the Smith Amendment, shortly after the Order, supports an inference of retaliation, the issue of contempt will not be resolved at this stage of the proceedings.

*Conclusion*

Plaintiff has met his burden for issuance of a preliminary injunction, by showing the possibility of success on the merits of his retaliation claim and the possibility of irreparable injury. Defendants have failed to rebut the inference of retaliation. As such, Plaintiff's security clearance shall be reinstated. Defendants are not found in contempt of the Court's Order dated February 28, 2003, at this time. However, Defendants will be enjoined from taking any action to discharge, demote, or otherwise voiding or suspending Plaintiff's status as Captain, or to revoke Plaintiff's security clearance, based upon Plaintiff's actions prior to December 2002.

Accordingly, and pursuant to the hearing held on February 20, 2004,

IT IS ORDERED that all pending motions as of February 20, 2004, in the case numbered CIV 03-0555-PHX-EHC are DENIED without prejudice. [Dkts. 18-1, 18-2, 18-3, 19-1, 20-1, 20-2, 33-1, 34-1, 35-1, 35-2, 35-3, 40-1, 41-1, 42-1, 42-2, 42-3, 43-1].

IT IS FURTHER ORDERED that all pending motions as of February 20, 2004, in the case numbered CIV 03-1252-PHX-EHC are DENIED without prejudice. [Dkts. 5-1, 6- 1].

IT IS FURTHER ORDERED that cases numbered CIV 03-0555-PHX-JAT, CIV 03-1252- PHX-JAT, CIV 03-1321-PHX-JAT, CIV 03-1693-PHX-JAT shall be consolidated into case number CIV 02-0967-PHX-EHC, and all future filings in any of these cases should reflect the case number CIV 02-0967-PHX-EHC.

IT IS FURTHER ORDERED that Plaintiff's Motion for Preliminary Injunction is GRANTED. [Dkt. 75-3].

IT IS FURTHER ORDERED that Defendants are enjoined from taking any action to discharge, demote, or otherwise voiding or suspending Plaintiff's status as Captain, or to revoke Plaintiff's security clearance, based upon Plaintiff's alleged history of lies and misrepresentations prior to December 2002. [Dkt. 75-3].

IT IS FURTHER ORDERED that Plaintiff's Motion for Declaratory Judgment is STAYED without prejudice to consideration at an appropriate time. [Dkt. 75-4].

IT IS FURTHER ORDERED that Plaintiff's Motion to Find Defendant's in Contempt will be addressed, if necessary, at a future hearing. [Dkt. 75-5].

APPENDIX

Chronology of Events

*/85*

*Wright v. U.S. Army Total Personnel Command, et al.* (02 CIV 967)

May 24, 2002: Complaint filed (numbered CIV 02-0967-PHX-EHC).

December 12, 2002: Letter from Lieutenant Colonel Rafe R. Foster to U.S. Attorney Paul K. Charlton, which was attached as Exhibit 1 to Defendants' Motion to Dismiss [Dkt. 54], and states, in relevant part:

Based on the reasoning of the U.S. District Court in issuing the preliminary injunction, this command does not intend to take action to void Andrew Wright's status as a captain, U.S. Army Reserve, on or after 20 December 2002.

***10** Captain Wright is currently serving on a tour of extended active duty. Future actions after 20 December 2002 to extend that active duty tour or to allow that tour to terminate on its end date with Captain Wright's release to the Individual Ready Reserve will be in accordance with all laws and regulatory standards applicable to similarly situated officers of the U.S. Army Reserve who are serving on active duty.

[Dkt. 54, Exh. 1].

January 17, 2003: "Intent to Revoke" Memorandum issued by the Department of the Army Central Personnel Security Clearance Facility, notifying Plaintiff that a preliminary decision had been made to revoke his security clearance pursuant to the Smith Amendment.

February 25, 2003: Letter from Lieutenant Colonel Scott A. Westley recommending that Plaintiff's security clearance be reinstated and opining that he does not doubt Plaintiff's loyalty to the United States or his willingness to serve in the Army.

February 28, 2003: Court Order dismissing Plaintiff's Fifth Amendment and due process claims because "Plaintiff has received the relief he requested" pursuant to the Letter from Lieutenant Colonel Rafe R. Foster to U.S. Attorney Paul K. Charlton. [Dkt. 57, p. 4].

March 23, 2003: Defendants revoke Plaintiff's security clearance pursuant to the Smith Amendment.

July 10, 2003: Plaintiff submits Application for Active Duty, in which he fills in the box under "Security Clearance" with the word "Secret." [Hearing Exh. 29, p. 7]. Both parties stipulate to the fact that Plaintiff's security clearance had been revoked at the time. Plaintiff alleges he believed that the Court's Order, dated February 28, 2003, required Defendants to reinstate Plaintiff's security clearance.

October 17, 2003: Plaintiff sends email correspondence to Colonel Bruce Berwick requesting his security clearance be reinstated. [Dkt. 67, Exh. 4-6].

October 21, 2003: Colonel Bruce Berwick responds via email correspondence to Plaintiff's request for a waiver to the requirement that his security clearance be revoked. Colonel Berwick writes that "[g]iven your criminal conviction, and the determination of the Personnel Security Advisory Board, [Secretary Brownlee] will not consider a meritorious waiver at this time." [Dkt. 67, Exh. 4-6].

October 23, 2003: Plaintiff sends email correspondence to Colonel Bruce Berwick requesting an exception to his security clearance revocation pursuant to the Court's Order dated February 28, 2003, in which Plaintiff contends "estopped [the Army] from using my conviction against me in any personnel action." [Dkt. 67, Exh. 4-6].

December 7, 2003: Memorandum from Major General James R. Scholar, U.S. Army Reserve, notifying Plaintiff that "... I am initiating involuntary separation against you..." [Hearing Exh. 1].

December 19, 2003: Plaintiff files a Motion for Order to Show Cause why Defendants should not be held in contempt of court for violating the Order dated February 28, 2003.

***11** January 7, 2004: Plaintiff files a Motion for Temporary Restraining Order and Preliminary Injunction. [Dkt. 63].

February 3, 2004: Defendants notify Plaintiff of upcoming hearing to take place at the Armed Forces Reserve Center in North Little Rock, Arkansas, on February 18, 2004. The "subject" of the Memorandum is listed as "Notification of Show Cause Board." The Memorandum, issued by the Department of the Army, states that "[t]he hearing [is] to consider CPT Andrew K. Wright... for administrative separation for intentional misstatement of facts in official statements or records, for the purpose of misrepresentation and conduct unbecoming an officer..."

February 12, 2004: Order granting Plaintiff's Motion for Temporary Restraining Order. [Dkt. 81].

February 20, 2004: Evidentiary hearing conducted by the Court regarding Plaintiff's Motion for Preliminary Injunction and the activities leading up to the U.S. Army's decision to hold an administrative separation hearing at the Armed Forces Reserve Center in North Little Rock, Arkansas.

FN1. Letter from Lieutenant Colonel Rafe R. Foster to U.S. Attorney Paul K. Charlton, which was attached as Exhibit 1 to Defendants' Motion to Dismiss [Dkt. 54].

FN2. The Court was unaware on the date of its Order that an "Intent to Revoke" Memorandum had been issued.

FN3. Defendants contend that the Letter, *supra*, represents that the U.S. Army "would not seek to void plaintiff's status as a captain but would otherwise treat him as any similarly situated officer..." [Dkt. 78, p. 3]. The Motion and the Court's Order confirmed that any actions concerning a change in Plaintiff's status as an officer in the U.S.

Army Reserve would not be premised on matters which occurred prior to December 20, 2002.

FN4. The Court notes that the upcoming hearing in Arkansas is for consideration of "administrative separation" as opposed to "release to the Individual Ready Reserve" as stated in Defendants' letter of December 12, 2002.

FN5. Plaintiff also alleges due process claims that will not be addressed, as those claims were dismissed pursuant to the Court's Order dated February 28, 2003. The claim before the Court is that of alleged retaliation, after the same Court Order, in violation of the First Amendment.

FN6. Plaintiff avers in his Motion to Find Defendants in Contempt of Court and Motion for Declaratory Judgment that Defendants revoked Plaintiff's security clearance on March 23, 2003, twenty-three (23) days after the Court's issuance of it's Order. [Dkt. 67, p. 4](Plaintiff mistakenly lists the year as 2002, but it is evident Plaintiff intended the year to be reflected as 2003.). Plaintiff also has contended, at the evidentiary hearing of February 20, 2004, that the same Order required Defendants to reinstate his security clearance, the revocation of which was pending at the time of the Court's Order.

FN7. There exist numerous other positive reviews in Plaintiff's personnel file. One performance evaluation states that "CPT Wright is an outstanding officer" who has always been willing "to go the extra mile to complete the mission" and who "should be promoted and considered for positions of increasing responsibility." [Hearing Exh. 66, p. 73]. Another performance evaluation avers that Plaintiff has "strong convictions and stands behind them" and is "[u]nfazed by rapidly changing situations." [Hearing Exh. 66, p. 80].

FN8. Application to the National Guard, dated August 13, 1997.

FN9. Case No. 03-0555 is consolidated with Case No. 02-0967 due to its similar issues.

FN10. The Ninth Circuit rejected any bright-line rule that would be applied to the timing of retaliation. Instead, the Circuit held that "[i]n some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive; but the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment." *Id.* at 978.

FN11. The Smith Amendment cannot be regarded as *ex post facto* because the statute does not permit the revocation of an existing security clearance. Rather, the Amendment prohibits the Department of Defense from granting a new security clearance, or renewing an expiring one, *after October 30, 2000.* An *ex post facto* law is "[a] law that applies retroactively, esp. in a way that negatively affects a person's rights, as by criminalizing an action that was legal when it was committed." Black's Law Dictionary, 7th ed., p. 601 (1999).

FN12. Plaintiff's state convictions for conspiracy and manufacture of controlled substances were expunged in 1996. However, Plaintiff served eighteen (18) months for the federal charge of conspiracy to manufacture a controlled substance, to which Plaintiff pleaded guilty. A third charge for fraud, stemming from a check tendered with insufficient funds, was dismissed.

FN13. Plaintiff's security clearance does not expire until 2007.
D.Ariz.,2004.
Wright v. U.S. Army
2004 WL 439956, 2004 WL 439956 (D.Ariz.)
END OF DOCUMENT

Doc 1 of 3

Cite List



**DEPARTMENT OF THE AIR FORCE –**

**HEADQUARTERS UNITED STATES AIR FORCE**

**WASHINGTON, DC**

15 May 2004

MEMORANDUM FOR AFBCMR

FROM: HQ USAF/JAA
1420 Air Force Pentagon
Washington D.C. 20330-1420

SUBJECT: Application for Correction of Military Records - Marc J. Millican (AFBCMR
03-02505)

This is in response to your request for our further review and comment on subject application. Having reviewed the applicant's 19 February 2004 comments and arguments, we continue to recommend that the Board deny his application for relief.

The applicant through his counsel argues two primary points: (1) the promotion removal action was invalid and he is entitled to be promoted retroactive to December 2000; and (2) the applicant's commander was without authority to order members of his squadron to take the Anthrax shot, and any subsequent disciplinary actions taken against the applicant were improper. Neither of these arguments is meritorious.

Regarding the removal action, the applicant continues to insist that because the President did not approve the applicant's promotion removal recommendation within 18 months from the applicant's scheduled promotion date, he was promoted to lieutenant colonel effective December 2000 as a matter of law. Counsel obviously recognizes that the plain language of 10 USC § 14310 (promotion removal) does not support this argument, so he asks the Board to merge two separate and distinct statutes together, claiming that this is the only means by which Congressional intent can be divined. In an effort to support his position, counsel asserts that 10 U.S.C. § 14310 cannot operate independently, but must be applied in conjunction with 10 U.S.C. § 14311 (promotion delay). In doing so, counsel contends that the statutory 18 month deadline for promotion delays applies with equal force to promotion removal actions.

Applicant's argument fails because it violates a fundamental tenant of statutory interpretation: courts must give effect to the clear meaning of statutes as written. In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished. <u>Demarest v. Manspeaker</u>, 498 U.S. 184 (1991). The statutory provision for promotion removals is clear and unambiguous. The President may remove the name of any officer from a promotion list at any time before the date on which the officer is promoted. As the language of § 14310 makes clear, the President is not bound to make this decision within any specific timeframe.

Obviously, Congress could have required promotion removals to be completed within 18 months, but chose not to. The rationale for their decision is evident. Congress recognized that a

*/88*

*EX K*

promotion should be delayed while a disciplinary investigation is being conducted, a board of officers has been convened, or a criminal proceeding is pending against the officer. The delay gives the commander sufficient time to resolve uncertainties as to the appropriateness of promoting the officer. However, to prevent the delay from becoming indefinite, Congress imposed an 18-month limit on the delay period.

A promotion removal action however, requires a different decision making process. At this point, the commander has already determined that by a preponderance of the evidence (often through the information obtained during the promotion delay), the officer is unfit to assume the higher grade and is recommending to the President through the chain of command that the promotion be canceled. While a promotion removal action may involve delaying a promotion, the statutory purpose for the removal is distinct from the delay. A delay is meant to determine if the officer should be promoted, pending the outcome of existing inquires. In contrast, in a removal action, a commander has already made the decision that the officer is not fit to assume the higher grade.

Counsel's conclusion that the removal and delay laws must be read together "as part of a statutory scheme on the same subject" is simply not accurate and would, if followed, render § 14310 as subordinate and reliant upon § 14311; an outcome with no statutory basis. In effect, counsel is trying to create a new provision within § 14310 that does not exist.

Counsel further attempts to confuse the issue when he states that AFI 36-2504 requires a removal action to be initiated as a part of a promotion delay. The phrase "promotion propriety action" as used in the AFI is an umbrella term referring to promotion delays, removals, or information presented to the Secretary of the Air Force or a selection board that shows an officer may not be qualified for promotion. It does not, however, mean that the rules associated with a promotion delay are part and parcel the same as a promotion removal. In fact, the instruction differentiates between promotion delays and promotion removals by placing them into different sections within the AFI. Paragraph 7.5 defines the rules associated with promotion delays while paragraph 7.8 is reserved for promotion removals. As with 10 U.S.C. §§ 14310 and 14311, these two regulatory provisions are separate and distinct and must be applied as such. Nowhere in the AFI does it state that a promotion removal is subject to the rules for promotion delays. This is appropriate, given that the purposes of promotion delays and removals are not the same.

Additionally, counsel's argument that paragraph 7.8.7 requires a removal action to be completed within 18 months is erroneous. Paragraph 7.8.7 states, "Removal actions will be processed as expeditiously as possible. The total period of time that an officer's promotion is delayed pending decision on removal, including any prior period of delay under paragraph 7.5., should not exceed 18 months, excluding any period of delay attributable to the officer." The 18 month point is a standard that commander's should strive to meet when processing promotion removal actions; it is not however, an absolute requirement. This is evidenced by the use of the term "should" rather than a compulsory "must." Again, this comports with the fact that the law does not require a promotion removal action to be completed within a specific timeframe. Failure to meet this mark does not, in any way, negate the authority of the President to remove the officer's name from the promotion list or provide the applicant a legal expectation that he will be promoted if the 18 month goal is not met.

189

Counsel's lengthy discussion of various cases fails to acknowledge that no court has ruled a promotion removal action must take place within 18 months in order to be valid. Counsel's reliance on Rolader v. United States is unhelpful. Rolader dealt solely with a removal action that took place after the promotion delay period had ended. The court held that because the removal action had been initiated after the promotion delay expired, that by operation of law the promotion had already taken place. That analysis does not apply in the applicant's situation. The applicant's promotion was never delayed pursuant to § 14311, rather it was processed from the beginning strictly as a promotion removal under the provisions of § 14310 and AFI 36-2504. As previously discussed, the clear language of § 14310 does not impose an 18-month deadline for the President to act on a promotion removal. Consequently, Rolader does not apply in this case.

Likewise, counsel's enthusiasm for Barnes v. United States does not assist the Board either. Barnes involved an officer whose promotion had been delayed pending completion of administrative and disciplinary actions associated with nonjudicial punishment. The court determined that § 14311 did not authorize a promotion delay in order to complete purely administrative matters, and therefore the delay was improper from the outset. Consequently, the officer's promotion took place on the scheduled date and the removal action was invalid because it occurred after the promotion was already in effect. Because the applicant's promotion was removed in accordance with § 14310, the Barnes decision which dealt with whether a sufficient basis for a delay existed under § 14311, is not applicable.

It is further worth noting that during the discussion of Barnes, counsel references McCarthy v. United States in an attempt to bolster his claim that a federal court has previously "rejected the Air Force's argument that a commander's removal action with its indefinite delay always supercedes the outer limits on a pending delay period." Such a discussion is deceiving, as counsel does not mention that McCarthy was summarily reversed by the United States Court Of Appeals For The Federal Circuit (785 F.2d 326 (1985)) and therefore has no merit whatsoever.

The second prong of the applicant's argument is that Lt Col Padilla did not have the legal authority to order him to take the anthrax shot because it was an experimental or investigational drug and therefore required his informed consent. He maintains that any disciplinary action that was taken as a result of his refusal was improper. He relies on the recent Doe v. Rumsfeld decision issued by the D.C. Circuit in December 2003 to support his position.

The Doe case does not stand for the proposition that the DoD Anthrax Vaccine Immunization Program (AVIP) was administered in violation of the law. The court merely issued a preliminary injunction based on its determination that the FDA had not formally approved the vaccine against inhalation anthrax. It is important to recognize that the safety of the vaccine was the not the focus of the injunction, rather the issue dealt solely with the procedural question of whether the FDA had prepared a formal opinion to support an earlier verbal opinion the DoD had received from FDA officials. The court framed the issue in dispute: "Title 10 U.S.C. § 1107 and the attendant DoD regulation apply only if the FDA determines that AVA is an investigational drug or a drug unapproved for its present purpose." [italics in the original]. Thus, the only issue the court resolved was whether the FDA had made a formal determination to support earlier guidance given to the DoD.

In the absence of a formal FDA decision on whether the anthrax vaccine was experimental or investigational, the court took it upon itself to make a preliminary finding that it was. However, the court admitted that it was doing so only because the FDA had not issued a formal opinion. Once the FDA adopted the verbal guidance that had been previously given, the court immediately lifted its injunction. The court's preliminary determination that the AVA was an investigational drug is not binding because the court itself states that the FDA is the only agency that this court could properly defer to in determining the AVA's status. That in fact occurred in December 2003 when the court lifted the injunction. There was no requirement to obtain the applicant's informed consent prior to requiring him to obtain the anthrax shot.

What the applicant refuses to acknowledge or accept is that the removal action was not done simply because he refused to take the anthrax shot. The administrative actions that were taken, to include the LOR, UIF, referral OPR and promotion removal action resulted directly from the applicant's attempts to dissuade other members of the squadron from participating in the AVIP, undermining the authority of his commander, and his repeated efforts to cause dissension within the unit. That, in and of itself, is sufficient to warrant each of the administrative actions that were taken. Regardless of his personal views on the anthrax program, the applicant had absolutely no right, constitutional or otherwise, to make statements disloyal to his commander and to commit misconduct that was detrimental to the unit's mission. Such behavior is incompatible with that expected of an Air Force officer and warrants his promotion removal.

The applicant has failed to carry his burden of proving the existence of an error or injustice. We recommend his request for relief be denied.


HARLAN G. WILDER
Chief, Administrative Law Division
Office of The Judge Advocate General

Attachment:
Case File

/9/



**DEPARTMENT OF THE AIR FORCE**

**WASHINGTON, DC**

Office of the Assistant Secretary

MAY 2 1 2004

AFBCMR
1535 Command Drive
EE Wing 3rd Floor
Andrews AFB, MD 20762-7002


Major Marc J. Millican, USAFR, Retired
c/o Mr. John A. Wickham
32975 St. Moritz Drive
Evergreen, CO 80439

Dear Major Millican

　　　The attached additional advisory opinion is provided for
your review and comments. **THIS IS NOT THE DECISION OF THE AFBCMR
ON YOUR APPLICATION** (AFBCMR Docket No. BC-2003-02505).

　　　You have 30 days from the date of this letter to respond
and/or submit additional matters in support of your request.  If
no response is received during this period, we will assume you do
not wish to provide further comments and your case will be
scheduled for consideration by the AFBCMR.  If you need more time
to comment, it is suggested that you request that your
application be temporarily withdrawn until you are prepared to
proceed.  Your comments and/or submission of additional
documentation should be addressed to:

　　　　　AFBCMR
　　　　　1535 Command Drive
　　　　　EE Wing, 3rd Flr
　　　　　Andrews AFB, MD  20762-7002

　　　Please include your social security account number and/or
your service number, and your AFBCMR docket number on all
correspondence.

RAYMOND H. WELLER
Deputy Executive Director
Air Force Board for Correction
of Military Records

Attachment:
Ltr, HQ USAF/JAA, dtd May 15, 2004

cc:
Mr. John A. Wickham

*/9∂*

*EX L*



Reply to:
32975 St. Moritz Drive
Evergreen, CO 80439
(303) 670-3825
Fax 670-1586

John A. Wickham, Esq.
Admitted in Virginia,
District of Columbia
& Military Courts



# John A. Wickham & Associates
## Attorneys-at-Law

11 June 2004

Air Force Board for Correction of Military Records (AFBCMR)
Department of the Air Force
Washington D.C. 20330-1430



Re:    Dkt. BC-2003-02505,
       MARC J. MILLICAN,  Major, USAFR (Ret.) 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

SUBJECT:  Reply to 4th advisory opinion forwarded 21 May 2004, Office of JAG

Board:
       Applicant through counsel submits his reply to the 4th advisory opinion ("4Adv.Op.") dated 15 May 2004, with AFBCMR cover letter date 21 May 2004.

1.     The 4Adv.Op relies on what it believes is the plain reading of the removal statute § 14310(a), in that a service may remove an officer from a promotion list "at any time." The 4Adv.Op then says this reading gives the Air Force *carte blanch* to remove an officer's name from a promotion list without any time constraints under the promotion delay statute, § 14311.  However, the full statute allows removal "from a promotion list at any time *before* the date on which the officer is promoted [emphasis added]." This simply means that the statute is not concerned about delays in removal actions if they are completed by the President before the officer's actual scheduled appointment date from the existing promotion list. In other words, because such removal actions occur before the appointment date there is no delaying of a promotion date. If a recommendation for removal is not approved by the President before the scheduled promotion date, the appointment becomes automatically delayed thus triggering § 14311. It is common sense that Congress saw no need to insert an 18-month time limit on removals completed within § 14310, because there is nothing delayed.

1



A.    The 4Adv.Op admits that it is a "promotion delay" when a pending removal action is not completed by the promotion list date.  Presented with this dilemma, 4Adv.Op. argues this is not a delay within § 14311 because there are no "ongoing inquiries" or "uncertainties" into whether the officer is unfit to serve in the higher grade.  But to answer the question posed, 4Adv.Op. looks to the delay statute that it claims is not relevant.  It invokes subsection (a) of § 14311 by alleging that there is no delay in the absence of pending disciplinary actions, a board of officers, or criminal proceedings.  See 4 Adv.Op., referring to § 14311(a)(1).  This section is entitled "Delay During Investigations and Proceedings" with subparagraphs (A) - (C).  The Adv.Op argues that once a removal recommendation is initiated by a commander, he "has already made the decision that the officer is not fit to assume the higher grade," so there is no delay of further proceedings.[1]  As set forth below, the only triggering event that §§ 14310 and 14311 are concerned with is a delay of a scheduled promotion.

B.    The author of the 4Adv.Op. did not read the entire delay statute, nor understand that Millican's removal action was not an investigatory delay under subsection (a).  To preclude such post-hoc rationalizations, the statute contains a catch-all provision covering all situations that delay an appointment beyond the approved promotion list date.  Delays under subsection (b) invoke the same due process without further inquires whenever "there is cause to believe that the officer is. . .morally or professionally unqualified."  10 U.S.C. § 14311(b)(Delay for Lack of Qualifications).  This subsection does not condition a delay *pending further investigation* into whether the officer might be unqualified, but only when cause exists.  Here, the cause to believe Millican was unqualified was the commander's determination to submit a recommendation to remove his name from the LTC promotion list, based upon a reprimand and referral OPR.  AFI 36-2504 ¶ 7.5 (delay begins when removal action initiated); Barnes v. United States, 57 Fed.Cl. 204, 207 (2003)(under Navy Regulations, officer may be removed from promotion list only during a delay).  Moreover, Millican's promotion was not delayed under the

---

[1]  See also  4Adv.Op. at 2 ("A delay is meant to determine if the officer should be promoted, pending the outcome of existing inquiries.")

2

*194*

"pending investigation" subsection (a), but a delay invoking the exact language under subsection (b) for lack of qualifications. See attachment to 1Adv.Op. dated 26 Sep 03 (attached 21 May 2000 legal review of propriety of promotion action citing AFI 36-2504 ¶ 7.2). Regardless of the dubious argument of 4Adv.Op., the Air Force already invoked subsection (b) of the delay statute. Barnes, at 213 (rejecting Navy argument that delay period terminated when Article 15 proceedings ended; "cause" to disqualify is separate and additional statutory grounds for delay).

      C.    Under subsection (b), when Millican's removal action remained uncompleted at his appointment date in June 2000, his delay was then governed by the six month maximum delay limit without SAF extension under § 14311(d), with up to 18 months with SAF approval. See § 14311(d) (covers delays under either subsection (a) or (b)). In fact, because the commander had initiated the removal recommendation in March 2000 before his appointment date in June, the Air Force gave itself 21 months to complete the removal action before the 18 months expired in December 2001.

      D.    Another problem exists when the 4Adv.Op. argues that upon the removal recommendation there were no further "ongoing inquiries" into the officer's unfitness. A preliminary recommendation by a subordinate official that is not endorsed by the SAF, the SecDef, nor approved by the President, would transform a delay on-the-merits into a delay *pro forma* without effect. The statute presumes the President and his subordinates play meaningful roles. But 4Adv.Op. renders superfluous the removal statute's reserved Presidential powers by allowing a subordinate commander to conclusively act on the merits of an officer's fitness. Until the President agrees with the recommendation (and various endorsements) over the officer's rebuttal, the ultimate merits of the officer's fitness remain unresolved and subject to the Commander-in-Chief's discretion whether based upon an independent review or political considerations. Therefore, a commander's cause to question an officer's qualifications does not end the inquiry into his fitness, but requires officials senior to the recommending officer to weigh-in before forwarding it up the chain of command. This is why subsections (a) and (b) both fall under the delay statute's due process.

<div align="center">3</div>

<div align="right">195</div>

E.    The 4Adv.Op claims that applicant cannot make the removal statue "subordinate and reliant" on the delay statute. However as noted above, the removal statute can operate independently if there is no delay for a removal completed *before* the officer's promotion list date. But if one takes the position of the 4Adv.Op to its logical conclusion, a commander could easily defeat the delay statute by simply initiating a removal recommendation pending the results of further investigations or proceedings. For example, a commander could defeat the 18-month limit by initiating a removal action when the OSI finds probable cause that an officer has committed an offense but an Article 15 proceeding is pending. Or a commander could find cause to disqualify and recommend removal but a senior commander disagrees and finds the officer qualified, but the next senior commander, acting beyond the 6-month deadline, reinstates the removal action. Subsection (b) forces a timely final resolution, otherwise the original promotion becomes effective automatically.

F.    The 4 Adv.Op. now sees the fallacy in its first advisory opinion that argued a removal action is *always* a separate process. It now changes its story so that a removal action is a delay within § 14311(a) if there are "ongoing inquires" into the officer's fitness. The 4 Adv.Op appears to grudgingly admit §§ 14310 and 14311 do operate in tandem. Having invoked the delay statute in removal cases, the Air Force cannot ignore the full effect of the statute.

2.    Because 4Adv.Op. admits removal actions must be read in conjunction with the delay statute, its regulatory argument falls apart. The opinion contends that in AFI 36-2504, delays and removals are "separate and distinct and must be treated as such," referring to ¶ 7.5 (delays) and ¶ 7.8 (removals). But ¶ 7.5 repeatedly states that a delay and removal are *not* separate. Paragraph 7.5 states that "a delay *also occurs* if an action begins to remove an officer from a promotion list [italics added]." Paragraph 7.5.2.1 then adds that promotion delays up to 6 months are automatic without SAF approval "upon initiation of a recommendation. . . .to remove that officer from the list." Paragraph 7.5 corresponds to the delay statute because ¶ 7.5.1 deals with pending investigations, and ¶ 7.5.2 deals with removals for lack of qualifications. Paragraphs 7.5.3 deals with notice and rebuttal, and ¶ 7.5.4 provides the 18

4

*196*

month limit.  Lastly, the section covering time limits on removals, ¶ 7.8.7, refers back to ¶ 7.5 (total period should not exceed 18 months "including any period of delay under paragraph 7.5.").  The interaction between ¶ 7.5 and ¶ 7.8 is consistent with the way the <u>Barnes</u> court read together the Navy's separate provisions for delays and removals.  <u>Barnes,</u> at 207 (court reads Naval regulation as meaning removal from promotion list occurs only during a delay period).

      A.    The 4Adv.Op. did not comment on the <u>Barnes</u> court's rejection of the Navy's litigation counsel's argument that tried to differentiate its own delay and removal provisions.  <u>Barnes</u> at 218 (counsel's argued this is a removal case not a delay case; "that position conflicts with the above regulatory constrains that a removal action be initiated during a period of delay").  Moreover, the AFBCMR has given the Air Force legal office two chances to comment on the <u>Rolader</u> warning that it has "serious misgivings about the enforceability"of an indefinite delay of an Air Force commander.  <u>Rolader</u> at 787.  Rather, because AFI 36-2504 is consistent with the other services' regulations, the Air Force's argument in <u>Rolader</u> appears now simply as merely its litigation counsel's personal spin commonly referred to "artful pleading."  The <u>Barnes</u> case shows that a similar approach is untenable to argue promotion removals and delays are apples and oranges.

      B.    Lastly, <u>Barnes</u> distinguished the <u>McCarthy</u> promotion delay case that was reversed on appeal.  <u>McCarthy v. U.S.,</u> 785 F.2d 326 (Fed.Cir. 1985)(Table).  Because the unpublished reversal was not reported, the <u>Barnes</u> court could ignore it because the reversal is of "questionable precedence." <u>Id</u> at n. 17.  In fact, the <u>Barnes</u> court cited the lower court's decision with approval as consistent with current delay statutes passed in 1996, and case law under <u>Law v. United States,</u> 11 F.3d 1061, 1065 (Fed.Cir. 1993)(court is not ordering a promotion but only recognized under statute that it already occurred).  <u>Barnes</u> at n. 17.  Moreover, other courts subsequently cited the lower <u>McCarthy</u> case for its rules of law.  <u>Long v. United States,</u> 12 Cl.Ct. 174, 176 (1987); <u>Schumacher v. United States,</u> 12 Cl.Ct. 195, 197 (1987).

      1.    Table decisions without reported opinions also mean the reasons are unique to the facts of that one case and thus have no binding effect on other similar cases.  It appears the <u>Barnes</u>

court did obtain the unreported reasons for the reversal by implying that <u>McCarthy</u> court in 1985 did not yet have statutory authority under then 10 U.S.C. § 8380(c), the predecessor to § 14311 (1996), to recognize a promotion. <u>Id</u> n. 17 ("[after guidance from <u>Law</u>,] the court in this case has applied objectively determinable records facts to statutory and regulatory mandates"). This delay statute predecessor before ROPMA in 1996 did not grant equality to reserve officers because promotions could be delayed indefinitely by a service secretary if "in the public interest." <u>See</u> <u>Nation v. Dalton, Sec'y of Navy</u>, 107 F.Supp.2d 37, 43, n. 6 (D.D.C.2000)(Naval officer's promotion delay in 1995 governed not under § 14311 but under prior indefinite delay provision § 5902(d) if in the public interest). The <u>McCarthy</u> court only relied on the Air Force regulation AFR 36-89 (1977) without a statutory mandate, while the court agreed "it lacks jurisdiction to promote plaintiff". <u>Id</u> n. 7. It is safe to assume that <u>McCarthy</u> was reversed on these limited grounds.

3.    In response to <u>Doe v. Rumsfeld</u>, the 4Adv.Op finally argues that only the FDA had the right to determine whether the Anthrax vaccine was safe, and if not then offer informed consent. <u>Id</u> ("the FDA is the only agency that the court could defer to in determining the AVA's status."). But this admission boxes the Air Force into a corner because Millican's commander, LTC Padilla, had no official or independent authority prior to the FDA Final Rule in 2003 to compel the vaccine on grounds that is was safe and effective. LTC Padilla was not the agent of the FDA. Moreover, the DoD admitted that the 2003 Final Order "marks the culmination of extensive agency consideration *finalized in the week prior to* the Court's preliminary injunction [italics added]." DoD Brief at 2. This begs the question whether it was arbitrary for LTC Padilla in 1999 to order his unit to take the vaccine when safety and efficacy were in doubt. Moreover, there is a legal presumption that if the FDA has not resolved the safety and effectiveness of AVA, then a lawful order cannot issue to vaccinate— by voluntary consent or otherwise. That is why the court argued DoD was using its troops as "guinea pigs" because in effect, they became an unwitting part of a unapproved field process to determine safety in lieu of the FDA doing its job in a lab and through the adjudication process.

6

*198*

A. Even assuming that Millican could not for himself find that the AVA was investigational under 10 U.S.C. § 1107, the order remains unlawful: the court rejected the alternative policy reason to continue the AVA as a matter of "military expediency" in the War on Terrorism because the FDA process was too burdensome. Mem. at 30. It is nonsense to argue that Millican had to accept the vaccine to protect himself from the dangers of Anthrax when DoD refused to determine if the vaccine was not a danger to his health. Moreover, Millican did not foment discord by arguing the AVA was an informed-consent investigational drug, but only repeated Congressional testimony that the vaccine was not yet proven safe and effective. Finally, the 4Adv.Op appears to absurdly imply that Millican should not have instigated disloyalty to not take AVA, but should have joined the Doe lawsuit as a co-plaintiff to force a halt to the entire program. Whether a litigant or whistle-blower makes little difference because administration of the AVA in 1999 could not support a lawful order of forced vaccination under threat of disciplinary action.

B. The remainder of the reply by 4Adv.Op offers only empty rhetoric. It does not dispute the military case law holding that an order is unlawful if the official giving it was without authority to do so. Nor does it dispute case law affirming a service-member's First Amendment rights to association to speak out against arbitrary command action. The cornerstone of arbitrary and capricious agency action is the failure to consider all the relevant factors. Citizens to Protect Overton Park v. Volpe, 401 U.S. 402 (1971). The federal laws designed to first assure the safety and efficacy of drugs forced upon US citizens, is certainly a relevant factor.

C. Finally, in Doe v. Rumsfeld, the court held a hearing on the motion and cross-motion for summary judgment on May 25, 2004. Although the transcript is not available on-line at the court website, a newspaper article reported on the hearing remarks by district court judge Sullivan, entitled "Judge See Little Evidence To Support Anthrax Vaccine," Washington Post, page A25, May 26, 2004.[2] The article reports that Sullivan presaged an adverse ruling against DoD, because he

> had significant doubts about whether the federal government has enough scientific evidence to
> show that the anthrax vaccine required for military personnel is either safe or effective. . . "one
> of the most jumbled, confusing processes I have ever seen."

---

[2] http://www.washingtonpost.com/wp-dyn/articles/A55581-2004May25.html.

199

CONCLUSION

For the foregoing reasons, the AFBCMR should grant relief as set forth in applicant's petition.

John A. Wickham, Esq.
Attorney for Millican