UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARC J. MILLICAN ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 06cv1582 (GK) |
| v. ) | |
| ) | |
| ) | |
| UNITED STATES ) | |
| ) | |
| Defendant. ) | |

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO
THE CROSS-MOTION FOR SUMMARY JUDGMENT

Millican submits his reply to defendant's response opposing Millican's cross-motion for summary judgement. As in his prior brief, the Doe v. Rumsfeld proceedings will be referred to as: Doe I, 297 F.Supp.2d 119 (D.D.C. 2003); Doe II, 341 F.Supp2d. 1 (D.D.C. 2004); Doe Appeal, 172 Fed.Appx. 327 (2006); Doe EAJA, 501 F.Supp2d. 186. The same terms apply: Department of Defense Anthrax Vaccine Immunization Program (AVIP), Air Force Board for Correction of Military Records (AFBCMR), The Administrative Procedure Act ("APA"), 5 U.S.C. § 702, *et seq*. Millican attaches a Reply Appendix containing excerpts of two military law journals.

    1.   Defendant first assumes *arguendo*, that if the AVIP was illegal from inception, it is harmless error. Defendant argues that Millican's punishment and removal from the promotion list were not related to his refusal to take the vaccine but were for inciting disloyalty and discontent by attempting to dissuade other unit members from taking their shots. Under traditional harmless error analysis, defendant appears to argue that there is no nexus between the AVIP and the reprimand and promotion list removal. See e.g. Muse v. United States, 21 Cl. Ct. 592, 604 (1990) (must be an adequate nexus or link between the error or injustice and the promotion non-selection).

    Defendant's argument has superficial appeal. Beneath the surface, however, common sense and legal analysis show the argument is specious. It is a transparent attempt to distance this case from the impact of the Doe rulings.

-1-

It is well recognized in military custom and jurisprudence that inciting disloyalty and disaffection are offenses against the presumed *lawful* exercise of authority, orders, or duties. Moreover, "the term 'lawful' under Articles 90, 91 and 92, UCMJ, recognizes the right to challenge the validity of a regulation or order with respect to a superior source of law." United States v. New, 55 M.J. 95, 101 (C.A.A.F. 2001). In Parker v. Levy, 417 U.S. 733 (1974) the court acknowledged that soldiers' free speech rights to actively oppose military policies or encourage others to disobey orders, has been curtailed based upon "customary military law or general usage" to maintain good order and discipline. This this is now embodied under Article 134, U.M.C.J.. Id 737, 748.

The two words in the officer's oath of office,[1] to "*support* and *defend* the constitution" are not intended as single thought, but each carries a different connotation. The former is a passive pledge to obey established orders and government, while the latter "to defend" means officers do not "obey unquestionably but are given the opportunity for flexibility and innovation." Reply Appx. at 23, LtCol Kenneth Keskel, USAF, The Oath of Office: Historical Guide to Moral Leadership, *Air & Space Power Journal*, (Winter 2002)(and comparing Soviet officers' oath to "unquestionably carry out the requirements of all military regulations and orders of superiors").

The above "custom and usage" quotation from Parker v. Levy derives from the Manual for Courts-Martial (2008)[MCM], para 60, part IV 111-12, Article 134, General Article, *Explanation* ("breach of the custom of services arise out of established practices by common usage...no custom may be contrary to existing law or regulation"). The related offenses of mutiny and disloyal statements also presume that orders and policies of the military are lawful, thus offering a defensive challenge. MCM, para 18, part IV 26, Article 94 (mutiny if person intends to usurp or override lawful military authority or to refuse to obey orders); MCM, para 72, part IV 121-22, Article 134 (disloyal statements if impair loyalty or promote disaffection of other members and if under the circumstances prejudices good order and discipline or brings discredit upon armed forces).

In sum, the suite of mutiny, disloyalty and disaffection offenses rely on the same rebuttable presumption of lawfulness applied to disobedience offenses. MCM para 14c.(2)(a), part IV 19 ("An

---

[1] 5 U.S.C. § 3331 (oath); and Article IV, clause 3, U.S. Const (all officers bound by oath).

order requiring the performance of a military duty or act may be inferred to be lawful"). A seminal military case is United States v. McQuaid, 5 C.M.R. 525 (AFBR 1952), rev denied, 5 C.M.R. 130 (C.M.A. 1952 (Table); 1952 WL 2196 (AFBR)(statements posted to officer's club and airbase headquarters bulletin board were designed to promote disloyalty and disaffection among airmen and encourage others to follow). The court found that the posted statements

> are clearly disloyal and disaffecting as they present a compellingly false picture of our defense effort and its aims and objectives, tend to discourage faithful service...by members of the armed forces and unjustly malign our economic system * * * such false accusations are patently disaffecting and disloyal as the tend to undermine the confidence of [these] members.

Id 530. [emphasis added].

Echoing McQuaid, is an instructive law review article. Military Persons and the First Amendment: 'Discreditable Conduct' as a standard for restricting political activity." 65 Yale L.J. 1267 (1956). The article acknowledged the balancing test to restrict free speech when there is a greater likelihood of harmful consequences to the military interest:

> Balancing of conflicting interests may show the need for some restriction, though, individuals should be free to express themselves on controversial subjects in order that the truth may emerge.

Id 1212 [emphasis added]. In that situation "mere injury to the reputation of the military is not essential to military success." Id 1215.

In support of this argument of truth as a defense, the law review article cites five Supreme Court cases involving war-time disloyalty. Id 1212 at n. 25, *e.g.*, Dennis v. United States, 341 U.S. 494, 550 (1951)("liberty of man to search for truth ought not to be fettered no matter what orthodoxies he may challenge, nor can truth be pursued in a hostile atmosphere...under dangers which are hazarded only by heroes"); American Communications Ass'n v. Douds, 339 U.S. 382, 396 (1950)(falsehoods and fallacies must be exposed not suppressed); Thorn Hill v. State of Alabama, 310 U.S. 88, 95 (1940)(falsehoods may be exposed to discover the truth). See also Brown, Sec'y of Defense v. Glines, 44 U.S. 348, 358, n. 15 (1980)(regulation requiring prior approval does not violate First Amendment when posed clear danger to discipline and averted disruptions; but when a commander applying regulation "acts irrationally, invidiously, or arbitrarily" then gives rise to legitimate free speech claim).

2. Defendant's argument implies that with respect to disloyalty-mutiny offenses, it is irrelevant whether active opposition was to criticize, or to avert, the unlawful exercise of authority, orders, or policy. This turns the concept of maintaining good order and discipline on its head. It effectively means that to compel obedience to an illegal order or policy, a commander should punish service-members for encouraging others to disobey invalid orders. This stance also offends the balancing test because free speech is restricted because it is presumably outweighed by the conflicting military interest to maintain discipline towards performing its mission, and as here, "to undergo the anthrax protocol." AR 50 (Reprimand). A soldier cannot be disloyal or mutinous by overriding the exercise unlawful military authority. Acts of disloyalty become a fiction. Finally, defendant's argument absurdly suggests that disloyalty-type offenses lie against an unassailable presumption of lawful authority or orders.

Defendant has an ulterior motive to argue that this disloyalty offense is unrelated to the underlying lawfulness of the vaccine orders. This sets ups defendant's assertion that Millican cannot "identify a false statement [in the reprimand] that should be corrected." Def. Reply 3. This is an irrelevant detour attempting to mislead the Court. It also sets up a strawman that a service member's sole remedy to oppose illegal orders or policies is direct court litigation.

3. Defendant next raises a red herring that Doe is "inapposite because it involved a separate and distinct issue....whether the Department of Defense could *require* members to take the vaccine." Def. Reply 6 [emphasis in original]. Specifically, the vaccine could not be compelled but made voluntary after informed consent. This relied on the finding that until the FDA issued a final order, the vaccine was either classified as a experimental drug or a vaccine program prematurely implemented without legal or factual basis as to its safety and effectiveness. Defendant argues that Millican's active opposition was fundamentally different by attempting to persuade service members to refuse *entirely* the vaccine protocol.

Defendant here improperly creates a legal fiction as if evaluating in retrospect Millican's actions: presuming that in 1999 DoD was properly implementing the "informed consent" provision of 10 U.S.C. § 1107, for experimental drugs. This is nonsense. As Judge Sullivan found in Doe I,

military members at that time were treated like "guinea pigs." In 1999, Millican's unit members were compelled to start the vaccine protocol *without* the required "notice" of vital information to make any informed decision. § 1107(d)(provide notice that the drug is experimental; possible side effects; any known side effects possible with drug interactions; such other information that as a condition of authorizing the use of the investigational new drug Secretary of Health and Human Services may require to be disclose). Such other information was in fact revealed as critical in the Doe proceedings: the FDA's 1985 proposed rule for AVA *did not extend* to the safety and effectiveness of the shots against inhalation anthrax. The underlying logic of the Doe litigation is that the DoD and FDA's failure of to inform service members of these unresolved issues of safety and effectiveness, is reminiscent of the secretive methods in United States v. Stanley, 483 U.S. 669, 683-684 (1983)(soldier secretly administered drugs under chemical warfare program).

Active opposition in 1999 by Millican properly rebutted the presumed lawfulness. As found in Doe, the AVIP as implemented in 1999— that is, without informed consent or notice— was an illegal directive. It follows that it was Millican's duty to persuade others to decline to take the shots as an illegal order. Secondly, Millican's disloyalty is a fiction because he attempted to expose the fallacies publicized by his commander that the shots were proven safe and effective, and to "trust" him. In a unit-wide letter February 1999, LTC Padilla, stated

> Effective immediately everyone must start the Anthrax series * * * this is less an issue over the shot than an issue concerning trust....I choose to turn towards experts I know and trust * * * our flight surgeon....says "get the shot." I trust Dr. Rob Singler who came to us to provide two excellent briefings...He says "get the shot" * * * Our medical people say the Anthrax shot is no more harmful than any other shots you have received during your military career. .....no known side effects... the regimen....will ensure protection.

AR 25 ¶¶ 7- 9. This was later repeated by Padilla referring to "experts in the program." AR 28 (May 1999 squadron monthly newsletter, "doctors endorse the shots.").

When DoD in 1998 initiated the AVIP, it touted the protocol as a safe and effective vaccine for weaponized inhalation anthrax. But later Doe proceedings have determined this was a falsehood— the AVIP at that time was not reasonably supported in scientific fact nor followed federal drug laws. As already set forth in Millican's prior brief, the FDA's 2005 Order that the vaccine is safe and effective has only prospective effect because of significant substantive and legal

changes. First, Doe II issued a declaratory *vacatur* setting aside the FDA's 2003 final order as not a logical outgrowth of its prior 1985 proposal, that is, it did not encompass AVA for treating inhalation anthrax. Secondly, the FDA in 2005 reversed its prior scientific conclusions along with new post-1998 scientific studies that resolved questions over safety and effectiveness.

4.      The defendant's next argument is that the Doe proceedings are virtually useless and offer no remedy— equitable or legal— to any service-members punished before the injunctive window of began in December 2003. First, defendant argues that the injunction was a "prospective ruling" to halt the AVIP until the final FDA's Order was issued in Dec 2005. Secondly, defendant argues the Doe court never found the vaccine "unsafe or ineffective," but merely found that until the FDA's issuance, DoD needed to obtain informed consent. Consequently, as defendant argues, the court never made any finding "that supports" Millican's contention that his active opposition to the vaccine was proper. Def. Reply. 8.

In essence, the defendant re-circulates the now obsoleted August 2004 BCMR decision that adopted an advisory opinion (May 2004). That opinion gutted the Doe proceedings to a non-substantive, irrelevant side-show involving the etiquette of drug law to ratify *nunc pro tunc* the earlier informal decision in 1985:

> It is important to recognize that the safety of the vaccine *was not the focus* of the injunction, rather the issue dealt solely with *the procedural question* of whether the FDA had prepared a formal opinion to support an earlier verbal opinion the DoD has received from FDA officials. * * * Once the FDA *adopted* the verbal guidance that had been previously given, the court immediately lifted its injunction.

AR 190-91 [emphasis added].

There are numerous problems with defendant's argument. Millican's argument does not hang on the 2003 injunction, as set forth below. Next, the BCMR decision and its advisory were written before the judicial mandates of Doe II (Oct 2004) with its retroactive *vacatur* of the FDA's 2003 Order; written before the 2005 FDA order with prospective effect only; written before Doe EAJA that explained the prior litigation and agency order; and written before a court upheld the 2005 FDA Order also without finding it retroactive.[2]

---

[2] Rempfer v. Von Eschenbach, FDA Commissioner, 535 F.Supp.2d 99 (2008).

Moreover, in March 14, 2008, is the related case decision cited in Millican's prior brief. Rempfer, et.al v. AFBCMR, 538 F.Supp.2d 200 (D.D.C. 2008)(two Air Force reserve officers appealed an AFBCMR denial of their claims of unlawful constructive discharge in 1999 after they refused the anthrax vaccine). In Rempfer the defendant-Air Force raised the same non-retroactivity argument, as well as others herein.[3]  However, the Rempfer court rejected *sub silentio* the Air Forces' arguments by remanding to the BCMR for reconsideration of the officers' 1999 involuntary discharges because the Doe litigants had prevailed:

> *Taken as a whole,* Judge Sullivan's decisions in Doe, conclude that *prior to* the FDA's December 2005 rulemaking, *it was a violation* of federal law for military personnel to be subjected to involuntary inoculation because the vaccine was neither the subject of a presidential waiver nor licensed for use against inhalation anthrax.  While the undisturbed *factual and legal findings* of the Doe litigation are clear, their impact on [plaintiffs'] claims before the AFBCMR is not.  Other courts have affirmed the legality of pre-2005 orders under AVIP, although they did so without giving detailed consideration to the implications of the FDA's licensing requirements. [citations omitted].

Id at 210.

The Rempfer court stated it was not dictating the BCMR's result on remand.  However, it still warned the BCMR that its interpretation of the governing drug approval process would not be entitled to the deference normally afforded to these military correction boards. Id.  This judicial warning arguably extends to the Millican's BCMR decision.  It dispenses with defendant's non-retroactivity objection.  Moreover, Millican's BCMR adopted advisory opinion presumed to interpret the AVIP drug approval process as unrelated to the legal status of vaccine orders in 1999.

5.   Defendant next argues that injunctions offer only prospective remedies, and Doe here made no declarations of prior unlawfulness.  The power to enjoin the AVIP is predicated from the DoD's conduct in the past— "the unlawful acts which the court has found to have been committed" and thus will fairly be anticipated in the future. NLRB v. Express Pub. Co., 312 U.S. 426, 435 (1941).  Defendant's argues that findings of prior unlawfulness were preliminary because the final

---

[3] Rempfer dkt entry # 29 *Defendant's Opposition* at 4 (Doe "has no bearing on the issues as it does not clarify whether or not the 2004 decision was retroactive...."). The BCMR decision of one Rempfer plaintiff is in Millican's Appendix at 9-15. The Air Force advisory to that BCMR raised a non-retroactivity argument; rejected as "arbitrary" the allegation the AVIP was illegal in the past, and allegation contrary to court decisions finding the AVIP legal. Pl.Appx. 12-13.

FDA order had not yet formally adopted its prior guidance to DoD.  The Order was hoped by DoD to retrospectively justify its 1998 decision to begin AVIP.   See Doe II at 10, 14 (defendants argue that 2003 FDA decision thereby "confirms" it license, since it as "identical" to the 1985 proposal.

Defendant's argument has been superceded.  Defendant fails to give operative effect to the later Doe II *vacatur* of the FDA's 2003 Order.  Doe II rejects what the now obsolete BCMR advisory opinion argued— the FDA prepared a mere *pro forma* order that adopted its prior verbal guidance to DoD.  Nor was this simply postponed until 2005 FDA order.  The *vacatur* instead operated as a refusal to let FDA and DoD adopt prior verbal guidance to ratify the AVIP from inception, then made permanent what were preliminary findings.

The court in Doe II found that the FDA's final order in 2003 substantively reversed the intent of 1985 proposed order that weaponized anthrax "was not an indication under licensing." Doe II at 16.  Moreover, the most of scientific studies, relied upon by FDA to find the vaccine safe and effective, were *after* the 1998 inception.  Doe II at 13-14 (FDA relies on 2002 report from Institute of Medicine and evaluation of studies 1996, 1998, and 2001).  After the FDA's 2005 Order Doe EAJA explained:  based upon the explicit qualification as to AVA's limited scope in the 1985 proposed order, the new 2005 order was a reversal of scientific evidence.  Id at 190.  As a final nail hammering shut the door to ratification, Doe EAJA concluded that DoD's decision to begin AVIP in 1998 was unreasonable in fact and law— an EAJA threshold akin to bad faith.  This indicates that under the APA standard of review, the AVIP from its 1998 inception was arbitrary and capricious agency action, unsupported by substantial evidence, and contrary to law.

The Doe II *vacatur* and Doe EAJA findings are effectively judicial declarations incorporating the prior Doe I 2003 findings of illegality that initially supported the preliminary injunction.  Moreover, the retroactive *vacatur* supplants the BCMR's position that the FDA order ratified the AVIP from inception.  This means that prior to the FDA order in 2005, the punishments for offenses attributed to vaccine refusals in Millican's unit, are unenforceable.  This is consistent with administrative law that *vacatur* of an agency rule generally renders unenforceable the agency's prior directives, penalties, or fees. National Fuel Gas Supply v. FERC, 59 F.3d 1281, 1284

(D.C.Cir. 1995)(*vacatur* of agency rule was retroactive so that prior directives issued thereunder were not "still valid" against plaintiff companies; repromulgation curing defects prospective).

6.  Finally, in order for defendant to support its non-retroactivity argument, cites several cases alleging that they contradict Millican's argument to apply Doe retroactively. Def.Reply at 7 (Loomis v. United States, 68 Fed.Cl. 503 (2005), and United States v. Bilby, 39 M.J. 467 (C.M.A. 1994)). Defendant's reliance on these cases is misplaced.

The cases do not support the argument defendant attempts to make. In neither case did the plaintiffs rely on prior court rulings that invalidated the underlying *military* policy or offense at issue. Second. Neither case relied on prior rulings that found an underlying military policy at issue to be illegal from its inception, or that the policy was unsupported legally and factually. Thirdly, the prior civilian court rulings were not addressing offenses within the military context under military control. For example, the military may punish certain adultery, fraternization, homosexual conduct violating the Don't Ask Don't Tell policy [DADT], or conduct becoming an officer. Fourthly, defendant ignores that neither plaintiff could claim retroactivity because the Chevron "new law" factors would apply. Chevron Oil v. Huson, 404 U.S. 97 (1971)(prospectively applied decisions establish new principle of law, such as by reversal or on first impression).

In Loomis, the plaintiff was as Army officer discharged for "conduct unbecoming an officer" under Article 133, UMCJ. Loomis' discharge relied on military offenses of non-consensual homosexual sodomy, conduct violating the DADT policy, and unlawful fraternization. Loomis unsuccessfully invoked a Supreme Court case that struck down a Texas statute criminalizing consensual sodomy. Lawrence v. Texas, 539 U.S. 558 (2003)(reversing Bowers v. Hardwick, 478 U.S. 186 (1986)).

The military courts have applied Lawrence but under a three-part test that Loomis could not overcome— a nexus between the sodomy offense and military concerns that removed the case outside of the Lawrence 'consensual' liberty analysis. United States v. Marcum, 60 M.J. 198, 202 (C.A.A.F.2004)(third part is "whether there are additional factors relevant solely in the military

environment that affect the nature and reach of the Lawrence liberty interest). Because Lieutenant Loomis was an officer of significant higher rank than the private with whom he had sexual relations, the court found that "the nature of the relationship between plaintiff and a PFC...is such that consent might not easily be refused and thus outside of the liberty interest protected by Lawrence." Id at 519. In addition, the conduct unbecoming had violated fraternization rules, and its notorious nature violated DADT policy. Defendant fails to place its quotation in this larger context unrelated to consensual sodomy. Def. Reply. at 7 ("regardless whether the military rule regarding homosexual conduct is invalidated...the plaintiff had engaged in conduct unbecoming as officer.").

In United States v. Bilby, 39 M.J. 467 (1994), the officer was convicted for 'conduct unbecoming' under Article 133 for the criminal offense of soliciting distribution of child pornography, an act proscribed under civil authority, 18 U.S.C. § 2552. The officer attacked the conviction by pointing to civilian courts that questioned the validity of the federal pornography statute. The court held that regardless of the ultimate lawfulness of the civil statute, the act of soliciting violation of a *federal* statute was conduct unbecoming. Id 470. But these other civilian courts, and Bilby, addressed violation of a civil statute entirely *outside* the confines of the military environment— it did not involve soliciting a military offense, mutinous conduct, disloyal or disaffecting statements, or disobedience to military orders.[4] A military legal commentator implies such distinction to exclude from an officer's customary oath the affirmative duty to challenge the legality *extra*-service legislation or executive action. Pl.Reply Appx. 14-15 (LtCol Thomas Reese, An Officer's Oath, *Mil.L.Rev.* 1, 31-32 (July 1964)(oath to defend the constitution means officer must permit its "checks and balances to operate...under these provisions, the Congress and the courts, not the military," are given this review authority.)

As set forth earlier, the suite of mutiny and disloyalty offenses are against the presumed lawful (albeit rebuttable) exercise of *military* authority, orders, or duty. This conduct "must be judged not in *vacuo* but in context." Parker v. Levy, 417 U.S. at 754; Priest v. Sec'y of Navy, 520

---

[4] MCM. para 105, part IV 140, Article 134 (Soliciting another to commit a military offense).

F.2d 1013, 1018 (D.C.Cir. 1977)(the context of particular speech determines whether it tends to clearly endanger loyalty and disaffection, and whether protected by the First Amendment). A case superceding Bilby illustrates the distinction above, *e. g.,* that a defense to mutinous or disloyal acts is to override unlawful military authority, or illegal orders. United States v. Brown, 45 M.J. 389 (C.A.A.F.1996)(solicitation to violate an statute that prohibited service-members from labor union activities within military units). The soldier was convicted for soliciting others during the Gulf War to violate the military's anti-strike statute, 10 U.S.C. § 976. The court first determined that the statute was a "reasonable effort to limit impermissible bargaining between soldiers and their commanders" and thus to preserve good order and discipline. Id 393. Because this was a "legitimate interest," the court upheld the solicitation conviction applying the following rule:

> Thus, the Court's will "not overturn a conviction unless it is clearly apparent that, in the face of a First Amendment claim, the military lacks a legitimate interest in proscribing the defendant's conduct."

Id at 396, quoting Avrech v. Sec'y of Navy, 520 F.2d 100, 103 (D.C.Cir. 1975). The military *sub judice* with its AVIP illegal, arbitrary, irrational, and wholly unsupported from inception, lacked a legitimate interest to punish Millican because his active opposition was to prevent the unlawful exercise of authority and orders.

7. Millican need only briefly turn to the remaining part of claim— the Air Force's violation of the promotion delay and removal status, and the appropriate remedies for both this violation and above AVIP issue.

Counsel has reviewed defendant's approximately two-page response to Millican's arguments in his main brief. However, defendant curiously does not answer any of Millican's points raised categorically in his brief. Like a ship passing in the night, defendant's brief repeats the same verbiage lifted from the BCMR advisory opinions, followed by on an extensive block-quotation. Barren of focused analysis, defendant's response on these remaining issues does not require Millican's rebuttal.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests the Court deny defendant's motions to dismiss, or for summary judgment, and grant plaintiff's cross-motion for summary judgment.

/s/  John A. Wickham
DC Bar 454863
32975 Saint Moritz Drive
Evergreen CO 80439
303 670-3825
Counsel for Marc Millican